*Signed Agreement*
*Security Agmts*
*UCC-1s*
*Guarantee*

# PATENT PURCHASE AND ROYALTY AGREEMENT

EFILED Document
CO Jefferson County District Court 1st JD
Filing Date: Mar 13 2007 1:25PM MDT
Filing ID: 14091914
Review Clerk: Jenine S

This Patent Purchase and Royalty Agreement (this "Agreement") is dated effective as of December ____, 1996, by and between Duane Robertson ("Robertson"), whose principal address is 122 Loveland Way, Golden, Colorado 80401, and The Avatar Group, Inc., an Ohio Corporation ("Avatar"), whose principal address is 189 West Southington Avenue, Worthington, Ohio 43085.

WHEREAS, Robertson is the owner of United States Patent No. 5,408,630 for a *Three-State Virtual Volume System for Managing Document Storage to Permanent Media*, as further described on Exhibit A attached hereto and made a part hereof. Such patent, together with the "IntelliVue" product and all other document imaging rights and inventions in connection therewith or described therein are hereinafter collectively referred to as the "Patent Rights"; and

WHEREAS, Avatar desires to acquire the Patent Rights and Robertson desires to sell the Patent Rights pursuant to the terms, covenants and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and representations herein contained, the parties agree as follows:

1. Robertson has the right to transfer the Patent Rights and he hereby sells, transfers, assigns and sets over to Avatar, all of Robertson's right, title and interest in and to the Patent Rights in consideration for the royalty payments described in Section 2 below.

2. In consideration for the Patent Rights, Avatar hereby agrees to pay to the order of Robertson the following royalty payments ("Royalty Payments"):

(a) Twenty percent (20%), up to a maximum aggregate amount of $750,000 (the "Minimum Royalty Obligation"), of all "Gross Revenues," which for purposes of this Agreement shall mean the entire gross proceeds and receipts of every kind and nature from all sales and services of any software products or services utilizing the Patent Rights or any modifications, improvements or continuations thereof, including, without limitation, IntelliVue document imaging software and support fees; and

(b) From and after Robertson has received the full Minimum Royalty Obligation, five percent (5%) of all Gross Revenues until December 31, 2011; and

(c) In the event of any sale, license or other transfer of all or any portion of the Patent Rights or any modifications, improvements or continuations thereof on or before December 31, 2011, Robertson shall be promptly paid at the closing from the gross proceeds (before any other payments or deductions are made) of such sale, license or transfer, the

K:\DAWN\ROBERTSO\PATENT.D13

K:\DAWN\ROBERTSO\PATENT.D11

4

PLAINTIFF'S EXHIBIT A

difference between $750,000 and the aggregate amount which has been paid to Robertson up to such time under (a) above, plus five percent (5%) of the gross sale, license or transfer proceeds in excess of such amount.

Notwithstanding anything contained herein to the contrary, Avatar shall not sell, license or otherwise transfer any right, title or interest in any of the Patent Rights, including any modifications, improvements or continuations thereof, for any consideration which would not be sufficient to provide Robertson with the full Minimum Royalty Obligation immediately upon the closing of such sale, license or transfer, without the prior written consent of Robertson. Any such sale without Robertson's consent shall constitute a default under this Agreement and Robertson shall have the right to take possession and title to the Patent Rights as set forth below and any interest of the transferee shall be subject to such rights of Robertson and the Royalty Payment obligations of Avatar under this Agreement. Notwithstanding the foregoing, Avatar may license the IntelliVue products to resellers and dealers on a revocable basis so long as (i) such license shall at all times be subject to the terms of this Agreement and Robertson's interest in the Patent Rights as provided herein; (ii) Avatar shall at all times maintain ownership and control of the licensed products and Avatar's Royalty Payment obligations hereunder shall include all fees received from such license and (iii) in the event of any default by Avatar hereunder or under the Security Agreement or in the event of any termination of this Agreement, Robertson shall have the right to revoke such license.

       3.      All Royalty Payments under subsections 2(a) and 2(b) shall be payable monthly to Robertson on the tenth day of each month with respect to Gross Revenues for the prior month. Such Royalty Payments shall commence on January 10, 1997 and continue until January 10, 2012. Royalty Payments under Section 2(c) shall be payable promptly at the closing of any such sale, license or transfer described therein. A general ledger, in a form which is reasonably acceptable to Robertson, showing Avatar's activities for the prior month including Gross Revenues, shall be included with each Royalty Payment to Robertson and certified as correct by the Chief Financial Officer of Avatar. Robertson shall have the right to audit at his expense Avatar's books and records which shall be made available to him or persons designated by him from time to time as he may request. Avatar shall also keep Robertson fully informed of its sales, marketing and service activities with respect to the Patent Rights and provide Robertson with any information regarding such activities which he may from time to time request.

       4.      In the event that Avatar fails to pay any Royalty Payments under subsection 2(a) or 2(b) on or before the 10th day of each month or under subsection 2(c) at the closing of any sale, license or transfer described therein, Avatar shall pay to Robertson a late charge of five cents for each dollar so overdue and such late charge, together with such overdue amount, shall thereafter bear interest at the rate of eighteen percent (18%) per annum until paid in full. Avatar shall also promptly reimburse Robertson for all costs and expenses, including attorneys' fees and court costs, incurred by Robertson to collect any past due amounts, late charges, interest or other amounts due to Robertson under this Agreement.

K:\DAWN\ROBERTSO\PATENT.D13       2

5. In order to increase the probability of Robertson receiving at least the full Minimum Royalty Obligation, Avatar shall be required and it hereby agrees to generate minimum annual Gross Revenues in the amount of $200,000 in the year 1997, $350,000 in the year 1998, $550,000 in the year 1999, and 110% of the prior year's Gross Revenues for each year thereafter.

6. As security for Avatar's obligations under this Agreement, including, without limitation, its obligation to make the Royalty Payments to Robertson and its obligation to meet minimum annual Gross Revenue requirements, Avatar hereby grants to Robertson a security interest in, and it hereby collaterally assigns to Robertson, all of Avatar's right, title and interest (whether now existing or hereafter acquired and wherever located) in and to the Patent Rights, including, without limitation, all modifications, improvements, continuations, substitutions, reissues, divisions, renewals, extensions, reexaminations, continuations-in-part, Gross Revenues and proceeds thereof (the "Collateral"). In the event of any default by Avatar in the payment of any Royalty Payment to Robertson or Avatar's obligation to meet minimum annual Gross Revenue requirements or any of Avatar's other obligations under this Agreement, Robertson shall have the right upon written notification thereof to promptly take sole possession and title to the Collateral, free and clear of any liens, charges, defenses or encumbrances of Avatar, and Robertson shall also have all other rights and remedies permitted by law, including the rights and remedies of a secured party under the Uniform Commercial Code. In conjunction with the execution of this Agreement, Avatar shall execute and deliver to Robertson a Security Agreement in the form attached hereto as Exhibit B, together with any financing statements or other documents requested by Robertson to perfect his security interest in the Collateral. Avatar shall have an affirmative duty to preserve and maintain the Collateral and it shall not abandon any of the Collateral without the consent of Robertson.

7. Avatar understands and agrees that it is purchasing the Patent Rights "AS-IS" and that Robertson has not made any representations or warranties, express or implied, with regard to the Patent Rights. All costs and expenses in connection with any maintenance, renewal, preservation, protection or any other condition of the Patent Rights shall be the sole obligation of Avatar and Avatar hereby releases Robertson from any and all claims which Avatar may otherwise have now or in the future against Robertson with respect to the Patent Rights. Avatar also hereby indemnifies and holds Robertson harmless from and against any and all claims, damages, demands, liabilities, costs and expenses of any kind or nature whatsoever, including attorneys' fees and litigation expenses, arising from the acts or omissions of Avatar and its employees, agents, independent contractors, servants and representatives in connection with the Patent Rights.

8. No course of dealing between Avatar and Robertson, nor any failure to exercise, nor any delay in exercising, on the part of Robertson, any right, power or privilege hereunder or under the Security Agreement executed in conjunction herewith shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege by Robertson. All of Robertson's rights and remedies with respect to the Collateral shall be cumulative and may be exercised singularly or concurrently. This Agreement shall be binding upon and inure to the benefit of

K:\DAWN\ROBERTSO\PATENT.D1                       3

Robertson and Avatar and their respective heirs, personal representatives, successors and assigns.

9. By their signatures hereon, A. Michael Chretien and Matthew L. Chretien hereby jointly and severally, unconditionally and irrevocably guarantee the full and complete performance by Avatar of Avatar's obligations under this Agreement and the Security Agreement provided to Robertson in connection with this Agreement.

10. Any controversy or claim arising out of or relating to this Agreement, or the breach hereof, shall be resolved by binding arbitration in Denver, Colorado in accordance with the Commercial Arbitration Rules of the American Arbitration Association and judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof.

11. Avatar may terminate this Agreement upon providing six months' advance written notification thereof to Robertson. In such event (i) the Patent Rights shall be transferred back to Robertson on the effective date of such termination and Avatar shall execute and deliver to Robertson prior to such effective date an assignment of all such Patent Rights and Avatar hereby appoints Robertson as Avatar's attorney-in-fact to execute all documents to accomplish such transfer in the event Avatar fails to do so when required by Robertson, (ii) Avatar's obligations to pay Royalty Payments to Robertson shall continue beyond the effective date of such termination and (iii) Avatar shall deliver all documents, software, customer lists and other information in its possession relating to or in any way connected with the Patent Rights, including, without limitation, any license agreements.

12. This Agreement may be executed in counterparts and delivered by facsimile transmission and when so executed and delivered it shall constitute the binding agreement of the parties.

13. This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado and it may not be modified except in writing and only when such writing is signed by both parties hereto.

In witness whereof, the parties have executed this Agreement effective as of __12-19.__, 1996.

GUARANTORS:

*A. Michael Chretien* (signature)
A. Michael Chretien, individually

*Matthew L. Chretien* (signature)
Matthew L. Chretien, individually

THE AVATAR GROUP, INC.,
an Ohio corporation

By: *A. Michael Chretien* (signature)
A. Michael Chretien, President

*Duane Robertson* (signature)
Duane Robertson, individually

# SECURITY AGREEMENT

From:     THE AVATAR GROUP, INC., an Ohio corporation ("Debtor"), whose chief executive office is at 189 West Southington Avenue, Worthington, Ohio 43085.

To:     DUANE ROBERTSON, individually ("Secured Party"), whose address is 122 Loveland Way, Golden, Colorado 80401.

**(A) Grant of Security Interest.**

    In consideration of financial accommodations given or to be given or continued by Secured Party to Debtor under the Patent Purchase and Royalty Agreement dated effective as of December _____, 1996 ("Purchase Agreement") by and between Secured Party and Debtor, Debtor hereby grants to Secured Party a security interest in, and Debtor hereby collaterally assigns to Secured Party, all of Debtor's right, title and interest (whether now existing or hereafter acquired and wherever located) in and to (a) United States Patent No. 5,408,630 for a *Three-State Virtual Volume System for Managing Document Storage to Permanent Media*, as further described on Exhibit A attached hereto and made a part hereof and all modifications, improvements, continuations, substitutions, reissues, divisions, renewals, extensions, reexaminations and continuations-in-part thereof, and the "IntelliVue" product and all other document imaging rights and inventions in connection therewith or described therein; (b) all insurance proceeds and Debtor's books, records, computer programs and data relating to any of the foregoing; (c) all accessories and additions to, substitutions for and replacements, products and proceeds of, any of the foregoing; and (d) all accounts receivable, gross proceeds and receipts of every kind and nature from all sales and services of any products or services utilizing or in any way connected with any of the foregoing (the "Collateral") to secure payment and performance of all of Debtor's present and future obligations under the Purchase Agreement (the "Debt"). Unless otherwise defined herein, words used in this agreement shall have the meanings given them in the Uniform Commercial Code.

**(B) Debtor's Representations and Agreements.** Debtor warrants, represents and agrees that:

    1. Debtor will immediately pay: (a) any Debt when due, with interest at the rate or rates provided for by the Purchase Agreement; (b) Secured Party's costs of collecting the Debt, of realization on Collateral, and any expenditure of Secured Party pursuant hereto, including attorneys fees and expenses, with interest from date of expenditure at the maximum rate provided for by the Purchase Agreement; and (c) any deficiency after realization on Collateral with interest from date of expenditure at the maximum rate provided for by the Purchase Agreement.

    2. Debtor owns all Collateral absolutely and no other person has or claims any interest in any Collateral, except as otherwise disclosed to and accepted by Secured Party. Debtor will defend any proceeding which may affect title to or Secured Party's security interest in any Collateral, and will indemnify Secured Party for all costs and expenses of Secured Party's defense. The Collateral will not be used in violation of any applicable statutes, regulations, ordinances or laws.

    3. Debtor will keep the tangible Collateral, or cause it to be kept at a location or locations agreeable at all times by Secured Party. Debtor will give Secured Party prompt written notice of any change of location of the Collateral and of any change of Debtor's chief executive office or name. The Collateral is used or bought primarily for use in business.

    4. Debtor will pay when due all existing and future charges, liens, maintenance charges and encumbrances on and all taxes and assessments now or hereafter levied or imposed on or affecting the Collateral.

    5. Debtor at its expense at all times shall insure the tangible Collateral against loss or damage from such casualties as Secured Party may require, with such insurance company or companies as may be satisfactory to Secured Party, with loss payable to Secured Party. Secured Party may apply any such insurance proceeds to any of the Debt, whether or not then due and payable.

    6. Debtor will provide Secured Party with any information regarding the Collateral or Debtor which Secured Party may request from time to time. All information at any time supplied to Secured Party by Debtor (including, but not limited to, the value and condition of Collateral, financial statements, financing statements, and statements made in documentary Collateral), is and shall be correct and complete when given, and Debtor will notify Secured Party of any adverse change in such information.

    7. Secured Party is irrevocably appointed Debtor's attorney-in-fact to do any act which Debtor is obligated hereby to do, to exercise such rights as Debtor might exercise, to enter Debtor's premises to give notice of Secured Party's security interest in, and to collect Collateral and proceeds and to execute and file in Debtor's name any financing statements and amendments thereto required to perfect Secured Party's security interest hereunder, all to protect and preserve the Collateral and Secured Party's rights hereunder. Secured Party may: (a) Endorse, collect and receive delivery or payment of instruments and documents constituting Collateral; (b) Make extension agreements with respect to or affecting Collateral, exchange it for other Collateral, release persons liable thereon or take security for the payment thereof, and compromise disputes in connection therewith; (c) Use or operate Collateral for the purpose of preserving Collateral or its value and for preserving or liquidating Collateral.

K:\DAWMAR\ROBERTSO\SECURITY.III2

PLAINTIFF'S EXHIBIT B

8. Discharge of any Debtor or other obligor of the Debt ("Obligor") except for full payment, or any extension or forbearance for the benefit of any Debtor or Obligor, or any impairment or suspension of Secured Party's rights against a Debtor or Obligor, shall not affect the liability of or Secured Party's rights or remedies against any other Debtor or Obligor or the Collateral. Until the Debt shall have been paid or performed in full, Secured Party's rights shall continue notwithstanding any change of rate of interest, or acceptance, release or substitution of Collateral or any transfer of a Debtor's interest to another, or any bar of rights or remedies by statutes of limitation or otherwise. Debtor waives (a) any right to require Secured Party to pursue any remedy; (b) presentment, protest and notice of protest, sale, and advertisement of sale; (c) any right to the benefit of or to direct the application of any Collateral until the Debt shall have been paid; and (d) any right of subrogation to Secured Party until all Debt shall have been paid or performed in full.

## (C) Defaults and Remedies; Non-waiver.

1. Each of the following shall constitute a default: (a) Debtor's or any Obligor's failure to pay any of the Debt or any other sum secured hereby when the same is due; (b) Failure to perform or comply with any agreement, condition or provision in this agreement, the Purchase Agreement, or any other instrument or document evidencing the Debt or from which the Debt arises, or any breach of warranty contained in this agreement, the Purchase Agreement or any such instrument or document; (c) Any breach by Debtor under any other agreements between Debtor and Secured Party; (d) Any loss, theft, damage, destruction, sale or encumbrance to or of any Collateral or any levy or seizure against any property of Debtor or Obligor or any of the Collateral; (e) Termination of the business of Debtor, or the assignment for the benefit of creditors, insolvency, appointment of receiver, or the filing of any petition under bankruptcy or debtor's relief laws of, by or against Debtor.

2. On default of Debtor or any Obligor, at Secured Party's option, without demand or notice, all or any part of the Debt shall immediately become due. Secured Party shall have all rights provided by this agreement, the Purchase Agreement and as provided by law, including the Uniform Commercial Code, and may sell Collateral in one or more sales or exercise its "self-help" remedy by repossessing the Collateral. At Secured Party's option, any such sale may be conducted in any locality where Secured Party or Debtor has an office. Sales for cash or on credit to a wholesaler, retailer or user of the Collateral, or at public or private auction, shall all be deemed commercially reasonable. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place designated by Secured Party. Secured Party's acceptance of partial or delinquent payments or failure of Secured Party to exercise any right or remedy at any time shall not waive any obligation of Debtor or Obligor, or any right or remedy of Secured Party, or modify this agreement, or waive any other similar default.

## (D) General Provisions.

1. On transfer of all or any part of the Debt, Secured Party may transfer all or any part of the security interest in the Collateral. Secured Party may deliver all or any part of the Collateral to any Debtor at any time. Any such transfer or delivery shall discharge Secured Party from all liability and responsibility with respect to such Collateral transferred or delivered. This agreement benefits Secured Party's heirs, legatees, personal representatives, successors and assigns and binds Debtor's successors and assigns. Debtor agrees not to assert against any assignee of Secured Party any claim or defense it may have against Secured Party. Time is of the essence. This agreement contains the entire security agreement between Secured Party and Debtor. Debtor will execute any additional agreements, assignments or documents which Secured Party reasonably may request to effectuate this agreement or perfect any rights or interests.

2. Captions, titles and section and paragraph divisions and arrangements in this agreement and in any instruments and documents heretofore or hereafter made or executed are for convenience and for reference only, and shall not affect the meaning, interpretation or construction thereof. Whenever the context so requires, any gender shall include all other genders, and the singular number shall include the plural.

3. This agreement shall be governed by and construed in accordance with the laws of the State of Colorado.

Dated this 19th day of December, 1996.

DEBTOR:   THE AVATAR GROUP, INC.
an Ohio corporation

By: _____
A. Michael Chretien, President

K:\DAWN\ROBERT\SECURITY.101

2

10/12/00  18:18  FAX 6143502780            INTELLINETICS                           ☐02



# PROMISSORY NOTE

Amount:   $100,000.00                                  Date:   10/25/00

For value received, the undersigned Intellinetics, Inc. (the "Borrower") at 2190 Dividend Drive, Columbus, OH 43220, promises to pay to the order of Duane Robertson (the "Lender"), at 122 Loveland Way, Golden CO 80401, (or at such other place as the lender may designate in writing) the sum of $105,666.66 with interest from 10/27/00, on the unpaid principal at the rate of 8.5% per annum.

The unpaid principal and accrued interest shall be payable in full on June 1, 2001 (the "Due Date").

All payments on this Note shall be applied first in payment of accrued interest and any remainder in payment of the principal.

If any installment is not paid when due, the remaining unpaid balance and accrued interest shall become immediately due at the option of the Lender.

The Borrower reserves the right to repay this Note (in whole or in part) prior to the due date with no repayment penalty.

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

If any of the following events occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

1. the failure of the Borrower to pay the principal and any accrued interest in full on or before the Due Date;

2. the death of the Borrower (s) or Lenders (s);

3. the filing of bankruptcy proceedings involving the Borrower as a Debtor;

4. the application for appointment of a receiver for the Borrower;

5. the making of a general assignment for the benefit of the borrowers creditors;

2190 Dividend Drive • Columbus, OH 43229 • www.intellinetics.com • Phone 614.921.8170 • 1.888.8AVATAR

4042 WEST CHINDEN • MERIDIAN, IDAHO 83642
(208) 887-1790 • FAX (208) 887-9330 • www.jayker.com



—Contributed by
Becky Garber, ALCC's
director of communications and certification

PLAINTIFF'S EXHIBIT

6. the insolvency of the Borrower;

7. the misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit.

In addition, the Borrower shall be in default if there is a sale, transfer, assignment, or any other disposition of any assets pledged as security for the payment of this Note, or if there is a default in any security agreement which secures this Note.

Borrower is required to maintain term life insurance payable to the Lender in an amount sufficient to pay the principal and accrued interest in full in the event of Borrower's death.

If any or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. Borrower waives presentment for payment, protest, and notice of protest and nonpayment of this Note.

No renewal or extension of this Note, delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note shall affect the liability of the Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This Note shall be construed in accordance with the laws of the State of Ohio.

Signed this 12th day of October, 2000, at 2190 Dividend Drive Columbus, OH 43228.

Borrower:
Intellinetics, Inc.

By: _____

Matthew L. Chretien