A. Michael Chretien                                                                                September 11, 2007

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

- - - - -

Duane Robertson,                :
    Plaintiff,              :
                            Case No. 07-CV-00729
  vs.                            :RPM/MJW
The Avatar Group, Inc.,         :
an Ohio corporation;
Intellinetics, Inc., an         :
Ohio corporation; A.
Michael Chretien,               :
individually; and
Matthew L. Chretien,            :
    Defendants.

- - - - -

DEPOSITION OF A. MICHAEL CHRETIEN

- - - - -

Taken at Shumaker, Loop & Kendrick, LLP
41 South High Street, Ste. 2400
Columbus, OH 43215
September 11, 2007, 9:10 a.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

## Page 2

APPEARANCES

ON BEHALF OF PLAINTIFF:

    Shughart, Thomson & Kilroy, PC
    1050 17th Street, Suite 2300
    Denver, CO 80265
    By Philip W. Bledsoe, Esq.

ON BEHALF OF DEFENDANTS:

    Dement Law Offices
    7720 E. Belleview Avenue, Suite 350
    Greenwood Village, CO 80111
    By Randolph S. Dement, Esq.

ALSO PRESENT
    Matthew L. Chretien

## Page 3

Tuesday Morning Session

September 11, 2007, 9:10 a.m.

- - - - -

STIPULATIONS

- - - - -

It is stipulated by counsel in attendance that the deposition of A. Michael Chretien, a Defendant herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

EXHIBIT 1

## Page 4

INDEX

| Examination By | Page |
|---|---|
| Mr. Bledsoe - Cross | 5 |
| Mr. Dement - Cross | 97 |

| Exhibits | | Page |
|---|---|---|
| 38 | Intellinetics 2007 Sales Plan, Revision Number: 2 | 9 |
| 39 | Intellinetics Sales Plan 2007 | 11 |
| 40 | Web pages re: Intellivue | 14 |
| 41 | Web pages re: Products | 16 |
| 42 | Web pages re: Partners | 18 |
| 43 | Outlook database entries | 23 |
| 44 | Status report, 10/16/02 | 31 |
| 45 | Handwritten letter, Mike Chretien to Duane, 12/3/03 | 38 |
| 46 | Comments, 10/09/02 | 38 |
| 47 | Sprint/Landis Installation Overview | 44 |
| 48 | Status Report, 10/08/10 | 45 |
| 49 | Letter, Robertson to Michael Chretien, 11/13/96 | 57 |
| 50 | Fax re: Contract, 12/13/96 | 58 |
| 51 | Short Term Funding Request, 10/12/00 | 65 |
| 52 | 2005 tax returns | 68 |
| 53 | 2004 tax returns | 68 |
| 54 | Financial reports | 97 |

(Exhibits retained by counsel.)

A. Michael Chretien                                       September 11, 2007

**Page 5**

1          A. MICHAEL CHRETIEN,
2  being first duly sworn, testifies and says as
3  follows:
4          - - - - -
5          CROSS-EXAMINATION
6  BY MR. BLEDSOE:
7  Q.    State your name, please.
8  A.    A. Michael Chretien.
9  Q.    Mr. Chretien, how are you currently
10 employed?
11 A.    I'm employed as vice president of
12 Intellinetics, Incorporated.
13 Q.    Can you give me the 30-second version
14 of your duties there?
15 A.    Basically, I, under the caption of
16 administration, take care -- oversee corporate
17 issues. Also, I get involved in sales, marketing
18 and sales efforts. Also, I am involved with the
19 process of selecting partner firms, or firms that
20 we're going to align ourselves with, to provide a
21 solution to the market. I wear many hats.
22 Q.    Who handles financial matters at
23 Intellinetics?
24 A.    Well, currently we have an outsourced

**Page 6**

1  firm, Beanstock by name, and they oversee the
2  financials.
3  Q.    Do you have a CPA firm that you use for
4  tax return purposes?
5  A.    Yes. Kenneth Gill, CPA.
6  Q.    And has Mr. Gill been the person you've
7  used for some time now?
8  A.    Yes.
9  Q.    Do you have any role or involvement in
10 the preparation of the firm's tax returns?
11 A.    No.
12 Q.    I take it that the president of the
13 company, Matt Chretien, does?
14 A.    Well, you can ask Matt.
15 Q.    Well, some officer normally would
16 review and sign off on them, wouldn't they?
17 A.    Oh, yes.
18       Is that the question?
19 Q.    Yeah.
20 A.    Yes.
21 Q.    Do you know whether you do that or Matt
22 does that?
23 A.    I think Matthew does at present.
24 Q.    All right. Are you one of the

**Page 7**

1  principal owners of the company?
2  A.    Yes.
3  Q.    Along with Matt?
4  A.    Yes.
5  Q.    And just for our record, Matt is your
6  son?
7  A.    Yes.
8  Q.    Not your -- not your older brother, as
9  he tried to convince us earlier.
10       How long have you been working for
11 Intellinetics?
12 A.    Approximately 14 years.
13 Q.    Fourteen years ago, was it called
14 Intellinetics?
15 A.    No. We initially operated under the
16 name Avatar Group, Incorporated.
17 Q.    And Avatar was formed in approximately
18 1993?
19 A.    I believe that's approximately it.
20 Q.    Do you know whether or not Avatar is
21 still an existing company?
22 A.    It's a wholly-owned subsidiary of
23 Intellinetics.
24 Q.    When was Intellinetics formed?

**Page 8**

1  A.    '95, 1995 or '96, thereabouts. It's a
2  matter of record.
3  Q.    Was it formed after the royalty
4  agreement was prepared and executed by Avatar?
5  A.    Yes, I believe that's the sequence.
6  Q.    Okay. When did you first meet Duane
7  Robertson?
8  A.    Either the latter part of '95 or '96.
9  Q.    At that time, did Avatar have a
10 business relationship with any company that
11 Mr. Robertson was associated with?
12 A.    Yes.
13 Q.    What was that company?
14 A.    Intellinetics or --
15 Q.    III G.I.?
16 A.    -- III G.I., Ltd.
17 Q.    Was Avatar, was it sometimes referred
18 to as a reseller?
19 A.    Yes.
20 Q.    What was it that Avatar was reselling?
21 A.    We were reselling a number of products,
22 but -- which included the Intellinetics of
23 Colorado's product, document imaging application,
24 and Intellivue.

A. Michael Chretien                                                                                  September 11, 2007

**Page 17**

1  "Intellinetics' software uses our patented
2  innovative mass storage algorithm to compress
3  stored information so that files matching search
4  specifications can be retrieved in less subsecond
5  time, regardless of the number of files, the size
6  of the network, or the number of simultaneous
7  users."
8          Did I read that right?
9  A.      Correct.
10 Q.      And this has been on your website as of
11 2006, correct?
12 A.      I don't know if it's still that way,
13 but it was that way, probably. This is an
14 accurate --
15 Q.      Well, take a look at the print date on
16 the bottom right-hand corner. Does it say
17 9/7/2007?
18 A.      9/7, uh-huh.
19 Q.      How many patents does Intellinetics
20 own?
21 A.      Well, the one in dispute.
22 Q.      Is that the only one they own?
23 A.      That is it.
24 Q.      So when the phrase "patented innovative

**Page 18**

1  mass storage algorithm" is used, it's referencing
2  the patent that's at issue in this suit, correct?
3  A.      That would have to be the only patent
4  that we have.
5  Q.      And it's true, is it not, that in 2006,
6  royalty liability to Mr. Robertson was continuing
7  to accrue and show up on the books of the company?
8  A.      Yes.
9          - - - - -
10         Thereupon, Exhibit 42 is marked for
11 purposes of identification.
12         - - - - -
13 Q.      Take a look at Exhibit 42. Again, it's
14 a portion of the website referencing partners.
15 You've seen this before?
16 A.      Yes, yes.
17 Q.      And I think you told me earlier in your
18 deposition that managing or involvement in the
19 partner relationships is something that you handle
20 for the company?
21 A.      Not exclusively, but I certainly have a
22 hand in it, yes.
23 Q.      All right. Who are Ray & Barney?
24 A.      They are consultants.

**Page 19**

1  Q.      And how do you partner with them in
2  terms of the Intellinetics business?
3  A.      The basic thrust, as far as our
4  interaction with Ray & Barney, is to look at our
5  operations to see how we can improve them.
6  Q.      So do I understand it that on this
7  partnership relationship, it is Intellinetics that
8  has been paying Ray & Barney to provide consulting
9  services to you for your internal operations? Is
10 that a fair statement?
11 A.      For all operations, really, but it's a
12 fair -- yes.
13 Q.      Has Ray & Barney --
14 A.      Including sales and marketing, the
15 whole nine yards.
16 Q.      For the entire gamut of Intellinetics'
17 operations?
18 A.      Yes, yes.
19 Q.      Has Ray & Barney helped you place any
20 of your services or products into the marketplace?
21 And by that I mean actively.
22 A.      For the most part, they've helped
23 position our offering. They've helped with, you
24 know, marketing, limited identification of leads.

**Page 20**

1  But the primary thrust has been to help us
2  position our offering in the marketplace,
3  basically identify where we should fish.
4  Q.      And when you say your offering, are you
5  talking about the four products that you use or
6  sell?
7  A.      All offerings. Our consulting
8  services, networking, anything that we do, which
9  is more expansive than the software application,
10 Intellivue.
11 Q.      And then there's also a reference here
12 to CompuDyne. Who's CompuDyne?
13 A.      CompuDyne is a large public safety
14 software vendor.
15 Q.      Focusing on the public safety
16 community?
17 A.      Yes.
18 Q.      And I take it that Identivue is the
19 principal service that you've offered to the
20 public safety community?
21 A.      Not really. Both imaging and
22 Identivue.
23 Q.      Okay. But certainly Intellivue would
24 be something that the public service community

A. Michael Chretien                                                                September 11, 2007

**Page 25**

1  A.     Yes.
2  Q.     When you say you talked with Duane,
3  does that mean you called him?
4  A.     Yes.
5  Q.     And you indicated that you advised
6  Duane of "impact of distraction" and asked him
7  what his ultimate goal was.
8         Now, obviously, that's a paraphrase,
9  correct?
10 A.     Yes, yeah. All of it is a paraphrase.
11 Q.     Right. Do you recall what else -- or
12 what you said to Duane?
13 A.     This is the essence of the
14 conversation.
15 Q.     Well, I appreciate that it is, but my
16 question is: Can you recall what else you said,
17 or what you said?
18 A.     As I say, this is the essence of the
19 conversation. I advised Duane of the impact of
20 distraction.
21 Q.     Well, what was the distraction?
22 A.     The distraction was this. This is a
23 distraction from our efforts to sell the --
24 Q.     Well, there was no suit on file in

**Page 26**

1  January of 2007, was there?
2  A.     No.
3  Q.     Had anybody even talked about a lawsuit
4  at that point?
5  A.     I do believe a lawsuit is always a
6  possibility when you have a dispute over money.
7  It was fairly apparent to me that that was quite
8  likely where this was headed, where this
9  distraction was headed.
10 Q.     And do you remember saying anything
11 else about this distraction?
12 A.     Well, my -- the next essence there,
13 "asked him what his ultimate goal was," I was
14 trying to find out what was his purpose of sending
15 an agent to Columbus, Ohio.
16 Q.     Well, what did he tell you?
17 A.     He was unresponsive. His response to
18 my question is indicated there. He was going to
19 meet with John, short for John Crist, and he would
20 get back to us.
21 Q.     In this conversation of January 23rd,
22 did you complain about Mr. Crist?
23 A.     I don't believe so.
24        In what manner?

**Page 27**

1  Q.     Well, I'm just asking. Either you did
2  or you didn't.
3         Do you remember complaining about him?
4  A.     No.
5  Q.     Do you remember expressing any
6  unhappiness at having an agent sent?
7  A.     I normally would prefer to deal with a
8  principal.
9  Q.     In all of the prior dealings with the
10 principal, which is Mr. Robertson, had any of
11 those dealings ever involved you paying him money?
12 A.     We made a payment on the patent
13 purchase agreement.
14 Q.     In 1998?
15 A.     I believe that's correct. And we made
16 payments on the promissory note.
17 Q.     In 2000?
18 A.     It's a matter of record.
19 Q.     In any of the conversations that you
20 had with him in 2003 or 2001, him being
21 Mr. Robertson, had any of those dealings with the
22 principal involved paying him any of the money he
23 was owed?
24 A.     If you're asking did -- were payments

**Page 28**

1  on a note or the PPA, patent purchase agreement,
2  did they follow conversations with Duane every
3  time, the answer is no.
4  Q.     Take a look on Exhibit 43 at the entry
5  for November 29th, 2001.
6  A.     Right.
7  Q.     Again, this is the essence of the
8  conversation?
9  A.     Uh-huh.
10 Q.     But it indicates Duane called you
11 today?
12 A.     Uh-huh.
13 Q.     Is that fair, if you would say Duane
14 called today?
15 A.     I can't remember specifically, but if
16 that's the way I wrote it up, I'm sure that's the
17 way it went down.
18 Q.     And here -- again, it's a paraphrase --
19 he's asking for a status report and a payment
20 schedule?
21 A.     Right, yes.
22 Q.     Do you recall whether or not you
23 provided him a status report?
24 A.     Yes.

A. Michael ChretienSeptember 11, 2007

**Page 29**

1  Q.Do you recall whether you provided him
2  a payment schedule?
3  A.We provided a payment schedule in
4  reference to the promissory note, yes.
5  Q.Did you make any of the payments under
6  that payment schedule?
7  A.We made two or three payments. I don't
8  know if they were in direct sync with the payment
9  schedule.
10 Q.In this conversation in November of
11 2001, did you indicate in any way to Mr. Robertson
12 that you were no longer using his patent?
13 A.No.
14 Q.Mr. Chretien, we have an exhibit book
15 here in front of you that contains the exhibits
16 that have previously been marked in this case.
17 Would you turn to Exhibit 28. That's the patent
18 purchase and royalty agreement.
19 A.Okay. I got it.
20 Q.Okay. Would you turn to page 4 of that
21 agreement.
22 A.Yes.
23 Q.And that's got your signature on
24 page 4, correct?

**Page 30**

1  A.Yes.
2  Q.Along with that of Matthew?
3  A.It sure looks like it.
4  Q.All right. And at that time, you were
5  the president of Avatar, correct?
6  A.Yes.
7  Q.And you signed also individually,
8  because there's a guaranty that's included in this
9  agreement, right?
10 A.Yes.
11 Q.Look at paragraph 11. Does that
12 reference Avatar's termination of this agreement,
13 its termination rights?
14 A.Yes.
15 Q.Avatar has never exercised any of these
16 termination rights, have they?
17 A.No.
18 Q.Would you take a look at -- just bear
19 with me for a second here.
20 In Exhibit 33 in your book is a
21 pleading, and then included in that pleading are
22 several exhibits. Would you find Exhibit 3.
23 A.Yes. It's a letter dated October 16th,
24 2002.

**Page 31**

1  Q.2002. All right. I'm sorry, I do
2  have -- I want to mark that separately. I do have
3  that.
4  - - - - -
5  Thereupon, Exhibit 44 is marked for
6  purposes of identification.
7  - - - - -
8  Q.Take a look at Exhibit 44.
9  MR. DEMENT: Phil, for the record, the
10 Exhibit 3 to the pleading that is marked as
11 Deposition Exhibit 33 is 13 pages, 14? I'm just
12 trying to make sure it's the identical --
13 MR. BLEDSOE: I'm not sure if it is, in
14 all honesty, and that's why I've marked this one,
15 because I had some other questions about this one
16 here.
17 Q.Have you had a chance to look at
18 Exhibit 44?
19 A.I haven't examined all --
20 Q.I understand.
21 A.Yeah. Okay.
22 Q.It says it's a status report, and I
23 take it that's what it's intended to be. Correct?
24 A.Uh-huh.

**Page 32**

1  Q.Is that a yes?
2  A.Yes. I'm sorry.
3  Q.That's all right.
4  When I was asking you about the
5  conversation from the end of November 2001 in
6  Exhibit 43 where Mr. Robertson had asked for a
7  status report, do you recall that you had
8  indicated that you had provided a payment
9  schedule?
10 A.Yes.
11 Q.Take a look at the very back of that
12 Exhibit 44.
13 A.Uh-huh. Yes. I'm sorry.
14 Q.Is that the payment schedule you were
15 referencing?
16 A.At that point, it was the desire to
17 furnish a payment statement, yes. It probably is
18 the same.
19 MR. DEMENT: I'm sorry, Phil, are you
20 at the --
21 MR. BLEDSOE: I'm at the last one that
22 has an amortization schedule on it.
23 MR. DEMENT: All right.
24 Q.And it reflects, does it not, a payment

A. Michael Chretien                                                September 11, 2007

**Page 37**

1  Did you fire her?
2  A.   Yes.
3  Q.   All right. And do you recall that she
4  was fired in 2003?
5  A.   I think -- it must have been at the --
6  yeah. Well, again, it's a matter of record.
7  Q.   Well, I understand that it's a matter
8  of record, but I'm actually asking what your
9  recollection is, which may or may not be the same
10 as the record.
11 A.   Right. Well, based on this entry, it
12 would be on or about -- you know, at that time
13 when -- I don't know if it was the front end or
14 the middle or the back end of this situation, but
15 it was on or about then.
16 Q.   Okay. And if you look at the entry
17 right above that, it says 4/12/03. Now, based on
18 what I know about this case, I've got a suspicion
19 that that's supposed to be 4/12/04.
20      Would you take a look at that and tell
21 me if you think that's probably right,
22 Mr. Chretien?
23 A.   That's probably right.
24 Q.   It indicates --

**Page 38**

1  A.   A correct deduction, yeah.
2  Q.   It indicates you had a discussion with
3  Mr. Robertson, that you had reached a settlement
4  with Cher and were trying to focus on moving
5  forward, correct?
6  A.   Yes.
7  Q.   Do you know whether or not any
8  additional packet of information was provided to
9  Mr. Robertson after April of 2003?
10 A.   I don't know. I can't recall.
11           - - - - -
12      Thereupon, Exhibits 45 and 46 were marked
13 for purposes of identification.
14           - - - - -
15 Q.   Mr. Chretien, would you take a look at
16 what's been marked as Exhibits 45 and 46? And I'm
17 handing them to you together, because at least I
18 think they go together. But the purpose of my
19 question is for you to tell me whether they do.
20      Would you take a look at both of those
21 exhibits.
22 A.   Yes.
23      MR. BLEDSOE:   Would this be a
24 convenient time to take a break? We're moving

**Page 39**

1  along nicely.
2      MR. DEMENT:   Sure.
3      (A short recess is taken.)
4  BY MR. BLEDSOE:
5  Q.   Before we took our break, Mr. Chretien,
6  we were talking about Exhibits 45 and 46. Have
7  you had an opportunity to look at those?
8  A.   Yes, I have.
9  Q.   Exhibit 45 is a document you prepared,
10 I take it?
11 A.   Yes.
12 Q.   And it's a handwritten note to Duane?
13 A.   Yes.
14 Q.   Dated December of 2003?
15 A.   Right.
16 Q.   And also, it references an attachment
17 with -- that shows an October 9th, '02, date?
18 A.   Right.
19 Q.   Along with a revised payment schedule?
20 A.   Yes.
21 Q.   Would you take a look at Exhibit 46 and
22 tell me if those are the comments referenced and
23 the revised payment schedule?
24 A.   I would have to say yes. I mean, it's

**Page 40**

1  the right date. It's -- the topic is correct, so,
2  yes.
3  Q.   Taking a look at Exhibit 46, these are
4  comments relating to the profit and loss
5  statements of the company, correct?
6  A.   Yes. I'm sorry. I was looking at the
7  body.
8  Q.   All right. And it talks about -- if
9  you go down to near the bottom where it says,
10 "Sufficient time has elapsed from the May 2000
11 redirection." Do you see that?
12 A.   Yes.
13 Q.   What redirection are you referencing
14 there?
15 A.   Time has passed, memory is dim, but
16 what I believe here -- prior to 2000 -- to May --
17 Q.   Right.
18 A.   -- or on or about May, we came to the
19 realization that it was probably going to be
20 better for Intellinetics to direct its efforts at
21 singles as opposed to home runs.
22      And what I'm talking about, we had
23 projects -- we were attempting to land contracts
24 that were associated with major integrators. And

10 (Pages 37 to 40)

Spectrum Reporting LLC                                              614-444-1000

A. Michael Chretien September 11, 2007

**Page 65**

1 suit, I verbally indicated to him that it was very
2 questionable whether we were currently using the
3 patent.
4 Q. That was at the end of 2006?
5 A. Correct.
6 Q. Now, you did, however, talk to
7 Mr. Robertson about making a loan to you all in
8 2000, correct?
9 A. Yes. I mean, I don't know that I was
10 the one that was the lead on that, but there was a
11 contact with Duane.
12         - - - - -
13     Thereupon, Exhibit 51 is marked for
14 purposes of identification.
15         - - - - -
16 Q. And Exhibit 51 is a memo to Duane from
17 Matt Chretien regarding what is referred to as a
18 short-term funding request dated October 12th,
19 2000; is that right?
20 A. Yes.
21 Q. You're shown as receiving a copy of
22 that on this memo, correct?
23 A. Okay. Yes.
24 Q. Just a minute ago you indicated that

**Page 66**

1 you didn't recall being the lead on that. I take
2 it that means that Matt was?
3 A. It would -- it is -- that's what this
4 document would indicate.
5 Q. All right. But in any event, you do
6 recall in this time frame approaching
7 Mr. Robertson about a short-term loan?
8 A. Yes.
9 Q. Until June 1st, 2001?
10 A. Yes, that's --
11 Q. Ultimately, he did not agree to loan
12 you the full 300,000, did he?
13 A. No.
14 Q. He did agree to loan a hundred
15 thousand?
16 A. Yes. The promissory note in question.
17 Q. Right. There's no doubt in your mind
18 that you all owe that money, is there?
19 A. No. That we owe a sum of money, yes.
20 Q. Based on the promissory note?
21 A. Based on the promissory note.
22 Q. In fact, there's no doubt in your mind,
23 either, that you owe a sum of money based upon the
24 royalty agreement, correct?

**Page 67**

1 A. Correct.
2 Q. And so at some level, what this lawsuit
3 is about is kind of like the old joke: We're
4 haggling over the price?
5 A. Absolutely. There is a significant --
6 and I underline the operative word significant --
7 variance between the opposing positions.
8 Q. Most of that variance being on the
9 royalty agreement?
10     MR. DEMENT: Object to the form.
11 A. Yes.
12 Q. I didn't make copies of all of these,
13 because we've got plenty of paper already,
14 Mr. Chretien. And all I'm going to do is mark
15 some of these tax returns for the record, and then
16 we'll ultimately make copies of them all later.
17 But --
18     MR. DEMENT: Why don't we just make
19 copies at the lunch break.
20     MR. BLEDSOE: Yeah, we could do that,
21 too. I just didn't want to carry them all with me
22 and all that other kind of stuff. And I don't
23 really have a lot of questions about it -- about
24 them.

**Page 68**

1         - - - - -
2     Thereupon, Exhibits 52 and 53 are marked
3 for purposes of identification.
4         - - - - -
5     MR. DEMENT: I'm going to -- are you
6 going to look at that for a little bit?
7     MR. BLEDSOE: Actually, no.
8     MR. DEMENT: You're going to start
9 inquiring?
10     MR. BLEDSOE: Yeah. Do you need a
11 break?
12     MR. DEMENT: I was going to go to the
13 restroom.
14     MR. BLEDSOE: Yeah, let's take a break.
15     (A short recess is taken.)
16 BY MR. BLEDSOE:
17 Q. Mr. Chretien, I'm going to show you two
18 of the tax returns that have been provided in the
19 course of this discovery. I'm going to -- I've
20 just got a couple questions for you about these,
21 and then the balance of my questions about the
22 financial aspects of the company will be directed
23 to Matt.
24     But take a look at Exhibits 52 and 53.

A. Michael Chretien                                                September 11, 2007

**69**
1  Is Exhibit 52 a group exhibit of tax return
2  material for Intellinetics of Ohio for the year
3  2005? Exhibit 52.
4  A.        Oh, I'm sorry. Yes.
5  Q.        And that includes your federal and
6  state, and I think even some local return
7  information in there?
8  A.        Appears to be two copies of the Form
9  1120. But, yes, there are county records. I
10 believe they're the total file.
11 Q.        All right. Probably provided to us via
12 Mr. Gill or a copy provided to you for Mr. Gill?
13 A.        Yes.
14 Q.        The only question that I have for you
15 is on the page that's tabbed.
16 A.        Okay.
17 Q.        And that's a portion of some of the
18 financial statements that are typically included
19 in that kind of package.
20 A.        Uh-huh.
21 Q.        And the reference there is to a portion
22 of the balance sheet of the company as of the end
23 of 2005. Does that look correct?
24 A.        You mean the bottom-line figure, 701 --

**70**
1  Q.        Well, this is a portion of the balance
2  sheet for the company as of the end of --
3  A.        December 31st, yes. Okay.
4  Q.        Is the company a calendar-year
5  taxpayer?
6  A.        Yes.
7  Q.        Do you -- are you a cash-basis taxpayer
8  or an accrual-basis taxpayer?
9  A.        I should know. I think it's cash.
10 Q.        And there are two lines that I want to
11 ask you about here under liabilities. And the one
12 is under -- excuse me just one second. Under
13 "long-term liabilities," there's an amount
14 reflected for a loan with Duane Robertson.
15 A.        Yes.
16 Q.        Based on an October 28th, 2000, loan,
17 correct?
18 A.        Yes. That's what the --
19 Q.        And it shows a -- an amount of $85,000
20 and change, correct?
21 A.        Yes.
22 Q.        Now, was the original note intended to
23 be that long of a term note?
24 A.        No. If that's referring to the

**71**
1  promissory note at issue, answering no.
2  Q.        And then a little bit further down
3  under "other long-term liabilities" is a dollar
4  figure associated with --
5  A.        Right there.
6  Q.        Yeah. -- patent rights --
7  A.        -- due --
8  Q.        -- due D. Robertson, correct?
9  A.        Yes.
10 Q.        And that's in the amount of
11 $558,701.07?
12 A.        Correct.
13 Q.        Who keeps those books that would
14 reflect that dollar figure?
15 A.        That would -- I believe it would come
16 from Beanstock.
17 Q.        Is that who you were using in 2005?
18 A.        Yes.
19 Q.        And that would be based upon
20 information you provide to them about how to
21 account for books and -- or charges to the
22 company?
23 A.        Actually, it more would be a
24 continuation of a historical pattern that was in

**72**
1  place before Beanstock, but -- so does that
2  make -- you understand -- does that make sense?
3  Q.        Well, I guess that's what I'm trying to
4  figure out. Is -- there's some dollar figure
5  added to that every year, correct?
6  A.        Yes.
7  Q.        And somebody has been directed about
8  how to do that, correct?
9           MR. DEMENT: Object to the form.
10 A.        It has now come to our attention that
11 that was incorrect, that the preparation was
12 incorrect.
13 Q.        Has any amended tax return been filed?
14 A.        Not that I'm aware of.
15 Q.        Do you know whether or not those
16 payments that are shown have been deducted or
17 depreciated in any way?
18 A.        You'll have to contact Mr. Gill.
19 Q.        Would you turn to this exhibit book
20 that you've got in front of you now, Mr. Chretien?
21 A.        Uh-huh.
22 Q.        Take a look at Exhibit 4, please.
23          Who prepared this document?
24 A.        I did.

A. Michael Chretien                                                                September 11, 2007

### Page 81

1  communications.
2      MR. DEMENT: And to be equally clear,
3  it's my belief they are.
4      MR. BLEDSOE: I understand.
5      MR. DEMENT: So I -- just a standing
6  objection on -- as far as negotiations, for lack
7  of a better word, moving forward from this meeting
8  until --
9  A.    It's to be noted, one of the last
10 communications that we received from Mr. Crist is
11 entitled "settlement negotiation," or words to
12 that effect. So apparently he understood that it
13 was negotiations, at least at that time.
14 Q.    Well, I guess -- let me ask you what
15 you understood, then.
16 A.    There's no question --
17 Q.    Mr. Chretien, I'm going to ask you a
18 different question here.
19 A.    Oh, okay. Sorry.
20 Q.    Were you going into this meeting with a
21 plan to reduce your obligation to Mr. Robertson or
22 pay your obligation in full?
23 A.    I was going into the -- into the
24 meeting with Crist -- initially, it was discovery

### Page 82

1  on his part, and then it quickly -- in response to
2  his inquiry, "where do we go from here," it's
3  clear that that's an effort to negotiate and
4  arrive at a --
5  Q.    I'm not asking about that. I'm asking
6  about what your intent was, not what Mr. Crist's
7  intent was. Because I'm going to take it you
8  don't have the ability to read anybody's mind.
9  A.    Right.
10 Q.    I'm only going to ask about what was in
11 yours.
12     And my question is --
13 A.    But I do have the ability to listen to
14 his voice and sentences that indicate that this is
15 clearly a negotiation -- I took to be a
16 negotiation.
17 Q.    And to negotiate what?
18 A.    To negotiate a payment plan that would
19 have put us at a position not involving
20 depositions.
21 Q.    All right. But as you had -- in your
22 own intent to negotiate a payment plan, were the
23 amount of payments that you had intended to
24 negotiate something less than what was owed to

### Page 83

1  Mr. Robertson?
2      MR. DEMENT: Object to the form in that
3  it's conclusory that there's nothing with respect
4  to the amount owed.
5      MR. BLEDSOE: Except for the books and
6  records of the company.
7      MR. DEMENT: Well, that's
8  argumentative, but --
9  Q.    Well, let me put it this way: Did you
10 intend to pay less than what the books and records
11 of the company showed?
12 A.    The event of Mr. Crist's discovery trip
13 caused us to review the entire situation, which
14 that is a review of the patent agreement, the
15 patent purchase agreement, which, quite frankly,
16 had been years since we had looked at, in an
17 effort to definitively arrive and be able to
18 respond to your question. And at that point, it
19 had not even started.
20     So as we got into the review, it became
21 quite apparent that we owed significantly less
22 than the figure that was erroneously carried on
23 our balance sheet.
24 Q.    Take a look at Exhibit No. 6. This is

### Page 84

1  to Mr. Robertson and Mr. Crist. Are you the
2  author?
3  A.    Yes. I believe I was.
4  Q.    All right.
5  A.    Well, wait a minute. It may not have
6  been me.
7  Q.    All right. Is it fair to say you would
8  have reviewed this before it went out?
9  A.    If I was around, yes.
10 Q.    There's a payment plan that's
11 referenced in the second page here. Do you see
12 that?
13 A.    Yes.
14 Q.    Now, that precise plan was rejected by
15 Mr. Robertson, correct?
16 A.    I do believe so. That's why we're
17 here.
18 Q.    All right. And was this payment plan
19 intended to capture both whatever amounts were due
20 under the promissory note and the patent purchase
21 agreement?
22 A.    Yes, I believe that was the global --
23 we were trying to reach a global agreement,
24 settlement.

Spectrum Reporting LLC                                                                614-444-1000

*Mathew Chretien Rob127 12/01/07*

Matthew L. Chretien                                                                                      September 11, 2007

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

- - - - -

Duane Robertson,          :
      Plaintiff,          :
                          :   Case No. 07-CV-00729
      vs.                 :   RPM/MJW
The Avatar Group, Inc.,   :
an Ohio corporation;      :
Intellinetics, Inc., an   :
Ohio corporation; A.      :
Michael Chretien,         :
individually; and         :
Matthew L. Chretien,      :
      Defendants.         :

- - - - -

DEPOSITION OF MATTHEW L. CHRETIEN

- - - - -

Taken at Shumaker, Loop & Kendrick, LLP
41 South High Street, Ste. 2400
Columbus, OH 43215
September 11, 2007, 1:43 p.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

**Page 2**

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Shughart, Thomson & Kilroy, PC
1050 17th Street, Suite 2300
Denver, CO 80265
By Philip W. Bledsoe, Esq.

ON BEHALF OF DEFENDANTS:

Dement Law Offices
7720 E. Belleview Avenue, Suite 350
Greenwood Village, CO 80111
By Randolph S. Dement, Esq.

ALSO PRESENT

A. Michael Chretien

**Page 3**

Tuesday Afternoon Session
September 11, 2007, 1:43 p.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Matthew L. Chretien, a Defendant herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

**Page 4**

I N D E X

| Examination By | Page |
|---|---|
| Mr. Bledsoe - Cross | 5 |

| Exhibits | | Page |
|---|---|---|
| 55 | 2003 and 2004 tax returns | 6 |
| 56 | 2002 tax returns | 6 |
| 57 | 2001 tax returns | 6 |
| 58 | 2000 tax returns | 6 |
| 59 | Four-page document of books and records for Intellinetics as of October 31st, 2006 | 8 |
| 60 | Intellinetics custom transaction detail report, 12/7/06 | 12 |

(Exhibits retained by counsel.)

**EXHIBIT 2**

---

Matthew L. Chretien                                                September 11, 2007

**Page 9**

1  Q.    On the first page of Exhibit 59, under
2  the category called Expense, there's something
3  called Payroll Reclassification, and it's a fairly
4  large figure of $208,000.
5        Do you remember why there was an
6  adjustment of that size for payroll
7  reclassification?
8  A.    I don't recall the exact accounting
9  principle behind that. I do recall him covering
10 that as a topic; however, I don't recall the
11 detail behind it.
12 Q.    All right. On the second page, there's
13 a statement of cash flow. It's for the same time
14 frame, January through October 2006. At the very
15 bottom of adjustments to the net income is a
16 patent rights due D. Robertson line. Do you see
17 that?
18 A.    Yes, I do.
19 Q.    Do you know how that was calculated?
20 A.    It was through a formula, an approach
21 that was inherited by Growth Management/Beanstock,
22 and not something that we've covered in
23 particular. So I don't -- I don't recall the
24 details.

**Page 10**

1  Q.    Is it a percentage of some revenue?
2  A.    Yes. I do know that.
3  Q.    All right. But do you know what
4  revenue it's a percentage of?
5  A.    I believe it's software sales. On the
6  first page.
7  Q.    When did Growth Management start
8  providing outsourced accounting services to you
9  all?
10 A.    At the time we established our
11 relationship with them.
12 Q.    Which was when?
13 A.    As I presented, I believe in the
14 four-year time period, perhaps longer.
15 Q.    2002 or so?
16 A.    Yes.
17 Q.    How were the books prepared prior to
18 2002?
19 A.    They were maintained internally.
20 Q.    By who?
21 A.    Cher Williams. Well, actually, Karen
22 Etnyre. Excuse me. Karen was there for several
23 years, and before that, going way back, it was
24 Cher.

**Page 11**

1  Q.    How do you spell Karen?
2  A.    It's K-A-R-E-N, last name E-T-N-Y-R-E,
3  I believe.
4  Q.    Etnyre?
5  A.    Yes, sir.
6  Q.    She did the books after Cher Williams?
7  A.    Correct.
8  Q.    And is it your recollection that the
9  separation between your company and Ms. Williams
10 was in 2003?
11 A.    That sounds about the time frame.
12 Q.    Okay. Continuing to look on page 2 of
13 Exhibit 59, there are financing activities that
14 are described there.
15 A.    Uh-huh.
16 Q.    Are those all that current year
17 financing activities, as you understand it?
18 A.    Correct.
19 Q.    Okay. So since there were no moneys
20 being paid to Mr. Robertson under the promissory
21 note, there wouldn't be any information reflected
22 there because it's not a cash flow?
23 A.    Correct.
24 Q.    And the last two pages of Exhibit 59

**Page 12**

1  are the balance sheet through October 31st, 2006.
2  And again, if you would look at the second page
3  under long-term liabilities, there's a reference
4  to angel loans.
5        Is Mr. Robertson's loan in there?
6  A.    Yes.
7  Q.    And then there's the reference to
8  patent rights due to Mr. Robertson showing as of
9  October 31st, 2006, accrued patent rights of
10 $586,750, correct?
11 A.    Yes.
12 Q.    Now, it's your testimony, is it not,
13 that that's a mistake?
14 A.    Correct.
15 Q.    But it's a mistake that had been on the
16 company books at least as of the time that Exhibit
17 59 was prepared, which is November of 2006. It
18 had been on the company books for seven or eight
19 years, hadn't it?
20 A.    Correct.
21        - - - - -
22        Thereupon, Exhibit 60 is marked for
23 purposes of identification.
24        - - - - -

Matthew L. Chretien								September 11, 2007

**Page 13**

1  Q.       Exhibit 60 is a custom transaction
2  detail report for Intellinetics, Inc.  Shows that
3  it was prepared -- or printed, more accurately, on
4  December 7th, 2006, up there in the left-hand
5  corner.
6          Do you see that?
7  A.       Yes.
8  Q.       Have you seen this before?
9  A.       Yes.
10 Q.       Was this prepared for Mr. Crist?
11 A.       No.
12 Q.       Why was it prepared?
13 A.       I don't recall.
14 Q.       Do you know what it -- what this
15 transaction detail report details?
16 A.       Yes.  It looks like it's an accounting
17 of the numbers rolling up to what is displayed on
18 the balance sheet.
19 Q.       And it shows a balance, a total balance
20 on this report, of $586,000 and change, correct?
21 A.       Correct.
22 Q.       And that jibes, generally, with what
23 we've seen on these balance sheets?
24 A.       Correct.

**Page 14**

1  Q.       And after a starting point, in
2  particular in 2003, we see a number of
3  adjustments, each in -- during the course of a
4  year.  Do you see?
5  A.       Are you referring to the entries?
6  Q.       Yes.
7  A.       I see the entries.
8  Q.       And there's -- you know, for 2001 and
9  2002, for example, there's just single entries,
10 correct?
11 A.       Yeah.
12 Q.       And then thereafter, we see what --
13 entries with a little bit more detail, such as the
14 entry for 9/30/2003.
15         Do you see that entry?
16 A.       Yes.
17 Q.       And it says -- it doesn't have a
18 number, but it says "MMGMS."
19         Do you know what that means?
20 A.       GMS, Growth Management, is the
21 historical name of what is now Beanstock.  I think
22 it's a memo.
23 Q.       And then it says, "Ohio, Ricart."
24         Did that -- what does that mean to you?

**Page 15**

1  A.       )       That's a customer.
2  Q.       What kind of customer are they?
3  A.       They are an auto dealer customer.
4  Q.       And they were sold Intellivue?
5  A.       Yes.
6  Q.       They have 50 users?
7  A.       Yes.
8  Q.       And then the memo says:  Accrue
9  software patent expense on Ricart sale.  Then it's
10 $6396, correct?
11 A.       Correct.
12 Q.       And you can just see that that's added
13 to the then balance, right?
14 A.       Yes.
15 Q.       And then the next one is Tiburon.  And
16 does that -- for the Arlington Police Department.
17         Was a product sold to Tiburon as part
18 of -- for Virginia police officers or --
19 A.       We were a subcontractor.
20 Q.       And so you sold through Tiburon, the
21 end user being the Arlington, Virginia, Police
22 Department?
23 A.       Yes.
24 Q.       And again, Identivue was sold?

**Page 16**

1  A.       No.
2  Q.       What was sold?
3  A.       Intellivue.
4  Q.       Intellivue.  Thank you.
5          Was Version 6 sold there in 2003?
6  A.       Yes.
7  Q.       So from 2003 to today, you've gone from
8  6 to 6.2?
9  A.       6.25, I believe.
10 Q.       6.25?
11 A.       Uh-huh.
12 Q.       And then Franklin County Data Center,
13 it says "enterprise expansion."  What's an
14 enterprise expansion?
15 A.       That's a negotiated licensing model
16 whereby we -- the customer commits to using our
17 software as their standard, and for that
18 commitment they receive reduced pricing.
19 Q.       So that's not the actual sale of a
20 software?
21 A.       Can you just -- what's the date of the
22 entry, and I'll --
23 Q.       It's 12/31/2003.
24 A.       Yes.  That would be the sale of

21

1  Q.      And who was that?
2  A.      My dad.
3  Q.      Other than that statement, was there
4  any discussion about how -- what impact the fact
5  that you weren't using the patent anymore would
6  have on the discussions that were occurring?
7  A.      No.
8  Q.      Did you have an understanding that one
9  of the reasons Mr. Crist was coming out was
10 because Mr. Robertson wanted to get paid some
11 money?
12 A.      Yes.
13 Q.      There wasn't anything ambiguous about
14 that, was there?
15 A.      No.
16 Q.      Is it your testimony that as of today,
17 or let's just say 2007, none of your revenues
18 arise from the patent?
19 A.      The attempts to settle, which were
20 prompted by John's visit, gave us the impetus to
21 go back and do a comprehensive review of the
22 technology around the agreement, because any
23 review, any validation of what's owed around the
24 patent purchase agreement is dependent upon, of

22

1  course, the patent itself.
2          So the process was one of first sharing
3  the agreement with Tom, who could understand the
4  patent purchase agreement as it related to the
5  technology.  Then, once we understood the
6  technology and the timeline around the patent
7  technology -- that was a prerequisite, then, to
8  going back and doing a line-item-by-line-item
9  review of the revenue received for the invoices.
10         MR. BLEDSOE:  I need to move to strike
11 the answer as nonresponsive.
12         Would you please read the question
13 back.  And listen to that, and answer that
14 question, Mr. Chretien.
15         (The Reporter read back as requested.)
16 A.      No.
17 Q.      I didn't ask it very well, because I'm
18 not sure I understand it.
19         As of 2007, is it your testimony today
20 that no revenues -- that none of your revenue is
21 from the patent?
22 A.      No.
23 Q.      I'm still asking it bad.
24         How much 2007 revenue is from the

23

1  patent?
2  A.      Oh.  Zero.
3  Q.      All right.  And when was it that you
4  formed the belief that it was zero?
5  A.      Well, the belief was formed at the
6  point in time we got the technical analysis from
7  Tom.
8  Q.      And when was that?
9  A.      Well, the technical analysis that
10 formed the foundation to understand whether any
11 revenue was due in 2007 or any other year was a
12 process that was not concluded until the
13 deposition process started.
14         MR. DEMENT:  I think the question --
15 Q.      I'm just looking for an estimate of
16 time.  If you can't remember it, you can't
17 remember it.
18         MR. DEMENT:  Just listen to his
19 question, and I'm -- I think -- Phil, correct me
20 if I'm wrong -- he's trying to figure out when you
21 got this technical review you're talking about
22 from Tom Moss.
23         THE WITNESS:  Oh.
24 Q.      Maybe I can help you.

24

1  A.      There's another -- isn't there a --
2  Q.      Take a look at Exhibit 37 in the book.
3  A.      Yeah.  2/21/07.
4  Q.      All right.  That's when Mr. Moss
5  provided this review, correct?
6  A.      Correct.
7  Q.      All right.  Now, at the time that
8  Mr. Moss provided this review on February 21st,
9  2007 -- at least that's the date of it, the date
10 that's on the document -- had he yet disclosed to
11 you that he was the catalyst for Mr. Crist's visit
12 on behalf of Mr. Robertson?
13 A.      No.
14 Q.      You didn't learn that until Mr. Crist's
15 deposition?
16 A.      Correct.
17 Q.      But it's your testimony that you heard
18 your dad say in a December meeting you weren't
19 using the patent anymore, correct?  I mean, that's
20 what you said, right?
21 A.      It was probably closer to a statement
22 such as, we're not sure if the technology is in
23 play today or even has been for some time.
24 Q.      All right.  Well, what did you think,

Matthew L. Chretien                                                September 11, 2007

**Page 25**

1  Mr. Chretien?  You've been involved in the
2  business for ten years.  Did you think you were
3  using the technology or not?
4  A.      We hadn't addressed the issue of the
5  patent since the agreement was signed, from an
6  operational perspective.  So it wasn't a topic,
7  from a technical perspective, that was even looked
8  at.  The reason it wasn't looked at --
9  Q.      -- was that you weren't making any
10 payments?
11 A.      The reason it wasn't looked at -- no --
12 was that we were, A, simply trying to keep the
13 doors open and respond to market needs, and, B,
14 generate profits such that we could meet not just
15 any obligations related to this discussion but
16 just obligations in general.  We were --
17 Q.      Would you agree with me that it's
18 easier to put it out of mind when you're not
19 making regular payments?
20         MR. DEMENT:  Object to the form, and
21 it's argumentative.
22 A.      I would tell you it's easier to put it
23 out of your mind when there's absolutely no
24 proactive or reactive external prompts to address

**Page 26**

1  it.
2  Q.      Does that mean you're blaming
3  Mr. Robertson for not being more aggressive in
4  collecting moneys that were owed to him?
5  A.      Not at all.  What I'm saying is the
6  squeaky wheel kind of gets the grease, and we were
7  simply trying to survive.
8  Q.      And Mr. Robertson wasn't being squeaky.
9  In fact, he was being the opposite.  He was being
10 patient, wasn't he?
11 A.      As we've acknowledged in our
12 communications, I agree.
13 Q.      Look at Exhibit 8.  Are you the author
14 of Exhibit 8?
15 A.      Yes.
16 Q.      Take a look at this middle statement in
17 here:  Payment schedule for hundred thousand
18 dollar loan not presented.  Do you see that?
19 A.      Yes.
20 Q.      And at this point in time, was it your
21 belief that there had been some previous payments
22 made on the note?
23 A.      Yes.
24 Q.      Is that your belief today, that

**Page 27**

1  previous payments were made on the note?
2  A.      Yes.
3  Q.      Is it your belief today that there have
4  ever been any payments made on the royalty
5  agreement?
6  A.      Yes.
7  Q.      There have been?
8  A.      Yes.
9  Q.      All right.  The total -- if you look at
10 the next page here -- or the same page, up top,
11 you're talking about Intellinetics making monthly
12 payments totaling a minimum of 5 percent of gross
13 revenue from business related to the patent.  And
14 this statement is being made by you to
15 Mr. Robertson and Mr. Crist at the end of January
16 2007, correct?
17 A.      Correct.
18 Q.      And then you reference three total
19 payment amounts, depending upon how quickly they
20 could be paid out, correct?
21 A.      Correct.
22 Q.      And just so we're clear here -- I'm
23 going to get a calculator out.  I've got one here.
24         Mr. Chretien, I want to make sure that

**Page 28**

1  we do this right.  I think I know the answer, but
2  I want to make sure we're clear on this.
3         You talk about making a payment of a
4  minimum of 5 percent of the gross revenue from
5  business related to the patent, correct?
6         MR. DEMENT:  I object.  Compromise and
7  settlement negotiations, which is a carryover from
8  the previous deposition.
9         MR. BLEDSOE:  Right.  Just so we're
10 clear, I don't think there's any basis for that.
11 We've both made our record at this deposition as
12 well.  I just don't think it's correct that this
13 is a compromise and settlement negotiation
14 document, but that's okay.  I'm offering it for a
15 different purpose anyway.
16 Q.      Just so we're clear, how much revenue
17 would you have to have that would be related to
18 the patent to get $750,000 payable to
19 Mr. Robertson?
20         MR. DEMENT:  Same objection concerning
21 compromise and settlement negotiations.
22 A.      Quite a bit.
23 Q.      Quite a bit?
24         If that figure represented 20 percent

Matthew L. Chretien                                                                September 11, 2007

**Page 29**

1  of revenue, that dollar figure, just so we're
2  clear, would follow from five times that amount if
3  it's 20 percent, right?
4  A.        Well, four, but -- right, five times
5  four is twenty?
6  Q.        That would be $3,750,000.
7  A.        Oh, you mean in terms of top-line
8  revenue?
9  Q.        Yeah, right.
10 A.        Oh, okay.
11 Q.        It's a fifth?
12 A.        Right.
13 Q.        It's 20 percent.
14 A.        I gotcha.
15 Q.        Right. Did you think -- and, of
16 course, if it was only five percent, it would be a
17 lot more than that. It would be 20 times,
18 wouldn't it?
19 A.        Yes.
20 Q.        That would be 14 million something?
21 Actually, north of 15 million.
22           At the time that you wrote this in
23 December -- or, excuse me, January of 2007, did
24 you think there was any likelihood that there was

**Page 30**

1  going to be over three and a half million dollars
2  of patent-related revenue?
3           MR. DEMENT: Same objection concerning
4  compromise and settlement negotiation.
5  A.        This -- the date of this document, of
6  course, predates our analysis of the patent itself
7  from Tom.
8  Q.        I want you to listen to my question,
9  Mr. Chretien.
10          MR. BLEDSOE: Would you read it back to
11 him?
12          (The Reporter read back as requested.)
13          MR. DEMENT: Same objection.
14          You can go ahead and answer it.
15 Q.        Either you did or you didn't,
16 Mr. Chretien.
17 A.        It's what it indicates.
18 Q.        Well, just so --
19 A.        In looking at it out of context --
20 Q.        And just so we're clear -- and just so
21 we're clear, whether it's a settlement negotiation
22 or a business negotiation, it's a communication to
23 Mr. Robertson that you authored, correct?
24 A.        That's correct.

**Page 31**

1  Q.        And again, whether it's a settlement
2  negotiation or business negotiation, you would
3  have never intended to offer anything that you
4  thought was false, would you?
5  A.        No.
6  Q.        And so whatever you were thinking as of
7  the end of January 2007, I anticipate you were
8  thinking there was going to be enough
9  patent-related revenue to get to these dollar
10 figures, correct?
11 A.        No. This was done as part of
12 settlements. There were a lot of iterations going
13 on.
14           And by the way, at the time this
15 communication was created, we were under a lot of
16 day-to-day stress. So part of this may simply be
17 a reflection of trying to be responsive in
18 Mr. Crist's efforts to find settlement and keep
19 the doors open.
20 Q.        Well, this doesn't have anything to do
21 with the loan. It says so itself by its own
22 terms, correct?
23 A.        That's correct.
24 Q.        Right. And whatever it says, I'm just

**Page 32**

1  trying to figure out whether or not you thought
2  there was any truth at all behind the statements
3  you're making today.
4           MR. DEMENT: Same objection.
5  Compromise and settlement negotiations.
6  A.        Is that a new question or --
7  Q.        Yeah.
8           MR. BLEDSOE: Read it back. Subject to
9  the objection already made.
10          (The Reporter read back as requested.)
11 A.        Yes.
12 Q.        Did you play any role in negotiating
13 the patent purchase agreement originally?
14 A.        No. In a sense of detailed terms and
15 conditions review.
16 Q.        Certainly you signed it?
17 A.        Correct.
18 Q.        And I take it before you signed it, you
19 read it?
20 A.        Correct.
21 Q.        And, likewise, you had the benefit of
22 counsel in reviewing it as well, correct?
23 A.        I don't recall reviewing it or getting
24 feedback from Steve in that process.

Matthew L. Chretien                                                September 11, 2007

**33**

1  Q.      All right.  And that's Mr. Smith?
2  A.      Correct.
3  Q.      I'm not asking for what he did or
4  didn't say, because I'm not entitled to know it.
5  But is it your testimony today you don't remember
6  whether or not he reviewed it at all?
7  A.      That's correct.  I do not recall his
8  involvement in that process.
9  Q.      All right.  You do recall an
10 understanding that you were guaranteeing the
11 payment obligations that are set out in that
12 agreement?
13 A.      I do.
14 Q.      Do you ever recall having any
15 discussions, with your dad or anybody else at
16 Intellinetics of Ohio, about obligations to
17 generate gross revenues, minimum gross revenues?
18 A.      Not since the suit was filed.
19 Q.      I'm asking before the suit was filed.
20 A.      No.
21 Q.      Before the suit was filed, when was the
22 last time you took a look at this document or a
23 copy of the patent purchase and royalty agreement?
24 A.      Probably at the time it was filed in

**34**

1  our filing cabinet.  Shortly after the agreement
2  was signed.
3  Q.      In October of 2000, the promissory note
4  was signed by Intellinetics, Inc., correct?
5  A.      Correct.
6  Q.      And that's Intellinetics of Ohio?
7  A.      Yes.
8  Q.      Now, I heard your father testify today
9  that Avatar is a wholly-owned subsidiary of
10 Intellinetics.  Is that your belief as well?
11 A.      Right.  It's a separate entity owned by
12 Intellinetics.
13 Q.      All right.  At some point, I take it
14 that Avatar was owned by yourself and your father
15 and perhaps some others?
16 A.      Correct.
17 Q.      And that stock was conveyed or
18 transmitted when Intellinetics opened?
19 A.      No.
20 Q.      How did the stock of Avatar get
21 transferred to Intellinetics?
22 A.      It was a corporate resolution or action
23 that's a matter of record, but I don't recall the
24 timing of that.

**35**

1  Q.      All right.  And let me make sure I'm
2  following you, because I may not be.
3          At one point you owned some stock of
4  Avatar?
5  A.      Correct.
6  Q.      You don't own any stock of Avatar
7  anymore; is that right?
8  A.      That's correct.
9  Q.      All of the stock ownership of Avatar is
10 now owned by Intellinetics of Ohio?
11 A.      That's correct.
12 Q.      Did you sell your stock to
13 Intellinetics?
14 A.      I do not recall the terms of that
15 transfer.
16 Q.      All right.  Did you pay anything for
17 the stock of Intellinetics that you have?
18 A.      Yes.
19 Q.      All right.  What did you pay for it?
20 A.      That's in the articles, but I don't
21 recall.
22 Q.      And is it your testimony you don't
23 recall whether you were paid anything for your
24 Avatar shares when they were transferred, however

**36**

1  that was accomplished, to Intellinetics?
2  A.      That's correct.  I don't remember the
3  terms of that transaction.
4  Q.      All right.  But it ought to be
5  reflected in the corporate records of
6  Intellinetics and Avatar?
7  A.      Correct.
8  Q.      Exhibit 41 was marked this morning.  If
9  you would find that.  Hopefully they're in order.
10 A.      Okay.  Yes.  Got it.
11 Q.      Exhibit 41 is a page out of your
12 website that discusses the products.  Actually, it
13 identifies the products.  Do you see that?
14 A.      I do.
15 Q.      And then if you would, behind this on
16 the web page, if you went down and clicked on
17 Intellivue, you'd get more of a definition -- more
18 explanation about Intellivue.  And this page that
19 we saw today, Exhibit 41, makes a statement that
20 Intellinetics software uses our patented
21 innovative mass storage algorithm.
22          You recall hearing about that this
23 morning, correct?
24 A.      Correct.

Matthew L. Chretien                                         September 11, 2007

**Page 37**

1  Q.      Does your software use a patented
2  innovative mass storage algorithm?
3  A.      No.
4  Q.      So that's a mistake also?
5  A.      That's correct.
6  Q.      Now, who was this outsourced to? Who
7  was the software company outsourced to?
8  A.      They're called Minds On. It's two
9  words.
10 Q.      M-I-N-D-S?
11 A.      Yes.
12 Q.      On?
13 A.      Uh-huh.
14 Q.      And was it done in 2006?
15 A.      I think it began earlier, but...
16 Q.      Who did you work with at Minds On?
17 A.      I worked with Randy James, Doug Stitt,
18 S-T-I-T-T, and Tom Augustine.
19 Q.      Did you provide them -- you or anyone
20 else at Intellinetics provide any of those three
21 gentlemen information so they could develop the
22 text for your web page?
23 A.      Yes.
24 Q.      Who was the person from Intellinetics

**Page 38**

1  that interfaced with Minds On?
2  A.      Heather Randles.
3  Q.      What about yourself?
4  A.      I was involved up -- you know, up
5  front, kind of in our discussions, but the project
6  management and execution was handled by Heather.
7  And certainly if she needed something, you know, I
8  would assist.
9  Q.      What's Miss Randles' job description?
10 A.      She's no longer with the company.
11 Q.      Well, what was it?
12 A.      It was sales and marketing support.
13 Q.      Do you have written sales and marketing
14 information?
15 A.      Yes.
16 Q.      Written stuff that you leave behind and
17 that kind of stuff?
18 A.      Uh-huh.
19 Q.      When were they last printed?
20 A.      Oh, some of them probably go back a
21 couple of years, probably 18 months. Some of
22 them -- if they run out -- most of them are
23 electronic, so we'll just try and print on demand
24 versus having --

**Page 39**

1  Q.      Who prepared those -- the electronic
2  versions of those?
3  A.      Well, Heather.
4  Q.      Was that separate and apart from the
5  website?
6  A.      The website project included creating
7  templates on the visual side, and those templates
8  could then be filled with information. So they
9  kind of, you know...
10 Q.      But whoever -- I mean, the folks at
11 Minds On wouldn't have made up patented innovative
12 mass storage algorithm on their own, would they?
13 A.      That's correct.
14 Q.      They got it from you all?
15 A.      They got it from someone at
16 Intellinetics, yes.
17 Q.      And as we see by the print date on
18 Exhibit 41, that's what it says as of Friday of
19 last week, correct?
20 A.      Correct. That's what the print date
21 says.
22 Q.      Did you go back and look over the lunch
23 hour?
24 A.      I didn't, no.

**Page 40**

1          MR. DEMENT: Phil, if you're going to
2  change subject matters, I'm going to go to the
3  restroom.
4          MR. BLEDSOE: Yeah, that would be fine.
5          (A short recess is taken.)
6  BY MR. BLEDSOE:
7  Q.      Would you pull Exhibit 51 out of the
8  stack?
9  A.      Yes. Got it.
10 Q.      It's a memo from you to Duane
11 Robertson, correct?
12 A.      Correct.
13 Q.      The subject of which is short-term
14 funding request?
15 A.      Yes.
16 Q.      Of October 12th, 2000?
17 A.      Yes.
18 Q.      Requesting a $300,000 immediate
19 short-term loan until June 1st, 2001, at an
20 interest rate of 8 1/2 percent.
21          Ultimately, Mr. Robertson agreed to
22 provide a third of that amount, correct?
23 A.      Yes.
24 Q.      Were you able to secure an additional

10 (Pages 37 to 40)

Spectrum Reporting LLC                                      614-444-1000