Agren Blando Court Reporting & Video Inc.

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07-cv-00729-RPM

DEPOSITION OF DUANE D. ROBERTSON   August 15, 2007

DUANE ROBERTSON,
Plaintiff,

vs.

THE AVATAR GROUP, INC., an Ohio corporation;
INTELLINETICS, INC., an Ohio corporation;
A. MICHAEL CHRETIEN, individually; and
MATTHEW L. CHRETIEN,

Defendants.

APPEARANCES:

SHUGHART THOMSON & KILROY, P.C.
  By Philip W. Bledsoe, Esq.
    1050 17th Street, Suite 2300
    Denver, Colorado 80265
    Appearing on behalf of Plaintiff.

LAW OFFICES OF RANDOLPH S. DEMENT
  By Randolph S. Dement, Esq.
    7720 East Belleview Avenue, Suite 350
    Greenwood village, Colorado 80111
    Appearing on behalf of Defendants.

Also Present: Mike Chretien
              John Crist

**Page 2**

1    Pursuant to Notice and the Federal Rules
2  of Civil Procedure, the deposition of DUANE D.
3  ROBERTSON, called by Defendants, was taken on
4  Wednesday, August 15, 2007, commencing at 9:10 a.m.,
5  at 7720 East Belleview Avenue, Suite 350, Greenwood
6  Village, Colorado, before Marlene F. Smith,
7  Registered Professional Reporter and Notary Public
8  within and for the State of Colorado.
9
10
11             I N D E X
12
13  DEPOSITION OF DUANE D. ROBERTSON
14  EXAMINATION BY:                  PAGE
15    Mr. Bledsoe              --
16    Mr. Dement               4
17
18
19

EXHIBITS                 INITIAL REFERENCE

14  Verified Complaint          32

15  Notice of Dismissal with    36
    Prejudice
16  United States Patent,        37
    Patent No. 5,408,630

17  Letter, 8-31-94, to T. Stelter   41
    from F. Progar

**Page 3**

1          I N D E X (Continued)
2  EXHIBITS                INITIAL REFERENCE
3  18  Fax, 8-31-94, with brochure      45
4  19  Memo, 3-14-95 to Laurie          47
      from L. Dallas
5
   20  Fax, to L. Dallas, from Laurie    51
6      with attachments
7  21  Intellinetics Value-Added        52
      Partner Agreement
8
   22  Intellinetics Software           53
9      License Agreement
10 23  Biennial Report, 1995            55
11 24  Letter, 4-16-96, To D.           56
      Robertson from Avatar Group
12
   25  12-19-96, To Whom It May         62
13     Concern from D. Robertson
14 26  Unanimous Consent of
      Shareholders of III G.I. LTD.     65
15
   27  Colorado UCC-1 form              71
16
   28  Patent Purchase and Royalty      72
17     Agreement
18 29  Security Agreement               81
19 30  Letter, 4-23-99, to D. Robertson  85
      from A. Pidcock
20
   31  Promissory Note, 10-25-00        89
21
   32  Complaint and Jury Demand        94
22
   33  Plaintiff's Response in Opposition  97
23     to Defendants' Motion to Transfer
      Venue
24
25

**Page 4**

1              P R O C E E D I N G S
2              DUANE D. ROBERTSON,
3   being first duly sworn in the above cause, was
4   examined and testified as follows:
5              EXAMINATION
6   BY MR. DEMENT:
7      Q    Please state your full name.
8      A    Duane D. Robertson.
9      Q    What's your date of birth?
10     A    10-29-35.
11     Q    Mr. Robertson, is there any reason you
12  can't give a deposition today?
13     A    No.
14     Q    During the deposition, if you need to
15  take a break, let me know and before you do, just
16  answer any pending question.
17     A    Okay.
18     Q    If you don't understand a question that I
19  ask, just let me know.  If you don't, I'll assume
20  you understood the question.
21     A    Okay.
22     Q    And then we can't talk over each other --
23     A    Right.
24     Q    -- because the court reporter gets
25  confused about who's speaking and what.  So let me

Agren Blando Court Reporting & Video Inc.

17

1  received from him. I don't know exactly what all
2  that was.
3    Q   End result was you received documentation
4  from John Crist concerning the amounts due to you
5  from the Chretiens.
6    A   Right.
7    Q   Do you know if that documentation, all of
8  it, has been produced to me and my clients in this
9  case?
10    A   I think so.
11    Q   How much money do you believe is owed on
12  the promissory note that is a subject of this
13  lawsuit?
14    A   Well, when I figured it up -- but I
15  compounded it -- and it was over $200,000.
16    Q   Have you figured it up with simple
17  interest?
18    A   No, I didn't. But it -- I mean, it
19  was -- that was the amount -- whenever you compound
20  it, you -- this amount is owed and then this amount
21  is owed on this.
22    Q   How much do you believe is owed on the
23  patent purchase agreement that is a subject of this
24  case?
25    A   Well, we figured it up yesterday to be

18

1  about a million 200,000.
2    Q   And on what documents do you base that
3  belief?
4    A   From the information that Mike gave John.
5    Q   And that John, in turn, gave to you?
6    A   Well, yeah. And that was just the
7  information that Mike gave John, not the information
8  that we figured it should have been because we
9  figured it should have been about a million eight.
10    Q   Have you personally done any calculations
11  of amounts due from the Chretiens to you on the
12  patent purchase agreement?
13    A   Not other than what we worked out
14  together, no. Not separately I didn't have.
15    Q   So you essentially gave Mr. Crist the
16  duty of figuring how much was owed?
17    A   Yes, I did. Because that's his business.
18    Q   Excuse me?
19    A   That's what he does. So I gave him the
20  responsibility of figuring it out, yeah.
21    Q   All right. Has the debt represented by
22  the promissory note in this case been sold or
23  transferred or assigned by you to any person or
24  company?
25    A   No.

19

1    Q   Has the debt represented by the patent
2  purchase agreement been sold, transferred or
3  assigned by you to any person or entity?
4    A   No.
5    Q   Is it true that Mr. John Crist is
6  providing services to you in this case as your agent
7  and consultant?
8    A   Yes.
9    Q   How are you compensating Mr. Crist for
10  those services?
11    A   We haven't reached any agreement on that.
12    Q   Nothing in writing or handshake deal?
13    A   No. No verbal. No writing. No nothing.
14    Q   Do you have plans to compensate Mr. Crist
15  in the future for his services as your agent and
16  consultant in this case?
17    A   I do. Depending on how the outcome is on
18  this.
19    Q   So you intend on compensating him based
20  on how much you collect on this case?
21    A   Yes. Um-hmm.
22    Q   Are you talking about a percentage of
23  what you collect?
24        MR. BLEDSOE: I'll object. Calls for him
25  to speculate what he might do in the future. You

20

1  can answer.
2    A   We, as I say, we haven't come to any
3  agreement any way, shape or form. So we don't know.
4    Q   (By Mr. Dement) So in the future,
5  whether you compensate Mr. Crist on a percentage
6  basis or an hourly basis or some other basis is
7  going to depend on how much is collected from the
8  Chretiens and Intellinetics?
9    A   I would say yes.
10    Q   And that's something you formulated in
11  your mind but haven't put in writing yet?
12    A   That's true.
13    Q   Okay. Why did you ask John Crist to go
14  to Columbus, Ohio, to conduct an audit of the
15  Intellinetics books and records for you?
16    A   Because we had to know where we stood and
17  what we needed to do, I guess.
18    Q   That audit, if you recall, occurred in
19  December of 2006; is that right?
20    A   I think that's true, yeah.
21    Q   What prompted you to send Mr. Crist to
22  Columbus, Ohio, to conduct that audit?
23    A   Because they hadn't been receiving any
24  income and Avatar owed me a lot of money. So I
25  thought it was about time we did something because

Agren Blando Court Reporting & Video Inc.

37

1  been applied for and was pending concerning this
2  document imaging technology?
3      A    Yes.
4      Q    Ultimately the patent was issued, right?
5      A    Right.
6          (Exhibit 16 was marked.)
7      Q    (By Mr. Dement)  Deposition Exhibit 15 --
8  I'm sorry, Deposition Exhibit 16, is that a true and
9  correct copy of the patent that was ultimately
10 issued to III G.I. Limited?
11     A    Right.  If you can understand it, that's
12 it.
13     Q    Sir?
14     A    If you can understand what it says.
15     Q    Is this a true and correct copy of --
16     A    Yes.
17     Q    -- the patent?
18     A    Yes.
19     Q    Can you explain the patent technology to
20 me?
21     A    The only thing I know about it is you can
22 take a number of CD ROMs and line them up and it can
23 read all of them at the same time.  You don't have
24 to do like a jukebox where you take one and put it
25 in there and read it, you put it back and put

38

1  another one in and read it.  It can read all of them
2  at the same time.  It's basically what the patent is
3  about.
4      Q    Do you have any other explanation for
5  what the patent is about?
6      A    No.
7      Q    What is a CD ROM?
8      A    Read only disk -- ROM.  Read only memory.
9  It -- ROM is read only memory is -- and it -- a disk
10 is self-explanatory.  A disk.
11     Q    What was the purpose of obtaining this
12 particular patent, if you recall?
13     A    Well, at the time we thought that it
14 could make us millions of dollars.  And nobody else
15 could, of course, duplicate it or copy it.
16     Q    To your knowledge, could the system, this
17 document imaging system, be sold without being
18 patented?
19     A    Well, it would be hard and it wouldn't be
20 very valuable without a patent on it.
21     Q    Why would it be hard to sell because the
22 patent's a good marketing tool?
23     A    Well, it's just like anything else.
24 Unless it's either patented or trademarked or
25 whatever, then it doesn't have any big value to

39

1  anybody because they can go ahead and do it
2  without -- without buying the patent.
3      Q    You'll notice on the first page of this
4  Exhibit 16 there's a reference to 10 claims.  Do you
5  see that?
6      A    Um-hum.
7      Q    What is a claim in reference to a patent?
8          MR. BLEDSOE:  Objection.  Foundation.
9  You can answer.
10     Q    (By Mr. Dement)  What is a claim in
11 reference to a patent?
12     A    Well, a claim is -- I claim that this is
13 -- I'm the only one that has this technology
14 basically.
15     Q    You personally have 10 patents, right?
16     A    Right.
17     Q    In connection with obtaining those 10
18 patents through the years, you've had experience in
19 dealing with a patent application; is that right?
20     A    Yes.  Oh, yes.
21     Q    As part of that experience, you gained an
22 understanding of what a patent claim is?
23     A    To an extent, yeah.  In other words, what
24 I claim is that this is the only one in existence or
25 to do this particular thing.

40

1      Q    All right.  Do you know -- let's say back
2  at the date of this patent, 1993 through 1995, was
3  this the only system in existence that used this
4  technology?
5      A    Yes.  It was the only one in existence.
6      Q    How do you know that?
7      A    Because the patenting office won't give
8  you a patent unless you're the only one.  And if
9  someone else has done it, then you can't get a
10 patent on it.
11     Q    Do you know how the technology was put
12 together in order to create the patented technology?
13     A    No.  Tom Moss would be the only one to
14 tell you that.
15     Q    Once you and Frank Progar took over
16 control of III G.I., did the company then go out in
17 the marketplace to market and try to sell its
18 product?
19     A    Oh, yeah.  Mike knows about that.
20     Q    Prior to any involvement with Mike or
21 Matt Chretien, did III G.I. go out to market?
22     A    We had -- I don't know what it was, maybe
23 20, 25 companies that were doing the same thing that
24 Mike does.
25     Q    Resellers?

Agren Blando Court Reporting & Video Inc.

53

1    Q    (By Mr. Dement)  Deposition Exhibit 21 is
2    titled, Intellinetics Value-Added Partner Agreement
3    between Intellinetics, a division of III G.I.
4    Limited, and the Avatar Group, correct?
5    A    Yup.
6    Q    And --
7    A    Yes.
8    Q    And you recognize Frank Progar's
9    signature on this document --
10   A    Yes.
11   Q    -- April 3, 1995?
12   A    Right.
13   Q    Does that refresh your recollection about
14   the time that Avatar Group became a reseller for III
15   G.I.?
16   A    Yes.
17   Q    Have you seen this document before today?
18   A    I don't think so.  If I did, I don't
19   remember it.
20   Q    Did you have a hand or were you involved
21   at all in the preparation of this particular
22   agreement?
23   A    No.
24   Q    Do you know who would have been?
25   A    Frank.

54

1        (Exhibit 22 was marked.)
2    Q    (By Mr. Dement)  Deposition Exhibit 22 is
3    titled, Intellinetics Software License Agreement.
4    And this is another agreement between III G.I.
5    Limited and the Avatar Group; is that correct?
6    A    Correct.
7    Q    Again, dated April 3, 1995?
8    A    Um-hum.  Yes.
9    Q    And do you recognize Frank Progar's
10   signature?
11   A    Yes.
12   Q    Have you seen this document before today?
13   A    Not that I know of.
14   Q    Do you know who would have prepared this
15   document?
16   A    I'm sure Frank Progar.
17   Q    Okay.  When was III G.I. dissolved?
18   A    '96.
19   Q    Who dissolved the company?
20   A    I did.
21   Q    And why did you dissolve it?
22   A    Because I was losing about 10,000 a
23   month.  Maybe even more.
24   Q    Prior to the dissolution of III G.I.,
25   were you the chief executive officer for the

55

1    company?
2    A    Yes.
3    Q    And was Frank Progar the president of the
4    company?
5    A    I think he was president of Intellinetics
6    and III G.I. was the owner of Intellinetics is -- to
7    the best of my knowledge, but I can't say for sure.
8    Q    When --
9    A    But what does that say?  Does that say --
10   what is he president of?  He says he's president.
11   Q    We'll get to that in a minute.  Do you
12   recall when Mr. Progar no longer was affiliated with
13   III G.I.?
14   A    Up until the day I shut it down.
15   Q    So up until sometime in '96 when you shut
16   it down?
17   A    Um-hum.  Yes.
18   Q    All right.
19       (Exhibit 23 was marked.)
20   Q    (By Mr. Dement)  Mr. Robertson,
21   Deposition Exhibit 23 is a biennial report filed
22   with the Colorado Secretary of State on June 13,
23   1995, by III G.I. Limited, correct?
24   A    Um-hum.  Yes.
25   Q    And this document shows you as CEO and

56

1    Frank Progar as president, right?
2    A    Right.
3    Q    So was Mr. Progar the president of III
4    G.I.?
5    A    Yes.
6    Q    And he remained so up until the time it
7    was dissolved?
8    A    Yes.
9    Q    And you remained as CEO up until the time
10   III G.I. was resolved --
11   A    Yes.
12   Q    -- dissolved?
13   A    Yes.
14       (Exhibit 24 was marked.)
15   Q    (By Mr. Dement)  Deposition Exhibit 24,
16   Mr. Robertson, is a letter from the Avatar Group
17   dated April 16, 1996, to you, correct?
18   A    Yes.
19   Q    And you've seen this letter before today?
20   A    Yes, I have.
21   Q    And you recall receiving this letter on
22   or about April 16, 1996?
23   A    Yes.
24   Q    Okay.  Signed by -- by Mike Chretien,
25   right?

Agren Blando Court Reporting & Video Inc.

65

1  Smith?
2      A    Yes.  I had him doing the legal work on
3  it, yes.
4      Q    All right.
5          (Exhibit 26 was marked.)
6      Q    (By Mr. Dement)  Mr. Robertson,
7  Deposition Exhibit 26 is a document I received from
8  your attorneys in this case, Bates numbers ROB 567
9  through 569, right?
10     A    Yes.
11     Q    And this is titled, Unanimous Consent of
12 Shareholders of III G.I. Limited, correct?
13     A    Yes.
14     Q    And the last page of this document says
15 that it's dated effective as of June 27, 1996,
16 right?
17     A    Yes.
18     Q    Do you recall this --
19     A    Yeah.  I remember all these names on
20 there.
21     Q    The top page of this document, all three
22 pages, show that it was sent by Cohen Brame & Smith
23 on November 20, 1996.  Do you see that?
24     A    Yes.
25     Q    Do you know if this was sent to you or

66

1  someone else?
2      A    I had this or have it in my paperwork
3  because of all the stockholders on here.
4      Q    Is this a document that you gave to your
5  attorneys in connection with this case?
6      A    Yes.
7      Q    Okay.
8      A    I'm sure it is.
9      Q    Okay.  The fax recipient number is
10 278-4580?
11     A    Um-hum.  Yes.
12     Q    Was that your facsimile number in 1996?
13     A    Yes.
14     Q    So this is something that was faxed to
15 you by Cohen Brame & Smith?
16     A    Yes.
17     Q    And this document, particular copy, is
18 not signed, but do you recall it ultimately being
19 signed by shareholders in III G.I. Limited?
20     A    What year is this?  '95?
21     Q    '96.
22     A    '96.  Yes.  I'm sure it was all -- all
23 signed.
24     Q    And was one purpose of this unanimous
25 consent in order to effect the sale of the patent

67

1  from III G.I. Limited to you?
2      A    Yes.
3      Q    All right.  Do you know what attorney at
4  Cohen Brame & Smith prepared this particular
5  document?
6      A    I'm pretty sure it would have been
7  Pidcock.  Andy.
8      Q    Andrew Pidcock?
9      A    Andrew Pidcock.
10     Q    Okay.  Through the course of
11 Mr. Pidcock's representation of III G.I., did he
12 ever provide any personal representation to you?
13     A    No.
14     Q    After III G.I. was dissolved, did
15 Mr. Pidcock ever provide any personal representation
16 to you?
17     A    No.
18     Q    Do you recall at some point in time
19 Mr. Pidcock moved from the firm of Cohen Brame &
20 Smith to a law firm known as Ballard, Spahr and
21 Ingersoll?
22     A    Yes.
23     Q    Did Mr. Pidcock ever provide any personal
24 representation to you when he was with Ballard Spahr
25 Andrews and Ingersoll?

68

1      A    That I don't recall.  I don't think so
2  because it was primarily Mike Cohen -- or Lindsey.
3      Q    This Deposition Exhibit 26, does it
4  accurately reflect resolutions made by the
5  shareholders of III G.I. Limited?
6      A    I would say yes to that.
7      Q    All right.  If you could go down to the
8  bottom of the first page, the next to last whereas
9  says, IBM, Kodak and Filenet performed extensive
10 evaluations of the patent -- and that's the patent
11 that's the subject of this case, right?
12     A    Um-hum.  Yes.
13     Q    -- each company individually refused to
14 offer any financial consideration to the corporation
15 in return for the right to use the patent.  Do you
16 see that?
17     A    Yes.
18     Q    Why were those three corporations
19 refusing to offer financial consideration to III
20 G.I. in return for the right to use the patent?
21         MR. BLEDSOE: Objection.  Calls for
22 speculation.  You can answer to the extent you know.
23     A    I can't tell you.
24     Q    (By Mr. Dement)  This same whereas I'm
25 speaking about, the last clause says, The

Agren Blando Court Reporting & Video Inc.

69

1 corporation has been unable to find a buyer for the
2 patent. Do you see that?
3     A    Yes.
4     Q    Why was it unable to find a buyer for the
5 patent?
6     A    That I don't know.
7     Q    Who on behalf of III G.I. Limited was
8 asking IBM, Kodak and Filenet to purchase the
9 patent?
10    A    I'm sure it was Frank Progar.
11    Q    Okay. Why are you sure of that?
12    A    Because he did all of the administrative,
13 I guess, work on -- with the company.
14    Q    Did Mr. Progar ever tell you how much he
15 was offering to sell the patent to IBM for?
16    A    No.
17        MR. BLEDSOE: Objection. Question
18 assumes facts not in evidence.
19    Q    (By Mr. Dement) Did Mr. Progar ever tell
20 you how much he was offering to sell the patent to
21 Kodak for?
22    A    No.
23    Q    Did Mr. Progar tell you how much he was
24 offering to sell the patent to Filenet for?
25    A    No.

70

1     Q    At any time before Avatar purchased the
2 patent from you, did you ever tell the Chretiens
3 that III G.I. was unable to find a buyer for the
4 patent?
5     A    To the best of my knowledge, no.
6     Q    Okay. The next whereas on Page 1 says,
7 Whereas, because of the lack of interest for the
8 patent by anyone else. Do you see that?
9     A    Yes.
10    Q    Before Avatar purchased the patent from
11 you, did you ever tell the Chretiens that there was
12 a lack of interest for the patent?
13    A    No.
14    Q    This same whereas I'm in says that the
15 corporation, that would be III G.I., sold the patent
16 on June 27, 1996, to you, in exchange for $20,000.
17 Do you see that?
18    A    Yes, I see it.
19    Q    And did you pay the corporation by cash
20 or check?
21    A    Check.
22    Q    Before Avatar purchased the patent rights
23 from you, did you tell the Chretiens that you had
24 paid $20,000 for the patent?
25    A    I don't think so.

71

1     Q    Okay. Between the date that you
2 purchased the patent, which is June 27, 1996, and
3 the date of the patent purchase agreement with
4 Avatar, which is in December 1996, what value did
5 you add to the patent?
6     A    None.
7        (Exhibit 27 was marked.)
8     Q    (By Mr. Dement) Mr. Robertson,
9 Deposition Exhibit 27 is a UCC statement filed with
10 the Colorado Secretary of State on November 27,
11 1996, regarding III G.I. Limited as debtor and Duane
12 Robertson as secured party, correct?
13    A    Correct.
14    Q    Okay. Do you recall signing this
15 document on or about November 27, 1996?
16    A    Certainly looks like my signature, yes.
17    Q    The document on the second page has an
18 Exhibit A, which is a description of collateral,
19 right?
20    A    Right.
21    Q    And do you consider that description of
22 collateral to include the patent rights that you
23 sold to Avatar?
24    A    Yes.
25    Q    All right. Now, back to the first page,

72

1 it shows the debtor is III G.I. Limited and you the
2 secured party, right?
3     A    Yes.
4     Q    Could you tell me how III G.I. could
5 grant a security interest to you in the patent
6 rights if III G.I. did not own the patent rights?
7        MR. BLEDSOE: I'm going to object to the
8 extent it assumes facts not in evidence and asks him
9 to form a legal conclusion. You can answer the
10 question.
11    A    I don't know the answer. I can't answer
12 it.
13        (Exhibit 28 was marked.)
14    Q    (By Mr. Dement) Deposition Exhibit 28 is
15 a copy of the patent purchase and royalty agreement
16 that's the subject of this case, right?
17    A    Right.
18    Q    Dated December 19, 1996, signed by you
19 individually and by the Avatar Group and both
20 Chretiens --
21    A    Right.
22    Q    -- right?
23    A    Right.
24    Q    Who drafted this agreement for you?
25    A    Andy Pidcock.

Court Reporting   Videography   Digital Reporting   Transcription   Copying   Scanning
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

Agren Blando Court Reporting & Video Inc.

81

1    Q    Paragraph 7, the same page, Paragraph 7,
2    first sentence, you're selling the patent rights as
3    is without making any representations or warrantees
4    with regard to the patent rights.  Do you see that?
5    A    I see that.
6    Q    Okay.  Why did you not make any
7    representations or warrantees with respect to the
8    patent rights?
9    A    Because they were buying it as is.  It
10   wasn't my responsibility to do any upgrades on it.
11   Q    Were you not confident in the viability
12   of the patent rights?
13   A    No, I think I was confident in what they
14   were written up -- in the way it was written up.
15        (Exhibit 29 was marked.)
16   A    So we done with the royalty agreement
17   then?
18   Q    (By Mr. Dement)  Well, for the time
19   being.  You never know what the future holds.
20   A    Okay.
21        MR. BLEDSOE:  29 is the security
22   agreement?
23   Q    (By Mr. Dement)  Deposition Exhibit 29 is
24   a copy of the security agreement between Avatar
25   Group and Duane Robertson dated December 19, 1998,

82

1    correct?
2    A    Correct.
3    Q    And the security agreement is also a
4    subject of this lawsuit, right?
5    A    Right.
6    Q    Okay.  Was this security agreement also
7    drafted by Andrew Pidcock?
8    A    To the best of my knowledge, yes.
9    Q    The security agreement on Page 2, Section
10   C, Paragraph 2, also gives you the option and the
11   right to repossess the collateral, right?
12   A    Right.
13   Q    On default by Avatar, why did you not
14   ever repossess the collateral?
15   A    I already told you that they kept making
16   the -- the idea that they were going to be making --
17   this is going to be our year.  We're going to make
18   you lots of money this year.
19        MR. DEMENT:  I think we can break for
20   lunch now.
21        (A lunch break was taken.)
22   Q    (By Mr. Dement)  Mr. Robertson, let's
23   move forward in time after the December 1996 patent
24   purchase agreement.
25   A    Okay.

83

1    Q    Do you recall anytime after that
2    agreement was made, the Chretiens telling you about
3    a proposed joint venture they had with Lucent
4    Technologies?
5    A    Yes.
6    Q    What do you recall them telling you about
7    that?
8    A    It was going to be wonderful and was just
9    going to make all kinds of money.  That's the
10   primary thing I remember about it.
11   Q    What do you know, if anything, came about
12   that proposed joint venture?
13   A    It never happened.
14   Q    When you talked to the Chretiens about
15   that proposed joint venture with Lucent, did they
16   tell you anything about the technology they were
17   proposing to use with Lucent technology?
18   A    IntelliVUE, as far as I know.  They
19   didn't say it wasn't going to be IntelliVUE.
20   Q    After your discussion with the Chretiens
21   about this proposed Lucent joint venture, do you
22   recall at all speaking with them about a proposed
23   sale to the Columbus, Ohio, Division of Police?
24   A    They have a system in Columbus and they
25   took me down and showed it to me.

84

1    Q    Who took you there?
2    A    Mike, I believe.  And Woody Harrelson was
3    one of the -- the -- his picture for bringing it up
4    on the system that's in there.
5    Q    So you went with the Chretiens to the
6    Columbus Division of Police?
7    A    Yes.  With Mike at least.  I can't
8    remember if Mike -- it was Mike.
9    Q    And viewed the system in place there?
10   A    Yes.
11   Q    And you saw them bring up a mug shot on
12   that system?
13   A    Um-hum.  Yes.
14   Q    What else do you recall observing about
15   that system in place at the Columbus Division of
16   Police?
17   A    Nothing else that I can recall.
18   Q    With respect to seeing the mug shot
19   technology, what did you observe?
20   A    Well, the only thing that they said was
21   that they didn't have to have any paperwork because
22   it all went into the computer.  And they could pull
23   everything off the computer, including pictures and
24   of course names and numbers.
25   Q    Could pull off a mug shot?

Agren Blando Court Reporting & Video Inc.

85

1    A    Yes.  Um-hum.
2    Q    Do you recall when that was, your visit
3  to Columbus Division of Police?
4    A    I believe it was that second time I went
5  out there, the time that Matt give me the check.
6    Q    Would that -- in the -- in the late part
7  of 1998?
8    A    I think that's accurate, yes.
9    Q    Possibly the early part of 1999?
10    A    You know, whenever I was out there and I
11  can't remember when I was out there.  So I can't
12  tell you.
13    Q    And I think you testified at that
14  particular visit to Columbus, Ohio, that's when you
15  received a check from Matt Chretien?
16    A    Yes.
17    Q    After that visit, the second visit to
18  Columbus, Ohio, when you went to the Division of
19  Police, did you have any discussions with Mike
20  Chretien or Matt Chretien about possibly capping the
21  debt owed under the patent purchase agreement?
22    A    No, we didn't discuss that that I know
23  of.
24    Q    Okay.
25        (Exhibit 30 was marked.)

86

1    Q    (By Mr. Dement)  Mr. Robertson,
2  Deposition Exhibit 30 is a letter dated April 30,
3  1999, from Andy Pidcock to you, correct?
4    A    Yes.  That's what it appears.
5    Q    Excuse me?
6    A    That's what it says.
7    Q    And you recall receiving this letter from
8  Mr. Pidcock on or about April 23, 1999?
9    A    I don't remember receiving this, but it's
10  certainly made out to me and has his signature on
11  it.  So apparently I got it.
12    Q    And you see the Bates number in the lower
13  right-hand corner, ROB 194?
14    A    Yes.
15    Q    That signifies that I received it from
16  your attorneys in this case.
17    A    Okay.
18    Q    And at some point in time, before or
19  after this lawsuit was filed, you did provide some
20  documents to your attorneys in this case, right?
21    A    Apparently, yes.
22    Q    Okay.  This letter in the first sentence
23  says, There are some additional sentences to add to
24  your letter to Mike Chretien.  Do you see that?
25    A    Yes.

87

1    Q    Do you recall sending a letter to Mike
2  Chretien at -- on April 23, 1999, or anytime
3  thereafter?
4    A    I remember having some correspondence
5  with him, but I sure don't remember what the dates
6  were.
7    Q    You don't know right now whether you did
8  send a letter to Mike Chretien concerning capping an
9  amount due under the patent purchase agreement?
10    A    I don't recall that, no.
11    Q    If you had sent such a letter, would you
12  have provided it to your attorneys in this case?
13    A    I'm sure I would have, yeah.  But I don't
14  recall what I did in '99.
15    Q    This letter from Mr. Pidcock to you, was
16  he representing you in a -- in a personal capacity
17  at this point in time?
18    A    Yes.  I'm sure he was.
19    Q    And the indented paragraph in this
20  letter, Mr. Pidcock is giving you language to put in
21  a letter to Mr. Chretien, correct?
22    A    That's what this says, yes.
23    Q    All right.  In this indented paragraph,
24  it states, My agreement to this cap amount is in no
25  way a waiver of my rights under the purchase

88

1  agreement of which, as you know, Avatar is currently
2  in default.  Do you see that?
3    A    Um-hum.  Yes.
4    Q    Did you make an agreement as to a cap
5  amount?
6    A    I don't remember making any agreement
7  like that.
8    Q    All right.  Is it true that Avatar was
9  currently in default under the patent purchase
10  agreement as of April 23, 1999?
11    A    I -- they -- well, I don't remember -- I
12  don't recall how long the agreement was for, but if
13  it's after the agreement, then they were in default,
14  yeah.
15    Q    And would that default also include Mike
16  Chretien and Matt Chretien?
17    A    Yes.
18    Q    And also would it include Intellinetics,
19  Inc.?
20    A    Yes.
21    Q    So there was a total default by all of
22  the defendants in this case as of April 23, 1999?
23    A    Yes.
24    Q    All right.  Mr. Robertson, you recall
25  sometime in the year 2000 lending a hundred thousand

Court Reporting   Videography   Digital Reporting   Transcription   Copying   Scanning
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

93

1    was owed and all that stuff.
2       Q    Did he audit the books?
3       A    Yes. Um-hum.
4       Q    And the books of what company?
5       A    Both Vale View and Portico.
6       Q    Okay. And do you recall sending
7    Mr. Crist out to Columbus, Ohio, in December of 2006
8    as your agent to audit the books and records of
9    Intellinetics?
10      A    Yes, I do remember that.
11      Q    Okay. And as a result of that audit and
12   subsequent negotiations, did you, in fact, place
13   Mr. Crist kind of in the position of point man to
14   try to get the debt from the Chretiens to you
15   resolved?
16      A    Yes.
17      Q    Earlier today, Mr. Robertson, you
18   testified that you had a final meeting with Tom
19   Moss?
20      A    Um-hum. Yes.
21      Q    Prior to that lawsuit being filed?
22      A    Yes. Um-hum.
23      Q    And I correct me if I'm wrong, that
24   meeting was at the Red Rooster in Mead?
25      A    Yes. Right.

94

1       Q    Is it your recollection that that meeting
2    was -- was on February 20, 2007?
3       A    Close enough, I think.
4       Q    Okay. And you already testified about
5    what you can recall being discussed at that meeting,
6    right?
7       A    Yes.
8            (Exhibit 32 was marked.)
9       Q    (By Mr. Dement)  Mr. Robertson,
10   Deposition Exhibit 32 is a copy of the complaint
11   that you filed against the Avatar Group and
12   Intellinetics and the Chretiens, correct?
13      A    Correct.
14      Q    If you could please turn to Paragraph 14,
15   which is on the third page of Exhibit 32.
16      A    Got it.
17      Q    Paragraph 14 of the complaint alleges
18   that Intellinetics has assumed the right to use the
19   patent from Avatar and has been or is using the
20   patent for its own purposes. Do you see that?
21      A    Yes.
22      Q    Did you review this complaint before it
23   was filed with the court?
24      A    I'm sure I did.
25      Q    On what facts do you base the allegations

95

1    in Paragraph 14?
2       A    Because they were sort of interchanging
3    Intellinetics and Avatar between the two of them.
4    So both of them had access to it.
5       Q    And so because of that interchanging of
6    Avatar and Intellinetics that you allege they have
7    assumed the right to use the patent?
8       A    Right.
9       Q    If you could turn two more pages down to
10   Paragraph 31?
11      A    (Deponent complied.)
12      Q    Paragraph 31 of the complaint, in
13   summary, alleges that in order to assess amounts
14   owed to you under the patent purchase agreement, you
15   need an accounting from the defendants, right?
16      A    Well, that's what John did. Yeah.
17      Q    Excuse me?
18      A    That's what John did. He went out and
19   got ...
20      Q    So the accounting's already been done?
21           MR. BLEDSOE: I'm going to object.
22   You're asking him to form a legal conclusion about
23   the effect of the legal claim filed by counsel. You
24   can answer the question.
25      A    Well, let me --

96

1            MR. BLEDSOE: He's asking you about
2    Paragraph 31.
3       A    Well, to the best of my knowledge, that's
4    what John has done when he went out there.
5       Q    (By Mr. Dement)  All right. What
6    information, aside from what Mr. Crist has done for
7    you so far, do you need from the defendants in order
8    to conduct this accounting?
9            MR. BLEDSOE: Well, I need to object to
10   that question because it invades the attorney/client
11   privilege. It necessarily involves discussions I've
12   had with him about what he does or does not need.
13   So it invades both the attorney/client and work
14   product privilege. I'll direct you not to answer
15   that question, Mr. Robertson.
16      Q    (By Mr. Dement)  Independently of any
17   discussions you've had with your attorney, what
18   information do you need in order to conduct this
19   accounting?
20           THE DEPONENT: Same?
21           MR. BLEDSOE: I think the same objection.
22   I think that's just a backdoor way of trying to
23   determine what I've told him.
24      Q    (By Mr. Dement)  Do you know of anything
25   independently of what your counsel has told you?

97

1    A    No, I don't know of anything
2  independently other than what information John has
3  compiled.
4    Q    What information do you, Duane Robertson,
5  need to assess the amount owed under the patent
6  purchase agreement that you do not already have?
7        MR. BLEDSOE:  Well, I'm going to object.
8  It calls for invasion of attorney/client privilege
9  because it asks him to reveal information that he
10  and I have discussed, and I direct him not to answer
11  on that basis because he does not want to waive any
12  privilege.
13        The question is actually also
14  argumentative in the sense you're asking him about
15  what's needed to prove the legal requirements of a
16  claim for our accounting.  You can ask it, I just
17  don't think it's a very fair question.  But in any
18  event, I'm instructing you not to answer because the
19  question as asked invades the privilege.
20    Q    (By Mr. Dement)  Okay.  I don't want you
21  to tell me anything that you and Mr. Bledsoe have
22  discussed and I'm not trying to ask that.
23  Independently of what you two have discussed.
24    A    I -- to the best of my knowledge, John
25  has got all the information that we need.  I can't

98

1  tell you anything more than that.
2    Q    All right.
3        (Exhibit 33 was marked.)
4    Q    (By Mr. Dement)  Mr. Robertson,
5  Deposition Exhibit 33 is a copy of plaintiff's
6  response in opposition to defendants' motion to
7  transfer venue that was filed in this lawsuit --
8    A    Yes.
9    Q    -- correct?
10    A    Right.
11    Q    Did you review this document before it
12  was filed with the court?
13    A    Roughly, yeah.
14    Q    If you could turn to Page 3?
15    A    (Deponent complied.)  Okay.
16    Q    The top paragraph, last sentence.
17    A    It is in regard to that patent that
18  Three-State Virtual Volume System for managing
19  document storage to permanent media becomes integral
20  to Intellinetics business.
21    Q    How is the, if you know, the -- how is
22  the system -- patented system that the Chretiens or
23  Avatar purchased from you integral to Intellinetics
24  current business?
25    A    I can't tell you.

99

1    Q    Okay.  The next paragraph, last two
2  sentences, first refers to a decision by you to shut
3  down your business.  Do you see that?
4    A    No.  The last two sentences?
5    Q    Yes.
6    A    Sell the patent and Intellinetics name.
7  I don't remember that.
8    Q    This Paragraph 3, I'm sorry, Page 3, the
9  middle paragraph, last two sentence refers to a
10  decision by you to shut down your business.
11    A    Yes.
12    Q    Right.  What business is that speaking
13  about?
14    A    Intellinetics, III G.I. Limited,
15  whichever one you want to call it.  Well, it's
16  Intellinetics dba -- no.
17        MR. BLEDSOE:  Other way around.
18    A    Yeah.  III G.I. dba Intellinetics.
19    Q    (By Mr. Dement)  The last sentence in
20  this same paragraph states that you agreed to sell
21  the patent, right?
22    A    I agreed to sell the patent and I told
23  them that I didn't want them to use the name
24  Intellinetics.  So I don't know how that got in
25  there but ...

100

1    Q    Is this statement in this paragraph that
2  you agreed to sell the Intellinetics name an
3  incorrect statement?
4    A    To the best of my knowledge it is because
5  I never did say go ahead and use Intellinetics
6  because they were operating under Avatar.
7    Q    And in fact, I think you earlier
8  testified that the patent purchase agreement
9  contains no reference to a purchase of the
10  Intellinetics name?
11    A    Not to the best of my knowledge, it
12  doesn't have anything in there about it.  It says
13  IntelliVUE, it doesn't say Intellinetics.
14    Q    Page 5 of this -- this document, Exhibit
15  33, the -- the last paragraph and it continues on
16  into Page 6, you're asserting that the defendants
17  have contacted and reaffirmed their indebtedness to
18  you relatively consistently throughout the past 10
19  years.  You see that?
20    A    Yes.
21    Q    And that sentence follows with some
22  examples you're giving of the defendants reaffirming
23  their indebtedness; is that right?
24    A    Um-hum.  Yes.
25    Q    The -- this paragraph states, In

**105**

1    Q    First page of Exhibit 3 is an October
2    2002 status report?
3    A    Yeah.
4    Q    Okay?
5    A    Um-hum.
6    Q    And the last page of Exhibit 3 is a
7    payment schedule, which you've already testified
8    relates to the promissory note, correct?
9    A    Yes. Right. But all these dates have
10   come and gone and there hadn't been any money coming
11   across yet. He said they did get $400,000 from
12   Milwaukee Police Department.
13   Q    How -- Exhibits 3 and 4 are not proposed
14   payment schedules concerning the patent purchase
15   agreement, correct?
16   A    Correct.
17   Q    All right. Then following on -- in the
18   next two sentences of -- next two sentences on Page
19   6 of Exhibit 33 --
20   A    Yeah.
21   Q    -- it's asserted that in December 2006,
22   you requested an accounting and sent a
23   representative to Ohio to review the defendants'
24   books. Do you see that?
25   A    Well, I know I did.

**106**

1    Q    That would be referenced --
2    A    Right here (indicating).
3    Q    I'm sorry, I'm talking over you and I
4    shouldn't do that. I apologize.
5          Is that a reference to Mr. Crist going
6    out to Ohio?
7    A    Yes.
8    Q    And Mr. Crist was thereafter handling
9    negotiations to try to get the debt resolved, right?
10   A    Yes.
11   Q    Then you refer in here to a revised
12   purchase agreement dated January 6th, 2007. Do you
13   see that?
14   A    Yeah. But I don't know what they think
15   they were doing revising it after it was already
16   past. Can't come up and say, I didn't make a good
17   deal, now I want to make another.
18   Q    Well, in any event, you did not accept
19   the settlement offer contained --
20   A    No.
21   Q    -- in Exhibit 5 --
22   A    No.
23   Q    -- that's referenced here on Page 6?
24   A    No.
25   Q    All right. No, you did not accept that

**107**

1    settlement offer?
2    A    I did not accept it.
3          That's where we end?
4          MR. BLEDSOE:  I have no questions for
5    you.
6    Q    (By Mr. Dement)  I have no more questions
7    for you today, Mr. Robertson.
8    A    Okay. Good.
9          THE REPORTER:  Reading and signing?
10         MR. BLEDSOE:  Send it to me.
11         (The deposition concluded at 1:32 p.m.,
12         August 15, 2007.)

**108**

1          I, DUANE D. ROBERTSON, do hereby certify
2    that I have read the foregoing transcript and that
3    the same and accompanying amendment sheets, if any,
4    constitute a true and complete record of my
5    testimony.

9          _____
           Signature of Deponent

           ( ) No Amendments
           ( ) Amendments Attached
11   Subscribed and sworn to before me this
12   _____ day of _____, 2007.

15   Notary Public:_____
16   Address: _____

18   My commission expires_____
19   Seal:

22              MFS