l Chretien                                                September 11, 2007

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

- - - - -

Duane Robertson,           :
    Plaintiff,             :
                           :   Case No. 07-CV-00729
    vs.                    :   RPM/MJW
The Avatar Group, Inc.,    :
an Ohio corporation;       :
Intellinetics, Inc., an    :
Ohio corporation; A.       :
Michael Chretien,          :
individually; and          :
Matthew L. Chretien,       :
    Defendants.            :

- - - - -

DEPOSITION OF A. MICHAEL CHRETIEN

- - - - -

Taken at Shumaker, Loop & Kendrick, LLP
41 South High Street, Ste. 2400
Columbus, OH 43215
September 11, 2007, 9:10 a.m.

- - - - -

Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

**Page 2**

APPEARANCES

ON BEHALF OF PLAINTIFF:

   Shughart, Thomson & Kilroy, PC
   1050 17th Street, Suite 2300
   Denver, CO 80265
   By Philip W. Bledsoe, Esq.

ON BEHALF OF DEFENDANTS:

   Dement Law Offices
   7720 E. Belleview Avenue, Suite 350
   Greenwood Village, CO 80111
   By Randolph S. Dement, Esq.

ALSO PRESENT
   Matthew L. Chretien

**Page 3**

Tuesday Morning Session
September 11, 2007, 9:10 a.m.

- - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of A. Michael Chretien, a Defendant herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

**Page 4**

I N D E X

| Examination By | Page |
|---|---|
| Mr. Bledsoe - Cross | 5 |
| Mr. Dement - Cross | 97 |

| Exhibits | | Page |
|---|---|---|
| 38 | Intellinetics 2007 Sales Plan, Revision Number: 2 | 9 |
| 39 | Intellinetics Sales Plan 2007 | 11 |
| 40 | Web pages re: Intellivue | 14 |
| 41 | Web pages re: Products | 16 |
| 42 | Web pages re: Partners | 18 |
| 43 | Outlook database entries | 23 |
| 44 | Status report, 10/16/02 | 31 |
| 45 | Handwritten letter, Mike Chretien to Duane, 12/3/03 | 38 |
| 46 | Comments, 10/09/02 | 38 |
| 47 | Sprint/Landis Installation Overview | 44 |
| 48 | Status Report, 10/08/10 | 45 |
| 49 | Letter, Robertson to Michael Chretien, 11/13/96 | 57 |
| 50 | Fax re: Contract, 12/13/96 | 58 |
| 51 | Short Term Funding Request, 10/12/00 | 65 |
| 52 | 2005 tax returns | 68 |
| 53 | 2004 tax returns | 68 |
| 54 | Financial reports | 97 |

(Exhibits retained by counsel.)

---

1 (Pages 1 to _)

Spectrum Reporting LLC                                         A-3

1 Chretien                                                September 11, 2007

**Page 25**

```
    Yes.
 2  Q.    When you say you talked with Duane,
 3  does that mean you called him?
 4  A.    Yes.
 5  Q.    And you indicated that you advised
 6  Duane of "impact of distraction" and asked him
 7  what his ultimate goal was.
 8        Now, obviously, that's a paraphrase,
 9  correct?
10  A.    Yes, yeah. All of it is a paraphrase.
11  Q.    Right. Do you recall what else -- or
12  what you said to Duane?
13  A.    This is the essence of the
14  conversation.
15  Q.    Well, I appreciate that it is, but my
16  question is: Can you recall what else you said,
17  or what you said?
18  A.    As I say, this is the essence of the
19  conversation. I advised Duane of the impact of
20  distraction.
21  Q.    Well, what was the distraction?
22  A.    The distraction was this. This is a
23  distraction from our efforts to sell the --
24  Q.    Well, there was no suit on file in
```

**Page 26**

```
 1  January of 2007, was there?
 2  A.    No.
 3  Q.    Had anybody even talked about a lawsuit
 4  at that point?
 5  A.    I do believe a lawsuit is always a
 6  possibility when you have a dispute over money.
 7  It was fairly apparent to me that that was quite
 8  likely where this was headed, where this
 9  distraction was headed.
10  Q.    And do you remember saying anything
11  else about this distraction?
12  A.    Well, my -- the next essence there,
13  "asked him what his ultimate goal was," I was
14  trying to find out what was his purpose of sending
15  an agent to Columbus, Ohio.
16  Q.    Well, what did he tell you?
17  A.    He was unresponsive. His response to
18  my question is indicated there. He was going to
19  meet with John, short for John Crist, and he would
20  get back to us.
21  Q.    In this conversation of January 23rd,
22  did you complain about Mr. Crist?
23  A.    I don't believe so.
24        In what manner?
```

**Page 27**

```
 1  Q.    Well, I'm just asking. Either you did
 2  or you didn't.
 3        Do you remember complaining about him?
 4  A.    No.
 5  Q.    Do you remember expressing any
 6  unhappiness at having an agent sent?
 7  A.    I normally would prefer to deal with a
 8  principal.
 9  Q.    In all of the prior dealings with the
10  principal, which is Mr. Robertson, had any of
11  those dealings ever involved you paying him money?
12  A.    We made a payment on the patent
13  purchase agreement.
14  Q.    In 1998?
15  A.    I believe that's correct. And we made
16  payments on the promissory note.
17  Q.    In 2000?
18  A.    It's a matter of record.
19  Q.    In any of the conversations that you
20  had with him in 2003 or 2001, him being
21  Mr. Robertson, had any of those dealings with the
22  principal involved paying him any of the money he
23  was owed?
24  A.    If you're asking did -- were payments
```

**Page 28**

```
 1  on a note or the PPA, patent purchase agreement,
 2  did they follow conversations with Duane every
 3  time, the answer is no.
 4  Q.    Take a look on Exhibit 43 at the entry
 5  for November 29th, 2001.
 6  A.    Right.
 7  Q.    Again, this is the essence of the
 8  conversation?
 9  A.    Uh-huh.
10  Q.    But it indicates Duane called you
11  today?
12  A.    Uh-huh.
13  Q.    Is that fair, if you would say Duane
14  called today?
15  A.    I can't remember specifically, but if
16  that's the way I wrote it up, I'm sure that's the
17  way it went down.
18  Q.    And here -- again, it's a paraphrase --
19  he's asking for a status report and a payment
20  schedule?
21  A.    Right, yes.
22  Q.    Do you recall whether or not you
23  provided him a status report?
24  A.    Yes.
```

Page 61

1  Q.      Right. Do you know whether or not --
2  well, as I read Exhibit 50, and paragraph 5 in
3  particular, the suggestion here is that they be
4  reduced to 200,000 for the first year, 350,000 for
5  the next year, and then 550,000 for the years
6  thereafter.
7  A.      Yes.
8  Q.      Based on a 110 percent increase.
9  A.      Yes.
10 Q.      Do you know whether or not that's what
11 ended up?
12 A.      Whether or not we made the thresholds?
13 Q.      No. Whether or not the thresholds were
14 changed as you negotiated here or not.
15 A.      Where is the final copy?
16 Q.      Well, I'm just trying to ask if you
17 remember.
18 A.      I believe they were.
19 Q.      Okay.
20 A.      But I'm not certain at this point in
21 time, but --
22 Q.      Well, let's take a look at 28, because,
23 actually, I believe they were not.
24 A.      Oh, okay. I stand corrected.

Page 62

1  Q.      That's all right.
2          Oh, I'm sorry, I stand corrected. They
3  were. They are in -- they are changed.
4  A.      Okay.
5  Q.      Do you recall any other items of
6  negotiation in the patent agreement, other than
7  the changes we've seen in paragraph 2A and the
8  reduction of the sales amounts in paragraph 5?
9  A.      I can't recall any, Counsel.
10 Q.      Okay. Let's take a look at Exhibit 28,
11 which is the patent purchase and royalty
12 agreement.
13 A.      Uh-huh, yes.
14 Q.      And look at paragraph 3.
15 A.      Yes. I'm looking at it.
16 Q.      It talks about the mechanics of the
17 payments, of the royalty payments, generally,
18 correct?
19 A.      Yes. Timing.
20 Q.      Right. Is it fair to say that,
21 generally speaking, Avatar has not made payments
22 monthly to Robertson?
23 A.      It is fair to say that.
24 Q.      At the end of that paragraph 3, there's

Page 63

1  a specific obligation of Avatar that says, "Avatar
2  shall also keep Robertson fully informed of its
3  sales, marketing, and service activities with
4  respect to the patent rights, and provide
5  Robertson with any information regarding such
6  activities which he may from time to time
7  request."
8          Did I read that right?
9  A.      Yes.
10 Q.      And we've seen some indication of
11 requests for information that he has made from
12 time to time in the documents we've reviewed in
13 this deposition, correct?
14 A.      Some examples of that, yes.
15 Q.      Right. But I want to focus on the
16 first part of that sentence: "Avatar shall also
17 keep Robertson fully informed of its sales,
18 marketing, and service activities with respect to
19 the patent rights."
20         Do you see that?
21 A.      Yes.
22 Q.      You told me earlier in this deposition
23 that until this litigation ensued in 2007, that
24 you had never told Mr. Robertson you were no

Page 64

1  longer using the patent. Correct?
2  A.      Correct.
3  Q.      Would you agree with me that keeping
4  Mr. Robertson fully informed about sales,
5  marketing, and service activities regarding the
6  patent rights would include, normally, telling
7  him, we're not selling anything involving the
8  patent?
9          MR. DEMENT: Object to the form.
10 Q.      You can answer the --
11         MR. DEMENT: To some extent, it calls
12 for a legal conclusion.
13         You can answer.
14 A.      To be in full compliance, one could
15 make that statement. But on the other hand, there
16 could be divided opinion.
17 Q.      As to the meaning of that section?
18 A.      As to the meaning, what the
19 performance -- what were the duties.
20 Q.      But there's no divided opinion that
21 until this lawsuit was filed in 2007, you never
22 told him you weren't using the patent, correct?
23 A.      That's correct, with one exception.
24 When his agent appeared in Columbus prior to the