09/27/00  14:30  FAX 6148502739          INTELLINETICS                      ☒01

## CONFIDENTIAL MEMORANDUM

TO:         DUANE ROBERTSON

FROM:       MATT CHRETIEN

SUBJECT:    SHORT TERM FUNDING REQUEST

DATE:       9/27/00

CC:         A. MICHAEL CHRETIEN, CHRIS WILLIAMS

Request: $300,000 immediate short term loan until June 1, 2001 at a rate of 8.5%

Background:

We need to alleviate shortfalls in our immediate cash flows caused by temporary delays in both project deliveries and project awards. We are currently on track to reach our sales goals for year end, however, several key project awards have been delayed from summer of 2000 to late November/December. Obviously this delays delivery & receipt of cash. We are requesting a short term loan to provide operating capital for the 4th Qtr 2000 and 1st Qtr 2001.

The following statistics are provided for your information:

| | | |
|---|---|---|
| Total Sales to-date this year | $1,018,830 | |
| Expected Projects to complete by year end | $ 688,753 | cash will be available 1st Qtr 2001 |
| **Total Projected 2000 Sales** | **$1,707,583** | 7% increase over Last Year |

1st Quarter Projects nearing close with at least an 80% chance of success:

| | | |
|---|---|---|
| Sacramento County | $1,023,000 | award expected 10/15/00<br>Cash expected 2nd Qtr 2001 |
| OH State Hwy Patrol | $ 357,753 | award expected 11/1/00<br>Cash expected late 1st Qtr 2001 |
| WA NJ PD | $ 85,282 | award expected 11/1/00<br>Cash expected 1st Qtr 2001 |
| Fairfield NJ PD | $ 40,000 | award expected 11/15/00<br>Cash expected 1st Qtr 2001 |
| WASPC | $ 850,000 | award expected 12/31/2000<br>Cash expected 2nd Qtr 2001 |

We appreciate your consideration. If we can provide any further information please call me.



PLAINTIFF'S
EXHIBIT

NO. 1

5/15/07

From: Mike Chretien

Mike Chretien's Documented Outlook Contact with Duane Robertson

Mike: 1/23/07
Talked with Duane. Advised Duane of impact of distraction. Asked him what his ultimate goal was.
He was going to meet with John and get back to us.

Mike: 11/28//06
John Crist (303.825.6630) called and will come out to review Intell's books on Tues, 12/12/06 on Duane's behalf.

Mike: 4/12/03
Talked with Duane yesterday. I gave him an update regarding where we are today. That we finally have our financials inorder, and have settled with Cher and can now focus on moving forward.
I indicated that he would be receiving an info packet that we are in the process of pulling together which will provide additional details.

Mike: 8/15/03
Duane called today and I advised him of the current status following the termination of Cher Williams. That we are basically still in discovery mode regarding our financials.
I indicated that until we completed our discovery process and had a firm fix on where we would be unable to meet our schedule. We, unfortunately, didn't know our cash flow status but expected the outside accountants to be complete with their review by the end of this month.
I indicated we would get back to him as soon as we had a handle on the situation.

Mike: 11/29/01
Duane called today. We need to furnish him with a status report and a payment schedule.

Mike: 6/27/01
Talked with Duane yesterday and gave him an update on our status.
Advised him of the significant Sales and Marketing activities including: OSHP, ODI, Public Defender's Office and the development of a strategic Teaming Agreement with Tiburon.
I also indicated that we would be sending him an updated "Pipeline" report in the near term.

***Heather***5/11/01
Mailed Duane a Strategic Business Plan via USPS Priority Mail per Cher's request.

Mike: 2/23/01
Advised Duane about the HNB's desire to have him subordinate his intell interests evidenced by his UCC filing to the bank. Duane declined to take this action.
Also gave Duane an update re intellinetics. He appreciated the update and gave me a lead re ADAMS COUNTY which he had heard scrapped their imaging system as was in the market for a replacement.

Mike: 10/23/00


PLAINTIFF'S EXHIBIT NO. 2

Talked with Duane, he believes that he will have his transaction by the 27th. He requested a copy of our BP.

Mike: 10/3/00
Talked with Duane, he will cover 1/3 of the problem.

\*\*\* MIKE \*\*\*  February 17, 2000 at 1:15pm
Talked with Duane. He was able to get an earlier filight out of Columbus for his 2/8 return to Colorado.
Had a nice visit.

\*\*\* MIKE \*\*\*  January 20, 2000 at 9:32am
Duane will be comming Suday, 2/6/00 @

\*\*\* MIKE \*\*\*  February 17, 2000 at 1:15pm
Talked with Duane. He was able to get an earlier filight out of Columbus for his 2/8 return to Colorado.
Had a nice visit.

\*\*\* MIKE \*\*\*  January 20, 2000 at 9:32am
Duane will be comming Suday, 2/6/00 @ 3:30PM and departing on 2/8 @ 10:57AM.

\*\*\* MIKE \*\*\*  January 18, 2000 at 11:49am
Talked with Duane re visiting during the weekend of the 2/6. He will check it out and get back to us.

\*\*\* MIKE \*\*\*  January 14, 2000 at 4:22pm
Duane called today. He wants to come out and visit us to check out the new office.
I am going to suggest that he visit on 2/6,7 or 8/00

\*\*\* MIKE \*\*\*  November 24, 1999 at 12:48pm
Talked with Tim yesterday and he gave me the followig update re State-wide Central Booking system which will include Mugshots.
Tim indicated that they are working on the following issues to make it happen:

They are seeking a $500,000 Federal Grant for the central booking whcih they are expecting results by 2/2000.
Next they are seeking legislation requiring statewide participation and will set forth the system standards.
Finally they are Federal funding to provide the means for the public safety agencies to either acquire system or reconfigure their current systems to permit participation in the Central Booking system. They are seeking 3 or 4 Million for this phase.
There senator suggested that they request 10 Million which could then fund mobile data.

\*\*\* MIKE \*\*\*  November 19, 1999 at 4:25pm
Gave Duane an update. He will call as far as scheuling a visit, he can't make the Open House on 12/9.

\*\*\* MIKE \*\*\*  March 18, 1999 at 5:45pm
Called Duane and gave him an update.

\*\*\* MIKE \*\*\*  December 1, 1998 at 1:39pm
Duane arrived in Columbus 11/18/98 (Tuesday) and left the following day 11/19 (Wednesday).
I believe that it went very well. Duane was pleased with the progress of Intellientics and was amenable to alter the terms of the sale agreement. Duane asked me to draft the changes to the agreement that we wanted.

\*\*\* MATT \*\*\* February 5, 1998 at 8:27am

12/3/97:          Duane called to inquire as to "what is happening."
          He indicated that Mark Weiss, still owes him $2,666.25 and would like us to pursue this matter.

          He was advised of our Board Meeting scheduled for 12/19.

1/7/97: Duane's Business: Dawn Industries, Inc., 4410 N. Washington St., Colorado  80216, (303) 296-4041, Fax 295-6604.

12/16/96:          Converstation with Adrew Pitcock regarding the final draft of the Patent Purchase
                        Agreement.
          The final document limits the definition of the term "Gross Revenue" to software or services which utilizes the Patent or any modification thereof.

          Executed Agreement faxed to Duane.

2/16/98: Duane advised of the recent developments including the signing of the CPD Project
contract          and  the Intellinetics - Lucent Reseller relationship.

10/29/96:          Duane called and indicated he had advised Frank of his intention to transfer the company to Avatar. He indicated that he was going to talk with his attorney today to determine what he could do and the legal procedure associated with his desire to "make Intellinetics go away."

10/28/96          Duane called and indicated he had not changed his mind.  That he would contact his attorney to deal with the legal issues associated with the transfer.

10/17/96:          Initial conact:  4/14/96

          Letter dated 4/16/96 outlining preliminary transfer plan

          Follow up conversation:  4/21/96

          Recontacted:  6/24/96

          Duane called, 10/17/96 and advised he wanted Avatar to take over Intellinetics


knowledge **in motion**

Duane Robertson
122 Loveland Way
Golden, CO 80401
4/16/1999

Reference:  Intellinetics Purchase and Royalty Agreement

Dear Duane:

As we discussed during your visit to Columbus Matt, Tom and I have certainly been focused on Intellinetics since January of '97.  We were determined that we were not going to be outworked.

Significant progress has been achieved, but as you mentioned, we are not out of the woods yet.

In an effort to take advantage of the opportunities that our achievements have made possible, we have put a loan package together to secure additional funding.  To date, we have been operating on a $250,000 Line of Credit.  This level of funding will not enable us to market intelliVUE and identiVUE nationally.

We are attempting to secure a $400,000 five-year permanent loan and a $350,000 Line of Credit that would fund further growth of Intellinetics.

Although we have demonstrated we have potential, unfortunately Intellinetics is not an attractive candidate to the banks.  There is not much in the way of inventory that can be attached, etc.  Typically, the banks are most willing to loan when you don't need them.

To date, we have been turned down by two banks but are hopeful that one of the two remaining banks will come through.  The bankers have expressed concern about the Agreement in terms of the fact that our indebtedness to you is not fixed.  We indicated that we were in the process of addressing this issue.

What we request is that the Agreement be modified so that our indebtedness is capped at **$750,000.**  The language that would have to be modified that expands our indebtedness is contained in sections 2 & 3.  We would be able to agree to a payment schedule of two sizable payments per year.  If Intellinetics were sold (we have no such intent) we would protect your interests by requiring payment to you of the balance of the debt at time of closing.

I know that this is asking much but quite frankly, If Matt, Tom and I had not stepped up to the plate I believe that you would have lost your total Intellinetics investment.

Additionally we would like to have the sense that our collective commitment and focus will be rewarded.

After you have had an opportunity to think about this please give me a call.

Sincerely,

Mike Chretien

PLAINTIFF'S
EXHIBIT
NO. 3
PENGAD-Bayonne, N.J.


**intellinetics™**
knowledge in **motion**

Mr. Duane Robertson
122 Loveland Way
Golden, Colorado 80401

October 16, 2002

Reference:  intelli**netics**, Inc. Status Report.

Dear Duane:

The purpose of this communication is to provide you with information that
will enable you to determine where we are today and, more importantly, to
assess where we are headed.  Clearly, we are not where we would like to be
but, we have made significant progress and the ship is headed in the right
direction.

The following listed document (with accompanying comments) are provided
for your review:

- intelli**netics**, Inc. and The Avatar Group Inc., Combined Profit &
  Loss Compilation & Pro Forma (1997-2002)
- intelli**netics**, Inc., Staffing, Support Volume, Clients Snapshot
- Sales Statistics Review – Combined Sales Team
- Sales Pipeline – Combines Sales Team
- Strategic Sales Plan 2002 - Revised

Despite an uncertain economic environment, we have produced a strong
sales year.  Our year-end expectation is to exceed last year's sales volume
while going into next year with a robust sales pipeline.

We have made significant progress towards building an efficient sales and
supportive operation teams.  This is demonstrated by our collective ability to
successfully price and close sales, followed by an "on time and on budget"
installation which leads to a satisfied client.  It certainly has not been easy,
but clearly the stage has been set for continued future growth.

Historically have been challenged to generate the necessary volume of
qualified sales opportunities that is a prerequisite to fuel growth.  All good
things start with sales.  As your review of the material will ascertain, we are
generating the type and volume of marketing and sales activities that result
in growth.

**PLAINTIFF'S EXHIBIT NO. 4**

Matt and I appreciate your patience and confidence in us.  We will continue to do what is necessary so that it will prove to be well founded. Although the wider economic climate has proven too challenging for many organizations that, in theory, had much more fiscal strength/staying power that we did, we continue to survive and grow.

More importantly, it is yet another affirmation that the tough work to understand how to build revenue and grow the company is beginning to take effect.  The attached repayment schedule is what we can commit to adhere to at this point.  After you have an opportunity to review this communication, please give me a call.

Thanks,

Mike Chretien
Vice President



12/3/03

MIKE CHRETIEN

Hi DUANE,

Sorry I didn't get THIS OUT SOONER

ATTACHED ARE: COMMENTS DTD 10/9/02 AND
A REVISED PAYMENT SCHEDULE. WHICH ARE
ATTACHMENT TO OUR 10/16/22 STATUS REPORT

Hope You HAVE A HAPPY HOLIDAY SEASON.

Found OUT teday THAT WE RECEIVED the
TIBURON MilwauKee PD SUB CONTRACT IN
THE OFFICE teday ($400K).

Mike Chretien

520 · 818 · 9362

PLAINTIFF'S
EXHIBIT

PENGAD-Bayonne, N.J.

NO. 5

Sprint / Landis Installation Overview:

| | |
|---|---|
| Sprint Payment:<br>(Made to Intellinetics) | $ 24,931.50 |
| Travel, Administrative and Training Expenses:<br>(Due to Avatar) | $  1,713.00<br>+ $ 11,006.63<br>---------------<br>$ 12,719.63 |
| | $ 24,931.50<br>-  $ 12,719.63<br>---------------|
| Overall Profit: | $ 12,211.87 |
| Avatar's 20% of Profit<br>(Due to Avatar) | $  2,442.37 |
| Dwayne Robertson's % of Profit | $  9,769.50 |



**Revised Purchase Agreement**

| | |
|---|---|
| **Date/Time:** | 1/06/2007 |
| **To:** | Duane R. Robertson (via fax), cc: John Crist (via email) |
| **From:** | Tom Moss, Mike Chretien, Matt Chretien |
| **Attachments** | 1. P/L and Balance Sheet for 1/1/06 – 10/31/06 |
| | 2. Accounting of balance due for Patent Purchase under existing Agreement |

**Context**

We appreciate John's visit as it was the catalyst needed to deal with an issue that required attention. As indicated to John during the meeting, the Patent Purchase Agreement placed us in debt situation that we have been unable to work our way out of.

Further, we have been unable to attract investor's to change our undercapitalized business. You have reviewed our financials which speak for themselves. Our orientation is to achieve a result that is viable in light of our constraints.

We do not intend to continue a scenario which results in a deeper hole from which we have little hope of digging ourselves out of.

**Discovery**

The responses to final discovery questions are provided below:

1.  Please show us the calculations supporting the amounts you indicate on your balance sheet that you owe Duane. See Attachment.

2.  Please provide a "year to date" 2006 Income Statement and Balance Sheet. See Attachment (through 10/31/06)

3.  Please provide a breakdown of the amounts and the loan terms for the amounts owed to DCB and HNB. HNB fully paid as of June 06, DCB - has a balance of $197K at the end of October. Although there is not stated repayment schedule, it matures in May. We have gotten it renewed the past two years, but recently began making nominal principal payments (~$1,000/month) in addition to the interest expense each month.

4.  Please explain the Medical Insurance showing up on your 2004 and 2003 Tax Returns. For a period of time, we continued The Avatar Corporation which was our original company when we started a business.

5.  Please explain your Profit Sharing program that shows up in 2005 on your Tax Returns and the difference, if any, in the Employee Benefits Program that shows up on your Tax Return in 2002. Different due to characterization change: '02 – Employee Benefits Program; '05 – Pension Plan.

6.  Please provide me the current terms of your office lease. Current Lease term: 7/11/03 – 1/31/10 Current Rent plus CAM charges – $8,640/mo.

7.  Please propose a viable plan to resolve your debt with Duane. See below.



PLAINTIFF'S
EXHIBIT
NO. 6

© 2006 Intellinetics™, Inc. (visit www.intellinetics.com)
Proprietary and Confidential



*Revised Purchase
Agreement*

**Framework**

➢ Intellinetics historical and anticipated financial model has not and will not enable it to amortize the debt incurred as a result of the Patent Purchase Agreement

➢ A new framework that Intellinetics can execute in light of its abilities is desired by both parties

➢ Major, sustained losses have made company valuation low and eliminated our ability to raise capital through equity

➢ A staged payment schedule that maps to Intellinetics modest growth plan is required

➢ A payment plan based upon our ability to pay is presented:

| Months | Payment |
|--------|---------|
| 1-18   | $2,500  |
| 19-36  | $3,500  |
| 37-54  | $4,500  |
| 55-72  | $5,500  |

➢ Total payout under this schedule      $279,000

➢ Other Ideas

o   Early payment incentive – 10% discount on total if paid out in less than 36 months

o   Reasonable grace period / interest rate if late



*Proposed Patent*
*Purchase Repayment*
*Schedule*

| | |
|---|---|
| **Date/Time:** | 1/29/2007 |
| **To:** | Duane R. Robertson [via fax (303) 278-4580], cc: John Crist (via email) |
| **From:** | Mike Chretien, Matt Chretien |
| **Attachments** | None |

## Framework

> Intellinetics will make monthly payments totaling a minimum of 5% of gross revenue from business related to Patent.

> Total payment amounts for Patent Purchase:

  o   $750,000 total if paid to Duane in 72 months or less
  o   $925,000 total if paid to Duane in 96 months or less
  o   $1,000,000 total if paid to Duane in more than 96 months

> Payment schedule for $100K loan is not presented – it will be pending response from Huntington National Bank on research for previous Avatar Group checks written to Duane (at this point thought to be approximately 50K, but not confirmed)

> Any tax advantages received by Duane as a result of this agreement will reduce amount owed dollar for dollar (awaiting feedback on this from Duane).

> Complete access to all Intellinetics operational and financial information relating to Patent will be provided to Duane and/or his designee(s).

PLAINTIFF'S
EXHIBIT
NO. 7

PENGAD-Bayonne, N. J.

**Page 1**

```
                                                    1
        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO

                 - - - - -

Duane Robertson,          :
        Plaintiff,        :
                          Case No. 07-CV-00729
        vs.             :RPM/MJW
The Avatar Group, Inc.,   :
an Ohio corporation;
Intellinetics, Inc., an   :
Ohio corporation; A.
Michael Chretien,         :
individually; and
Matthew L. Chretien,      :
        Defendants.

                 - - - - -


        DEPOSITION OF A. MICHAEL CHRETIEN
                 - - - - -


        Taken at Shumaker, Loop & Kendrick, LLP
           41 South High Street, Ste. 2400
               Columbus, OH 43215
          September 11, 2007, 9:10 a.m.

                 - - - - -

               Spectrum Reporting LLC
       333 Stewart Avenue, Columbus, Ohio 43206
           614-444-1000 or 800-635-9071
               www.spectrumreporting.com

                 - - - - -
```

**Page 2**

```
                                            2
  1           A P P E A R A N C E S
  2
  3   ON BEHALF OF PLAINTIFF:
  4       Shughart, Thomson & Kilroy, PC
  5       1050 17th Street, Suite 2300
          Denver, CO 80265
          By Philip W. Bledsoe, Esq.
  6
  7   ON BEHALF OF DEFENDANTS:
  8       Dement Law Offices
          7720 E. Belleview Avenue, Suite 350
  9       Greenwood Village, CO 80111
          By Randolph S. Dement, Esq.
 10
 11   ALSO PRESENT
 12       Matthew L. Chretien
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
```

**Page 3**

```
                                            3
  1                    Tuesday Morning Session
  2                    September 11, 2007, 9:10 a.m.
                          - - - - -
  4          S T I P U L A T I O N S
  5              - - - - -
  6       It is stipulated by counsel in attendance that
  7   the deposition of A. Michael Chretien, a Defendant
  8   herein, called by the Plaintiff for cross-
  9   examination, may be taken at this time by the
 10   notary pursuant to notice; that said deposition
 11   may be reduced to writing in stenotypy by the
 12   notary, whose notes may thereafter be transcribed
 13   out of the presence of the witness; that proof of
 14   the official character and qualification of the
 15   notary is waived.
 16              - - - - -
 17
 18
 19
 20
 21
 22
 23
 24
```

**Page 4**

```
                                            4
  1              I N D E X
  2   Examination By                        Page
  3   Mr. Bledsoe - Cross                      5
      Mr. Dement - Cross                      97
  4
      Exhibits                              Page
  5
        38   Intellinetics 2007 Sales Plan, Revision   9
  6          Number: 2
  7     39   Intellinetics Sales Plan 2007            11
  8     40   Web pages re: Intellivue                 14
  9     41   Web pages re: Products                   16
 10     42   Web pages re: Partners                   18
 11     43   Outlook database entries                 23
 12     44   Status report, 10/16/02                  31
 13     45   Handwritten letter, Mike Chretien to     38
             Duane, 12/3/03
 14
        46   Comments, 10/09/02                       38
 15
        47   Sprint/Landis Installation Overview      44
 16
        48   Status Report, 10/08/10                  45
 17
        49   Letter, Robertson to Michael Chretien,   57
 18          11/13/96
 19     50   Fax re: Contract, 12/13/96               58
 20     51   Short Term Funding Request, 10/12/00     65
 21     52   2005 tax returns                         68
 22     53   2004 tax returns                         68
 23     54   Financial reports
 24   (Exhibits retained by counsel.)
```

PLAINTIFF'S
EXHIBIT

NO. 8

A. Michael Chretien                                          September 11, 2007

5

1           A. MICHAEL CHRETIEN,
2    being first duly sworn, testifies and says as
3    follows:
4                 - - - - -
5                 CROSS-EXAMINATION
6    BY MR. BLEDSOE:
7    Q.        State your name, please.
8    A.        A. Michael Chretien.
9    Q.        Mr. Chretien, how are you currently
10   employed?
11   A.        I'm employed as vice president of
12   Intellinetics, Incorporated.
13   Q.        Can you give me the 30-second version
14   of your duties there?
15   A.        Basically, I, under the caption of
16   administration, take care -- oversee corporate
17   issues. Also, I get involved in sales, marketing
18   and sales efforts. Also, I am involved with the
19   process of selecting partner firms, or firms that
20   we're going to align ourselves with, to provide a
21   solution to the market. I wear many hats.
22   Q.        Who handles financial matters at
23   Intellinetics?
24   A.        Well, currently we have an outsourced

6

1    firm, Beanstock by name, and they oversee the
2    financials.
3    Q.        Do you have a CPA firm that you use for
4    tax return purposes?
5    A.        Yes. Kenneth Gill, CPA.
6    Q.        And has Mr. Gill been the person you've
7    used for some time now?
8    A.        Yes.
9    Q.        Do you have any role or involvement in
10   the preparation of the firm's tax returns?
11   A.        No.
12   Q.        I take it that the president of the
13   company, Matt Chretien, does?
14   A.        Well, you can ask Matt.
15   Q.        Well, some officer normally would
16   review and sign off on them, wouldn't they?
17   A.        Oh, yes.
18             Is that the question?
19   Q.        Yeah.
20   A.        Yes.
21   Q.        Do you know whether you do that or Matt
22   does that?
23   A.        I think Matthew does at present.
24   Q.        All right. Are you one of the

7

1    principal owners of the company?
2    A.        Yes.
3    Q.        Along with Matt?
4    A.        Yes.
5    Q.        And just for our record, Matt is your
6    son?
7    A.        Yes.
8    Q.        Not your -- not your older brother, as
9    he tried to convince us earlier.
10             How long have you been working for
11   Intellinetics?
12   A.        Approximately 14 years.
13   Q.        Fourteen years ago, was it called
14   Intellinetics?
15   A.        No. We initially operated under the
16   name Avatar Group, Incorporated.
17   Q.        And Avatar was formed in approximately
18   1993?
19   A.        I believe that's approximately it.
20   Q.        Do you know whether or not Avatar is
21   still an existing company?
22   A.        It's a wholly-owned subsidiary of
23   Intellinetics.
24   Q.        When was Intellinetics formed?

8

1    A.        '95, 1995 or '96, thereabouts. It's a
2    matter of record.
3    Q.        Was it formed after the royalty
4    agreement was prepared and executed by Avatar?
5    A.        Yes, I believe that's the sequence.
6    Q.        Okay. When did you first meet Duane
7    Robertson?
8    A.        Either the latter part of '95 or '96.
9    Q.        At that time, did Avatar have a
10   business relationship with any company that
11   Mr. Robertson was associated with?
12   A.        Yes.
13   Q.        What was that company?
14   A.        Intellinetics or --
15   Q.        III G.I.?
16   A.        -- III G.I., Ltd.
17   Q.        Was Avatar, was it sometimes referred
18   to as a reseller?
19   A.        Yes.
20   Q.        What was it that Avatar was reselling?
21   A.        We were reselling a number of products,
22   but -- which included the Intellinetics of
23   Colorado's product, document imaging application,
24   and Intellivue.

Spectrum Reporting LLC                                      614-444-1000

A. Michael Chretien                                                September 11, 2007

17

1   'Intellinetics' software uses our patented
2   innovative mass storage algorithm to compress
3   stored information so that files matching search
4   specifications can be retrieved in less subsecond
5   time, regardless of the number of files, the size
6   of the network, or the number of simultaneous
7   users.'
8           Did I read that right?
9   A.      Correct.
10  Q.      And this has been on your website as of
11  2006, correct?
12  A.      I don't know if it's still that way,
13  but it was that way, probably.  This is an
14  accurate --
15  Q.      Well, take a look at the print date on
16  the bottom right-hand corner.  Does it say
17  9/7/2007?
18  A.      9/7, uh-huh.
19  Q.      How many patents does Intellinetics
20  own?
21  A.      Well, the one in dispute.
22  Q.      Is that the only one they own?
23  A.      That is it.
24  Q.      So when the phrase 'patented innovative

18

1   mass storage algorithm' is used, it's referencing
2   the patent that's at issue in this suit, correct?
3   A.      That would have to be the only patent
4   that we have.
5   Q.      And it's true, is it not, that in 2006,
6   royalty liability to Mr. Robertson was continuing
7   to accrue and show up on the books of the company?
8   A.      Yes.
9           - - - - -
10          Thereupon, Exhibit 42 is marked for
11  purposes of identification.
12          - - - - -
13  Q.      Take a look at Exhibit 42.  Again, it's
14  a portion of the website referencing partners.
15  You've seen this before?
16  A.      Yes, yes.
17  Q.      And I think you told me earlier in your
18  deposition that managing or involvement in the
19  partner relationships is something that you handle
20  for the company?
21  A.      Not exclusively, but I certainly have a
22  hand in it, yes.
23  Q.      All right.  Who are Ray & Barney?
24  A.      They are consultants.

19

1   Q.      And how do you partner with them in
2   terms of the Intellinetics business?
3   A.      The basic thrust, as far as our
4   interaction with Ray & Barney, is to look at our
5   operations to see how we can improve them.
6   Q.      So do I understand it that on this
7   partnership relationship, it is Intellinetics that
8   has been paying Ray & Barney to provide consulting
9   services to you for your internal operations?  Is
10  that a fair statement?
11  A.      For all operations, really, but it's a
12  fair -- yes.
13  Q.      Has Ray & Barney --
14  A.      Including sales and marketing, the
15  whole nine yards.
16  Q.      For the entire gamut of Intellinetics'
17  operations?
18  A.      Yes, yes.
19  Q.      Has Ray & Barney helped you place any
20  of your services or products into the marketplace?
21  And by that I mean actively.
22  A.      For the most part, they've helped
23  position our offering.  They've helped with, you
24  know, marketing, limited identification of leads.

20

1   But the primary thrust has been to help us
2   position our offering in the marketplace,
3   basically identify where we should fish.
4   Q.      And when you say your offering, are you
5   talking about the four products that you use or
6   sell?
7   A.      All offerings.  Our consulting
8   services, networking, anything that we do, which
9   is more expansive than the software application,
10  Intellivue.
11  Q.      And then there's also a reference here
12  to CompuDyne.  Who's CompuDyne?
13  A.      CompuDyne is a large public safety
14  software vendor.
15  Q.      Focusing on the public safety
16  community?
17  A.      Yes.
18  Q.      And I take it that Identivue is the
19  principal service that you've offered to the
20  public safety community?
21  A.      Not really.  Both imaging and
22  Identivue.
23  Q.      Okay.  But certainly Intellivue would
24  be something that the public service community

A. Michael Chretien                                          September 11, 2007

97

1   percentage, so I can't apply it.
2               - - - - -
3           Thereupon, Exhibit 54 is marked for
4   purposes of identification.
5               - - - - -
6   Q.      I'm showing you what's been marked as
7   Exhibit 54, which is a document that your lawyer
8   gave to me today.  Do you know who prepared
9   Exhibit 54?
10  A.      Yes.
11  Q.      Who did?
12  A.      Matthew Chretien.
13  Q.      Then I'll ask Matthew about it.
14          MR. BLEDSOE:  Mr. Chretien, that's all
15  I have for you.
16          We'll take a lunch break unless you've
17  got some questions for him.
18          MR. DEMENT:  Let me check.  I don't
19  think I have.
20              - - - - -
21              CROSS-EXAMINATION
22  BY MR. DEMENT:
23  Q.      Mr. Chretien, take a look at Exhibit 4.
24  I just want to clarify something with respect to

98

1   handwriting on that document.
2           The last page of Exhibit 4 is an
3   amortization schedule which you were also asked
4   about in connection with Exhibit 33, which is a
5   document filed with the court in this case.
6           Exhibit 33, the same amortization
7   schedule, does not have handwriting on the
8   right-hand margin; is that correct?
9   A.      Right, yes.
10  Q.      However, there's handwriting on
11  Exhibit 4 in the right-hand margin, correct?
12  A.      Yes.
13  Q.      Is that your handwriting?
14  A.      I believe so.  It looks like my
15  printing, yeah.
16  Q.      Do you know how the handwriting got
17  removed from Exhibit 33, or does not appear on
18  Exhibit 33 versus appearing on Exhibit 44?
19  A.      No.  I have no idea.
20  Q.      All right.  Again, with Exhibit 44, the
21  amortization schedule, which is also referenced in
22  exhibit -- you were asked about in Exhibit 46 --
23  A.      Here.  I've got 46 here.
24  Q.      Exhibits 44 and 46 have an amortization

99

1   schedule.  And is it true that they reflect,
2   whoever did the calculations, based upon simple
3   interest as opposed to compounded annually?
4   A.      Yes.
5   Q.      All right.  Do you know who prepared
6   the amortization schedule on Exhibit 44 and 46?
7   A.      In all likelihood, it was Cher
8   Williams.  I know it wasn't myself.
9           MR. DEMENT:  I have no further
10  questions.
11          MR. BLEDSOE:  I don't have anything
12  else for you, Mr. Chretien.
13          THE WITNESS:  Thank you.
14              - - - - -
15          Thereupon, the foregoing proceedings
16          concluded at 12:27 p.m.
17              - - - - -
18
19
20
21
22
23
24

100

1   State of Ohio     :      C E R T I F I C A T E
2   County of Franklin: SS
3       I, Lance A. Boardman, RPR, CRR, a Notary Public
4   in and for the State of Ohio, certify that A.
5   Michael Chretien was by me duly sworn to testify to
6   the whole truth in the cause aforesaid; testimony
7   then given was reduced to stenotype in the presence
8   of said witness, afterwards transcribed by me; the
9   foregoing is a true record of the testimony so
10  given; and this deposition was taken at the time
11  and place specified on the title page.
12      Pursuant to Rule 30(e) of the Fed. R. Civ. P.,
13  the witness and/or the parties have not waived
14  review of the deposition transcript.
15      I certify I am not a relative, employee,
16  attorney or counsel of any of the parties hereto,
17  and further I am not a relative or employee of any
18  attorney or counsel employed by the parties hereto,
19  or financially interested in the action.
20      IN WITNESS WHEREOF, I have hereunto set my hand
21  and affixed my seal of office at Columbus, Ohio, on
22  _____, 2007.
23      _____
24  Lance A. Boardman, Notary Public - State of Ohio

7:22 AM
12/08/06
Accrual Basis

Intellinetics, Inc.
## Balance Sheet
As of December 31, 2005

| | Dec 31, 05 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| HNB 12810 | 105,630 |
| Petty Cash | 100 |
| **Total Checking/Savings** | 105,730 |
| | |
| **Accounts Receivable** | |
| Accounts Receivable | 149,738 |
| **Total Accounts Receivable** | 149,738 |
| | |
| **Other Current Assets** | |
| Accrued Revenue | 26,000 |
| Allowance for Bad Debt | (10,031) |
| Fine Lines LLC Loan 043003 | 32,296 ⚹ |
| Prepaid Expenses | 18,363 |
| Prepaid Insurance | 13,939 |
| Reimburseable Expense | 2,984 |
| TMoss Loan 010803 | 7,437 |
| **Total Other Current Assets** | 90,988 |
| | |
| **Total Current Assets** | 346,456 |
| | |
| **Fixed Assets** | |
| Accumulated Depreciation | (107,497) |
| Accumulated Depreciation - Avat | (303,070) |
| Avatar | 515,804 ⚹ |
| Computers & Equipment | 90,749 |
| Furniture & Fixtures | 27,643 |
| Leasehold Improvements | 2,728 |
| Patents | 1,456 |
| Software Products | 115,377 |
| **Total Fixed Assets** | 343,190 |
| | |
| **Other Assets** | |
| Avatar Other Assets | 2,074 |
| Escrow-Dividend Drive | 9,883 |
| **Total Other Assets** | 11,957 |
| | |
| **TOTAL ASSETS** | 701,603 |
| | |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 23,600 |
| **Total Accounts Payable** | 23,600 |
| | |
| **Other Current Liabilities** | |
| Accrued Liability | 146,898 ⚹ |



PLAINTIFF'S
EXHIBIT
NO. 9

FEIGCAD-Bayonne, N.J.

7:22 AM
12/08/06
Accrual Basis

# Intellinetics, Inc.
## Balance Sheet
As of December 31, 2005

|  | Dec 31, 05 |  |
|---|---|---|
| DCB Loan | 200,000 | mantavou |
| Deferred Revenue | 315,917 | |
| HNB Loan #59 - ST | 17,500 | |
| Sales Tax Payable | 6,429 | Project |
| Unearned Revenue | 42,044 | |
| **Total Other Current Liabilities** | 728,788 | |
| **Total Current Liabilities** | 752,388 | |
| Long Term Liabilities | | |
| Dell Lease | 16,542 | |
| Angel Loans | 278,731 | |
| Patent Rights due DRobertson | 558,701 | |
| **Total Long Term Liabilities** | 853,974 | |
| **Total Liabilities** | 1,606,362 | |
| Equity | | |
| Capital Stock | 1,000 | |
| Paid In Capital | 192,697 | |
| Retained Earnings | (1,072,216) | |
| Stock Reacquisition | (27,400) | |
| Net Income | 1,158 | |
| **Total Equity** | (904,761) | |
| **TOTAL LIABILITIES & EQUITY** | 701,601 | |





**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

JANUARY 31, 1997

PTAS

COHEN BRAME & SMITH
TERRANCE A. NOYES
1700 LINCOLN STREET
SUITE 1800
DENVER, CO 80203

*100315167A*

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF THE
U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS AVAILABLE
AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED
BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE INFORMATION
CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE
PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD FIND ANY ERRORS OR
HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE EMPLOYEE WHOSE
NAME APPEARS ON THIS NOTICE AT 703-308-9723.  PLEASE SEND REQUEST FOR
CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE, ASSIGNMENT DIVISION,
BOX ASSIGNMENTS, NORTH TOWER BUILDING, SUITE 10C35, WASHINGTON, D.C. 20231.

RECORDATION DATE: 11/25/1996          REEL/FRAME: 8239/0180
                                      NUMBER OF PAGES: 4

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
    III G. I. LTD.                    DOC DATE: 06/27/1996

ASSIGNEE:
    ROBERTSON, DUANE
    122 LOVELAND WAY
    GOLDEN, COLORADO 80401

SERIAL NUMBER: 08110160               FILING DATE: 08/20/1993
PATENT NUMBER: 5408630                ISSUE DATE: 04/18/1995

DIANE RUSSELE, EXAMINER
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS



PLAINTIFF'S
EXHIBIT
NO. 10

11/13/96   15:50

12-02-1996

002

RM PTO-1595
v. 6-93)
8 No. 0651-0011 (exp. 4/94)

MRD 11-25-96

Tab settings ⇉ ⇉ ▼

TUS BR.

R SHEE REC U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

▼ NOV 25 1996 ▼

RECEIVE ASOTHER copy thereof.

100315167

To the Honorable Commissioner of Patents and Trademarks. Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies) |
|---|---|

Name of conveying party(ies):

III G. I. Ltd., a Colorado corporation

Additional name(s) of conveying party(ies) attached? ❏ Yes ☒ No

2. Name and address of receiving party(ies)

Name: Duane Robertson

Internal Address:

Street Address: 122 Loveland Way

City: Golden    State: CO    ZIP: 80401

Additional name(s) & address(es) attached? ❏ Yes ☒ No

3. Nature of conveyance:

☒ Assignment          ❏ Merger

❏ Security Agreement   ❏ Change of Name

❏ Other _____

Execution Date: June 27, 1996

4. Application number(s) or patent number(s):

If this document is being filed together with a new application, the execution date of the application is: _____

A. Patent Application No.(s)

B. Patent No.(s)
5,408,630

Additional numbers attached? ❏ Yes ❏ No

5. Name and address of party to whom correspondence concerning document should be mailed:

Name: Terrance A. Noyes

Internal Address:

Street Address: Cohen Brame & Smith
1700 Lincoln St., Suite 1800

City: Denver    State: CO    ZIP: 80203

6. Total number of applications and patents involved: [ 1 ]

7. Total fee (37 CFR 3.41)............$ 40.00

☒ Enclosed

❏ Authorized to be charged to deposit account

8. Deposit account number:

(Attach duplicate copy of this page if paying by deposit account)

DO NOT USE THIS SPACE

9. Statement and signature.
To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

Terrance A. Noyes
Name of Person Signing

Terrance A. Noyes
Signature

Nov. 13, 1996
Date

[ 16 ]

Total number of pages including cover sheet, attachments, and document:

# PATENT AND INVENTION ASSIGNMENT

Assignment made effective as of June 27, 1996 by III G.I. Ltd., a Colorado corporation d/b/a Intellinetics ("Intellinetics"), whose principal address is 4955 Miller Street, Suite 202, Wheat Ridge, Colorado  80033, herein referred to as Grantor, to Duane Robertson, individually ("Robertson"), whose principal address is 122 Loveland Way, Golden, Colorado  80401, herein referred to as Assignee.

## RECITALS

A.     Grantor is the owner of the entire right, title and interest in and to the United States Patent Number 5,408,630 for a *Three-state Virtual Volume System for Managing Document Storage to Permanent Media*, as further described on Exhibit A attached hereto and made a part hereof, by Assignment executed August 17, 1993 and recorded in the United States Patent and Trademark Office on August 20, 1993 and the entire right, title and interest in and to the inventions described on Exhibit A, and all rights associated therewith, herein collectively referred to as the Patent, which is registered in the United States Patent and Trademark Office.

B.     Grantor is the owner of the entire right, title and interest in and to the technology and inventions described on Exhibit A attached hereto and made a part hereof, the know-how and trade secrets pertaining thereto, and all rights associated therewith, herein collectively referred to as the Inventions.

C.     Assignee desires to acquire the Patent and Inventions.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, and intending to be legally bound hereby, Grantor, Grantor's successors and assigns, hereby sell, transfer, assign and set over to Assignee, its successors, transferees and assigns, the entire right, title and interest in and to: (i) the Patent for the territory of the United States of America and for all foreign countries, and to all divisions, continuations, continuations-in-part, substitutions, reissues, reexaminations and extensions to be obtained therefor, (ii) the Inventions and all improvements and modifications thereto, including without limitation all works of authorship, trade secrets, technology, mask works, circuits, layouts, algorithms, computer programs, formulas, compositions, ideas, designs, processes, techniques, know-how and data, whether or not patentable, made or conceived or reduced to practice or developed by Grantor, either alone or jointly with others, relating to the Inventions, and (iii) all of Grantor's present and future right, title and interest in and to all rights and claims associated with the Patent and Inventions and all proceeds thereof, including the right to sue for any and all infringement of the Patent prior to or after the effective date of this Assignment and the right to apply for foreign patents on the Inventions.

Grantor agrees that it will communicate to the Assignee or its representatives any facts known to Grantor respecting the Patent and Inventions, and testify in any legal proceedings, sign all lawful papers, execute all division, continuation, continuation-in-part,

K:\DAWN\ROBERTSO\PATENT.ASN

substitution, reissue, reexamination and extension applications, execute all necessary assignment papers to cause any and all applications included within the Patent to be issued to the Assignee, make all rightful oaths and generally do everything necessary or desirable to aid the Assignee, its successors and assigns to obtain and enforce proper protection for the Patent and Inventions in the United States of America and in any and all foreign countries.

Grantor warrants and represents that it has not licensed the Patent or Inventions to any third party and that no other person, firm or corporation has been granted any rights by Grantor in respect of the Patent or Inventions. Grantor further warrants and represents that Grantor has full and unencumbered legal and equitable title to the Patent and Inventions. Grantor further warrants and represents that Grantor will forthwith from time to time after making any improvement upon the Patent or Inventions disclose the same to Assignee, who shall be entitled to the sole and exclusive benefit thereof, and that whenever required by Assignee, Grantor will give Assignee full information and particulars as to the nature and mode of performing the same, and will at Assignee's cost execute and do all applications, documents and other acts necessary or desirable for obtaining letters patent therefor in the United States of America or any foreign country and for vesting the same and the full and exclusive benefit thereof in Assignee.

IN WITNESS WHEREOF, the undersigned Grantor has caused this Patent and Invention Assignment to be executed by its duly authorized officer on the date first set forth above.

III G.I. LTD.,
a Colorado corporation

By: _____
Duane Robertson, President

STATE OF COLORADO          )
                               ) ss.
_____ COUNTY OF Jefferson )

        Subscribed and sworn to before me in the _____ County of ___Jefferson___, State of Colorado, this _9th_ day of November, 1996, by Duane Robertson as President of III G.I. Ltd.

        WITNESS my hand and official seal.

        My commission expires: ____11-13-99____

```
GIGI PIDCOCK
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 11-13-99
```

_____
Notary Public



**Dawn Industries, Inc.**
*Dedicated To Quality*

December 19,1996

To Whom It May Concern,

I, Duane Robertson, purchased U.S. Patent Number 5,408,630 together with the Intelellvue products and all document imaging rights from Intellinetics on June 27,1996. At this time the patent is registered in my name at the US.patents office.

Today I signed a patent purchase agreement selling the patent rights and all related rights and products the The Avator Group, Inc. of 189 Southington Avenue Worthington, Ohio 43085.

Sincerely,

Duane Robertson

Duane Robertson

20, 1996

My commission Expires 08/21/2000
10403 W. Colfax Ave.
Lakewood, CO 80215

PLAINTIFF'S EXHIBIT

NO. 11

AGREN·BLANDO COURT REPORTING & VIDEO

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:07-CV-729-RPM

DEPOSITION OF THOMAS D. MOSS          September 5, 2007

DUANE ROBERTSON,

      Plaintiff,

vs.

THE AVATAR GROUP, INC., an Ohio corporation;
INTELLINETICS, INC., an Ohio corporation;
A. MICHAEL CHRETIEN, individually;
MATTHEW L. CHRETIEN, individually;
Defendants.

APPEARANCES:
    SHUGHART, THOMSON & KILROY, P.C.
        By Philip W. Bledsoe, Esq.
        and
        Nicole A. Westbrook, Esq.
        1050 17th Street, Suite 2300
        Denver, Colorado 80265
        Appearing on behalf of Plaintiff.

    RANDOLPH S. DEMENT, ESQ.
        7720 East Belleview Avenue, Suite 350
        Greenwood Village, Colorado 80111
        Appearing on behalf of Defendants.


    Also Present:  Duane Robertson
                   John Crist

2

1       Pursuant to Notice and the Federal Rules
2   of Civil Procedure, the deposition of THOMAS D.
3   MOSS, called by Plaintiff, was taken on Wednesday,
4   September 5, 2007, commencing at 9:11 a.m., at 1050
5   17th Street, Suite 2300, Denver, Colorado, before
6   Marlene F. Smith, Registered Professional Reporter
7   and Notary Public within and for the State of
8   Colorado.
9
10
11              I N D E X
12
13  DEPOSITION OF THOMAS D. MOSS
14  EXAMINATION BY:              PAGE
15     Mr. Bledsoe          3, 118
16     Ms. Westbrook           --
17     Mr. Dement            110
18
19
     EXHIBITS          INITIAL REFERENCE
20
     34  Schematic drawing         34
21
     35  6-15-93, T. Moss document     34
22
     36  Fax memo, to T. Dunlop from    38
23       Tom
24   37  2-21-07, T. Moss document     43
25

3

1           P R O C E E D I N G S
2           THOMAS D. MOSS,
3   being first duly sworn in the above cause, was
4   examined and testified as follows:
5           EXAMINATION
6   BY MR. BLEDSOE:
7      Q    State your full name, please.
8      A    Thomas D. Moss.
9      Q    Mr. Moss, have you ever given a
10  deposition before?
11     A    Yes.
12     Q    And so I'll spare you all the
13  preliminaries, but for two. I'll work hard not to
14  step on your answers, if you'll work hard not to
15  step on my questions, that's for the benefit of the
16  court reporter. And if you will also, as the
17  situation calls for it, say yes or no as appropriate
18  and not um-hum or hum-um. Again, that is for the
19  reporter.
20          Finally, you're entitled from me to a
21  question you can understand. If I ask one that you
22  don't understand, you tell me. I'll see what I can
23  do about fixing it. I'm not going to guarantee I
24  can fix every question, but I can see what I can do.
25  And I'm entitled from you to your best and truthful

4

1   recollection. Do you understand that?
2      A    Yes.
3      Q    What is it that you do for Intellinetics
4   these days?
5      A    Develop software.
6      Q    How long have you worked for
7   Intellinetics?
8      A    Well, if you go back to the original
9   formation of Intellinetics, it would be 1991.
10     Q    Is that when you first met Duane
11  Robertson?
12     A    No. I first met Duane, I don't remember
13  the year. I know it was a couple years later. '93.
14     Q    That's close enough.
15     A    I don't even remember.
16     Q    That's close enough for our purposes.
17          And when you say, "The original
18  formulation", that was before the headquarters, if
19  you will, of Intellinetics/Avatar moved to Ohio?
20     A    Right. Originally, the product --
21  document imaging product from Intellinetics was
22  developed -- I developed that with the company,
23  North America Computer Services, which was a dba of
24  Confidential Data Services. And Intellinetics was
25  formed only as a name. So it was Con

PLAINTIFF'S
EXHIBIT
NO. 12

29

1  soft code -- the source code?
2      A    Well, in -- you mean in versions?
3      Q    Yeah.
4      A    Yes.
5      Q    And specifically I'm talking, for
6  example, 4.5 to 5.4 --
7      A    Yes.
8      Q    -- correct?
9          And in your experience, is it your
10 testimony that when you move from 5.4 to 5.1, which
11 is now 5.4, that you start totally over?
12     A    No.
13     Q    So obviously when you're moving from 5.1
14 to 5.4, you're building on existing code; is that
15 correct?
16     A    Right. You take the existing version
17 code and you may be correcting it, you know, bug
18 fixes, enhancing it, more features, more functions.
19     Q    But even when you go from a Version 4.5
20 to 5.1, for example, you don't start off with a
21 blank slate?
22     A    Yeah. When we went to -- when we went to
23 5, it was a clean slate.
24     Q    From 4.5?
25     A    In 4.5 to 5 because 4.5 and everything

30

1  previous is all written in straight C. And Version
2  5 was we started over from scratch and that was all
3  written in C++.
4      Q    And when was Version 5.1 introduced to
5  the market?
6      A    '99.
7      Q    And what is the difference between C and
8  C++?
9      A    Well, you know, the language C, the
10 syntax of C was, you know, pretty raw and low level.
11 C++ is -- is C Syntax code, but the addition of
12 using object-oriented programming, classes, methods,
13 properties, encapsulation. It's just -- it's just
14 better. Easier. I mean, I could sit here all day
15 giving you a lecture on languages, but ...
16     Q    Well, I just wanted the synopsis that you
17 gave.
18          And what are you writing GX in?
19     A    C#.
20     Q    And is C# a better version of C++?
21     A    Well, C# is based on C Syntax, but
22 it's -- I don't know if it's better. It's
23 different. It's kind of like C++, but C# in the dot
24 net world of Microsoft is just a whole different
25 programming world. It's managed code versus

31

1  unmanaged code. And the difference there is CC++
2  are compiled into machine code where managed code is
3  compiled into an intermediate language that is then
4  read by a run time so that the run time can run on
5  different CPUs. So you can run on a Motorola chip.
6  You can run on an Intel chip. So you don't have to
7  recompile and link for a specific CPU. That's
8  pretty much in a nutshell.
9      Q    And was IntelliVUE 6.0 written in C plus
10 or C#?
11     A    6?
12     Q    Yeah.
13     A    Yeah. C++.
14     Q    Is it -- take a look at what's been
15 marked as Exhibit 16.
16     A    Um-hum.
17     Q    I take it you've seen that before?
18     A    Yes.
19     Q    And is that a copy of United States
20 Patent 5408630?
21     A    Yes.
22     Q    Typically we refer to as the 630 patent?
23     A    Okay.
24     Q    You're shown as the inventor?
25     A    Yes.

32

1      Q    And you are the inventor?
2      A    Yes.
3      Q    And it was assigned to III G.I. at some
4  point in the past, correct?
5      A    I don't remember, but if you say it was,
6  it was.
7      Q    At the time in August of 1993, did you
8  work for III G.I.?
9      A    Yeah. I guess III G.I. Intellinetics.
10 I don't know who I was working for that time.
11     Q    But whoever you were working for, you
12 understood you were assigning the patent to the
13 company?
14         MR. DEMENT: Object. Asked and answered.
15     Q    (Mr. Bledsoe) You can answer.
16     A    That was so long ago I don't remember if
17 I was assigned it or not. I just don't remember
18 signing any document back then.
19     Q    Okay.
20     A    I just don't know.
21     Q    Did you draft the abstract or did you --
22 or ask for -- or did a patent lawyer do that for
23 you?
24     A    I would put stuff down on -- on paper.
25 When I was doing the patent, I thought it was kind

AGREN·BLANDO COURT REPORTING & VIDEO

49

1    A    Um-hum. That's when our offices were --
2  what was that street next to the Kong factory.
3  Right off of 6th.
4    Q    Is that in Golden?
5    A    Yeah, I think. Golden or Lakewood.
6      MR. ROBERTSON: Lakewood.
7    Q    (Mr. Bledsoe) And is it your
8  recollection that Avatar had been a reseller for a
9  year or so by the time you got to the fall of 1996?
10   A    I -- I can't remember the exact time
11 period, you know, when they established a contract
12 with the company in that time. But it probably,
13 yeah, was within a year or two.
14   Q    You had -- you've already testified just
15 a moment ago about your suggestion to Duane to do a
16 deal with Avatar?
17   A    Um-hum.
18   Q    Did you have any precise thoughts or
19 ideas about what that deal would be like or?
20   A    Back then, no. No. I mean, something
21 had to be done because Frank was bailing. He wanted
22 to build houses, I mean, the company was just days
23 from -- nothing was being done. I couldn't do it
24 myself. I didn't have any idea, but I wasn't privy
25 to the deal with Avatar. I mean, nobody asked me my

50

1  opinion. I just, you know, was left out in the
2  cold.
3    Q    Did you take any kind of initiative or
4  anything in terms of contacting either Matt or Mike
5  Chretien about doing a deal with Duane?
6    A    Yeah, I probably talked to them and said
7  I would talk to Duane and say, Are you guys
8  interested because, you know, we're going down the
9  tubes here. You know. And you guys are good. And,
10 you know, I'm working with, you know, two of us --
11 Three Stooges here, and we need to do something. So
12 I can talk to Frank and you guys can hook up and see
13 if you guys can do something.
14   Q    Do you recollect that you would have
15 talked to either Matt and Mike before you approached
16 Duane then? That's what I'm hearing you say; is
17 that correct?
18   A    Yeah. I probably -- yeah. Yeah, I said
19 I'll ...
20   Q    There's an exhibit book there in front of
21 you. Would you take a look at Exhibit No. 24? It
22 should be labeled there in front of you, Mr. Moss. That's a
23 letter of April 16th, 1996, to Duane Robertson. I
24 think it's actually signed by Mike Chretien.
25   A    Okay.

51

1    Q    Would you take just a minute to -- to
2  look at it? You don't have to read it word for
3  word. I'm not going to ask a lot of questions about
4  it.
5    A    Okay.
6    Q    It makes a reference in here to -- on the
7  third page to software development and establishing
8  a product development team. Do you see that?
9    A    Okay.
10   Q    Is that a yes, you see that?
11   A    Yes. Yes.
12   Q    Do you recall having any involvement in
13 putting together this letter to Duane from Mike?
14   A    No. This is the first I've ever seen it.
15   Q    There's a reference to -- in the
16 first page on the third paragraph about how hard
17 Avatar -- I'm paraphrasing, I'm not exactly ·
18 quoting -- about how hard Avatar has moved to sell
19 the Intellinetics product and being positioned to
20 move an incredible amount of product.
21      Do you recall having any discussions
22 yourself with either Mike or Matt in 1996 about
23 whether or not they were going to have the ability
24 to move a large or incredible amount of product?
25   A    I don't ever recall talking about that.

52

1    Q    Okay. Since 1996, to today, which is
2  2007, have you ever heard either Mike or Matt
3  Chretien say anything kind of like that? We are
4  positioned to move a large amount of product? ...
5      MR. DEMENT: Object to the form. Calls
6  for speculation. You can answer.
7    A    No.
8    Q    (Mr. Bledsoe) Have you heard them
9  express any kind of level of confidence in their
10 ability to sell product over the last 10 years plus
11 now?
12   A    Yes.
13   Q    Is it fair to say that they have
14 expressed that confidence to you on multiple
15 occasions?
16   A    No.
17   Q    Do you know how often they've told Duane
18 that they thought -- where they've expressed
19 confidence in the ability to move product?
20      MR. DEMENT: Object to the form. It
21 calls for speculation.
22   A    No.
23   Q    (Mr. Bledsoe) Look at the last page of
24 that exhibit. There's a statement made there that
25 says, and I'm quoting this, As I indicated, this is

57

1 Chretien's managerial abilities to Mr. Robertson?
2      MR. DEMENT: Object. Asked and answered.
3 You can answer it.
4      A   Yeah. I talked to Duane, you know. I
5 was kind of upset at the time. Talked to Duane.
6      Q   (Mr. Bledsoe) And you were upset, were
7 you not, about a number of things, one of which you
8 were not being paid, correct?
9      A   Right. There was a payroll, which got me
10 mad. Got me worked up. So I went to Duane with a
11 plan that was good for everybody. But, you know,
12 when I later found out about the deal, Avatar with
13 Duane, that all became a moot point.
14      Q   We're going to ask a little bit more
15 about those discussions and the deal.
16          Was there also a problem with health
17 insurance from the company that you were mad about?
18      A   Oh, yeah. There was an issue about four,
19 five years ago.
20      Q   Okay. That wasn't at the same time you
21 were not being paid?
22      A   No. That was an issue with a person
23 screwed me who was working for us, and then it got
24 rectified a year later.
25      Q   So you've indicated there was a time when

58

1 you were irritated or mad -- however you want to
2 characterize it, Mr. Moss, is fine with me -- in
3 part because you weren't being paid; is that fair?
4      A   Yes.
5      Q   And you called Duane?
6      A   Yes.
7      Q   This would have been in the fall of 2006?
8      A   Yes.
9      Q   You said you had a plan. Did you met
10 with him in person?
11      A   Yes.
12      Q   And that was at the Red Rooster?
13      A   Yes.
14      Q   That's in Mead?
15      A   I guess it's Mead.
16      Q   It's up north?
17      A   Yeah. It's on 66.
18      Q   And was Mr. Crist present?
19      A   Yeah.
20      Q   Had you ever met Mr. Crist before?
21      A   No.
22      Q   And just so we're clear, this is in like
23 November of 2006?
24      A   I believe so, yes.
25      Q   Before Thanksgiving?

59

1      A   I think.
2      Q   At that time in November of 2006, you had
3 a discussion with Mr. Robertson and Mr. Crist about
4 the state of the company, Intellinetics/Avatar,
5 correct?
6      A   Yes.
7      Q   Did you tell either of those gentlemen at
8 that meeting in November of 2006 that you were
9 scrapping the technology and starting over?
10      A   I don't recall any discussion on
11 technology in that meeting.
12      Q   You said you went to Mr. Robertson with
13 an idea of a plan?
14      A   Um-hum.
15      Q   What was that plan?
16      A   Well, I looked at the situation and I
17 thought a good plan for all parties involved -- it
18 was really like win/win for everybody. But that was
19 based on I thought Duane sold them the company, not
20 a patent, okay? Because we sell a product that is
21 massive and huge, and then the old product, a patent
22 was like 1/100 of 1 percent of, you know, the
23 product. It was like, why would you sell the patent
24 and not sell the company and stuff like that.
25      Q   I'm not asking what you were thinking

60

1 about. I'm asking what you -- what you said your
2 plan was. I'm asking about a conversation you had,
3 not what you thought about later, but --
4      A   Well, that --
5      Q   You got to let me finish, sir.
6          All right. I'm not asking about what you
7 were thinking. I'm not asking about what others
8 told you at the time. I'm asking what you said was
9 the plan at that meeting in November of 2006.
10 That's all I'm asking about.
11      A   Yeah. My idea was, why don't -- well,
12 the thing is based on how I thought their -- the
13 deal was with Avatar was the reason for my idea.
14      Q   But I want to know what you said, sir, to
15 the best that you can recall.
16      A   Yeah. I thought that, you know, if we're
17 holding all this liability to Duane on our books,
18 you know, I was thinking, hey, let's do this.
19 They -- those guys can still do the marketing and,
20 you know, if Duane could get back like the
21 IntelliVUE product, you know, it's like, well, you
22 can get it back. They can get that off their books.
23 They can get me off their payroll, okay, which
24 would, you know, save them an incredible amount of
25 money. We would take over just that product. They

AGREN·BLANDO COURT REPORTING & VIDEO

105

1   Q   -- you a question.
2       Well, did you ever have any --
3   participate in any of the discussions that Mr. Crist
4   had with either Matt or Mike Chretien?
5       MR. DEMENT: Object. Asked and answered.
6   Go ahead.
7   A   No.
8   Q   (Mr. Bledsoe) You've already testified
9   that you hadn't read, other than that one Exhibit 6
10  of December 6, 2006, any of the other correspondence
11  that was back and forth between the folks, correct?
12  A   Yes.
13  Q   So is it fair to say you didn't have any
14  personal knowledge of the negotiations that were
15  going on between Mr. Crist and the Chretiens; is
16  that fair?
17  A   Yeah. I didn't have personal knowledge
18  other than Matt said it wasn't, you know, it's not
19  going well. They're taking it to the next level.
20  Q   You had heard -- you heard Matt say it
21  was not going well?
22  A   Yeah.
23  Q   And after Mr. -- Matt had told you it was
24  not going well, one of the people you were mad at
25  was Mr. Crist?

106

1   A   Yeah. Upset that he just wasn't --
2   Q   Doing what you wanted?
3   A   No. I didn't care if he did -- he's kind
4   of a narcissist.
5   Q   Well, did you think it was important that
6   he do what Mr. Robertson wanted?
7   A   Well, no. I think Duane can do things on
8   his own without anybody else.
9   Q   Do you know it's okay for Mr. Robertson
10  to ask for help from people that he'd like to have
11  help from?
12  A   I don't know.
13  Q   You don't know?
14  A   No.
15  Q   You don't think Mr. Robertson has the
16  ability to select his own advisors? Do you think --
17  A   No.
18  Q   Do you think he has that ability?
19  A   Yeah, I guess he does.
20  Q   Do you think you ought to be the only
21  person that gets to select Mr. Robertson's advisors
22  for him?
23  A   No.
24  Q   Do you think Avatar ought to pay the
25  money it owes Mr. Robertson?

107

1   A   What do they owe?
2   Q   Well, whatever it is, do you think they
3   ought to pay?
4   A   I think they should pay -- there was a
5   use of a patent up there 4.2. Yeah, I believe they
6   should pay their share of that part of the patent of
7   the -- after the deal was made and sales were made,
8   using the patent, yeah, absolutely. I think they
9   should pay him back the money that, you know --
10  Q   That he owed?
11  A   -- he owed them, you know, when they
12  borrowed 100,000. Yeah, I do believe that.
13  Everybody believes that.
14  Q   Why haven't they?
15  A   Hum?
16  Q   Why haven't they paid the money that they
17  borrowed? Why haven't they paid that back?
18  A   I don't know. Did you ask them?
19  Q   I'll ask them next week.
20  A   All right.
21  Q   Have Matt and Mike indicated to you why
22  they haven't paid of the money that was --
23  A   Well --
24  Q   -- that's undisputedly owed?
25  A   In the early days, you try, you know, to

108

1   get the, you know, a company going. I don't know.
2   I -- I don't know what the arrangements were. Why,
3   you know, why they didn't pay. Poofh, who knows?
4   Q   Well --
5   A   That's between them and -- that's between
6   them and Duane, not me. I'm not part of the
7   agreement.
8   Q   You're an owner of the company though,
9   aren't you?
10  A   Yeah.
11  Q   You're an officer, correct?
12  A   Sure.
13  Q   Do you think ordinarily officers of
14  companies ought to -- ought to be honorable?
15  A   I don't know much about that. I've just
16  been developing software for 25 years. I'm doing
17  today what I did 10 years ago, what I did 15 years
18  ago. Okay. I don't care about corporate officer,
19  stuff like that. It means nothing to me.
20  Q   You don't care whether or not you cheat
21  somebody out of the money just as long as you get
22  your salary?
23      MR. DEMENT: Object to the form. It's
24  argumentative.
25  A   I didn't cheat anybody.

AGREN-BLANDO COURT REPORTING & VIDEO

---

129

1    I, THOMAS D. MOSS, do hereby certify that
2  I have read the foregoing transcript and that the
3  same and accompanying amendment sheets, if any,
4  constitute a true and complete record of my
5  testimony.
6
7
8
9
   _____
       Signature of Deponent
10
       ( ) No Amendments
11     ( ) Amendments Attached
12  Subscribed and sworn to before me this
13  _____ day of _____, 2007.
14
15  Notary Public:_____
16  Address: _____
17       _____
18  My commission expires_____
19  Seal:
20
21
22               MFS
23
24
25

---

130

1  STATE OF COLORADO)
2       ) ss.     REPORTER'S CERTIFICATE
3  COUNTY OF DENVER )
4       I, Marlene F. Smith, do hereby certify
5  that I am a Registered Professional Reporter and
6  Notary Public within and for the State of Colorado;
7  that previous to the commencement of the
8  examination, the deponent was duly sworn to testify
9  to the truth.
10      I further certify that this deposition was
11  taken in shorthand by me at the time and place
12  herein set forth, that it was thereafter reduced to
13  typewritten form, and that the foregoing constitutes
14  a true and correct transcript.
15      I further certify that I am not related
16  to, employed by, nor of counsel for any of the
17  parties or attorneys herein, nor otherwise
18  interested in the result of the within action.
19      In witness whereof, I have affixed my
20  signature and seal this 12th day of September, 2007.
21      My commission expires June 25, 2009.
22
23  _____
     Marlene F. Smith, RPR
24   216 - 16th Street, Suite 650
     Denver, Colorado  80202
25

---

131

1  AGREN-BLANDO COURT REPORTING & VIDEO, INC.
   216 - 16th Street, Suite 650
2  Denver, Colorado  80202
   4450 Arapahoe Avenue, Suite 100
3  Boulder, Colorado  80303
4  September 12, 2007
5  Randolph S. Dement, Esq.
   1050 17th Street, Suite 2300
6  Denver, Colorado  80265
7  Re: Deposition of THOMAS D. MOSS
        Robertson vs. Avatar, et al.
8       Case No. 1:07-CV-729-RPM
9  The aforementioned deposition is ready for reading
   and signing. Please attend to this matter by
10  following BOTH of the items indicated below:
11  _____ Call 303-296-0017 and arrange with
        us to read and sign the deposition in our
12       office
13  _XXX_ Have the deponent read your copy and sign the
        signature page and amendment sheets, if
14       applicable; the signature page is attached
15  _____ Read the enclosed copy of the deposition and
        sign the signature page and amendment sheets,
16       if applicable; the signature page is attached
17  _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18  _____ By _____ due to a trial date of _____
19  Please be sure the signature page and amendment
   sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC
20  and returned to Agren Blando for filing with the
   original deposition. A copy of these changes should
21  also be forwarded to counsel of record.
22  Thank you.
23  AGREN-BLANDO COURT REPORTING & VIDEO, INC.
24  cc: All Counsel
25

---

132

1  AGREN-BLANDO COURT REPORTING & VIDEO, INC.
   216 - 16th Street, Suite 650
2  Denver, Colorado  80202
   4450 Arapahoe Avenue, Suite 100
3  Boulder, Colorado  80303
4
5
       THOMAS D. MOSS
6      Robertson vs. Avatar, et al.
       Case No. 1:07-CV-729-RPM
7
8
   The original deposition was filed with
9
   Philip W. Bledsoe, Esq., on approximately the
10
   12th day of September, 2007.
11
   _____ Signature waived
12
   _____ Unsigned; signed signature page and amendment
13       sheets, if any, to be filed at trial
14  _____ Reading and signing not requested pursuant to
        C.R.C.P. Rule 30(e)
15
   _XXX_ Unsigned; amendment sheets and/or signature
16       pages should be forwarded to Agren Blando to
        be filed in the envelope attached to the
17       sealed original.
18
19
   Thank you.
20
   AGREN-BLANDO COURT REPORTING & VIDEO, INC.
21
   cc: All Counsel
22
23
24
25

---

Agren Blando Court Reporting & Video Inc.

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07-cv-00729-RPM

DEPOSITION OF DUANE D. ROBERTSON   August 15, 2007

DUANE ROBERTSON,
Plaintiff,
vs.
THE AVATAR GROUP, INC., an Ohio corporation;
INTELLINETICS, INC., an Ohio corporation;
A. MICHAEL CHRETIEN, individually; and
MATTHEW L. CHRETIEN,

Defendants.

APPEARANCES:

SHUGHART THOMSON & KILROY, P.C.
By Philip W. Bledsoe, Esq.
1050 17th Street, Suite 2300
Denver, Colorado 80265
Appearing on behalf of Plaintiff.

LAW OFFICES OF RANDOLPH S. DEMENT
By Randolph S. Dement, Esq.
7720 East Belleview Avenue, Suite 350
Greenwood village, Colorado 80111
Appearing on behalf of Defendants.

Also Present: Mike Chretien
John Crist

**2**

1    Pursuant to Notice and the Federal Rules
2   of Civil Procedure, the deposition of DUANE D.
3   ROBERTSON, called by Defendants, was taken on
4   Wednesday, August 15, 2007, commencing at 9:10 a.m.,
5   at 7720 East Belleview Avenue, Suite 350, Greenwood
6   Village, Colorado, before Marlene F. Smith,
7   Registered Professional Reporter and Notary Public
8   within and for the State of Colorado.

11            I N D E X

13   DEPOSITION OF DUANE D. ROBERTSON
14   EXAMINATION BY:                    PAGE
15   Mr. Bledsoe                        --
16   Mr. Dement                         4

19   EXHIBITS          INITIAL REFERENCE

20   14  Verified Complaint           32

21   15  Notice of Dismissal with     36
22       Prejudice
23   16  United States Patent,        37
         Patent No. 5,408,630
24
25   17  Letter, 8-31-94, to T. Stelter  41
         from F. Progar

**3**

1            I N D E X (Continued)
2   EXHIBITS            INITIAL REFERENCE
3   18  Fax, 8-31-94, with brochure   45
4   19  Memo, 3-14-95 to Laurie       47
        from L. Dallas
5
6   20  Fax, to L. Dallas, from Laurie  51
        with attachments
7   21  Intellinetics Value-Added     52
        Partner Agreement
8
9   22  Intellinetics Software        53
        License Agreement
10  23  Biennial Report, 1995         55
11  24  Letter, 4-16-96, To D.        56
        Robertson from Avatar Group
12
13  25  12-19-96, To Whom It May      62
        Concern from D. Robertson
14  26  Unanimous Consent of
        Shareholders of III G.I. LTD.  65
15
16  27  Colorado UCC-1 form           71

17  28  Patent Purchase and Royalty   72
        Agreement
18  29  Security Agreement            81
19  30  Letter, 4-23-99, to D. Robertson  85
        from A. Pidcock
20
21  31  Promissory Note, 10-25-00     89

22  32  Complaint and Jury Demand     94

23  33  Plaintiff's Response in Opposition  97
        to Defendants' Motion to Transfer
        Venue
24
25

**4**

1            P R O C E E D I N G S
2            DUANE D. ROBERTSON,
3   being first duly sworn in the above cause, was
4   examined and testified as follows:
5            EXAMINATION
6   BY MR. DEMENT:
7       Q    Please state your full name.
8       A    Duane D. Robertson.
9       Q    What's your date of birth?
10      A    10-29-35.
11      Q    Mr. Robertson, is there any reason you
12  can't give a deposition today?
13      A    No.
14      Q    During the deposition, if you need to
15  take a break, let me know and before you do, just
16  answer any pending question.
17      A    Okay.
18      Q    If you don't understand a question that I
19  ask, just let me know.  If you don't, I'll assume
20  you understood the question.
21      A    Okay.
22      Q    And then we can't talk over each other --
23      A    Right.
24      Q    -- because the court reporter gets
25  confused about who's speaking and what.  So let me

PLAINTIFF'S
EXHIBIT
NO. 13

Agren Blando Court Reporting & Video Inc.

61

1  with Mr. Chretien after the date of this letter but
2  before the patent purchase agreement was signed in
3  December 1996?
4      A   We had numerous conversations, but I
5  don't remember specifically when they were or
6  anything about that.
7      Q   This letter's dated April 16, 1996, and
8  the patent purchase agreement was dated December 19,
9  1996 --
10     A   Okay.
11     Q   -- right?
12     A   Right.
13     Q   Why did it take eight months to get to
14  the point of the actual signed written patent
15  purchase agreement?
16         MR. BLEDSOE: Objection. Assumes facts
17  not in evidence. You can answer.
18     A   I can't answer. I can't tell you why it
19  took that long. Just did.
20     Q   (By Mr. Dement) During that eight-month
21  time period, what were you doing with respect to the
22  patent?
23     A   I don't think I was doing anything. I
24  wasn't trying to market it to anyone else if that's
25  what you're asking.

62

1      Q   You were not trying to market it to
2  anyone --
3      A   No.
4      Q   -- else because you thought you had a
5  buyer?
6      A   Yeah.
7      Q   Okay.
8         (Exhibit 25 was marked.)
9      A   That yeah was a yes by the way.
10     Q   (By Mr. Dement) Do you know if during
11  the roughly eight-month time period between the date
12  of this letter and the date of the patent purchase
13  agreement whether III G.I. was out marketing the
14  patent?
15     A   No, it wasn't out marketing.
16     Q   Deposition Exhibit 25 is a letter dated
17  December 19, 1996, on Dawn Industries letterhead,
18  signed by you, right?
19     A   Yes.
20     Q   And you recall preparing this letter?
21     A   Yes.
22     Q   Okay. And for what purpose did you
23  prepare this letter?
24     A   To sell the patent to Avatar.
25     Q   You, in the first sentence of this

63

1  letter, state that you purchased the patent and
2  that's the patent that's the subject of this case,
3  right?
4      A   Yes.
5      Q   You purchased the patent from
6  Intellinetics on June 27, 1996. Do you see that?
7      A   Yes.
8      Q   Okay. And when you say you purchased it
9  from Intellinetics, do you mean you purchased it
10  from III G.I. Limited?
11     A   Yes. They're kind of interchangeable,
12  kind of like Intellinetics and Avatar Group.
13     Q   All right. Why did you purchase the
14  patent?
15     A   Because Intellinetics needed money to
16  operate on and instead of just loaning them money, I
17  sold -- I bought the patent so it didn't owe me that
18  money.
19     Q   Which Intellinetics needed money to
20  operate on?
21     A   III G.I. Limited and Intellinetics.
22     Q   Okay. How did that purchase transaction
23  come about on June 27, 1996?
24     A   I just wrote a check and got this in
25  place of check.

64

1      Q   Wrote a check to III G.I. Limited?
2      A   Yes.
3      Q   Were some --
4      A   Well, actually, I think it was under the
5  name of Intellinetics at the time, but -- so I wrote
6  the check to Intellinetics because III G.I. Limited
7  was just the owner of Intellinetics, basically. And
8  it's dba until -- III G.I. Limited dba
9  Intellinetics.
10     Q   And when you're talking about writing a
11  check to Intellinetics for the patent, you're
12  talking about III G.I. dba Intellinetics?
13     A   Um-hum.
14     Q   You're not talking about the
15  Intellinetics that's --
16     A   No.
17     Q   -- a defendant in this lawsuit?
18     A   No.
19     Q   Okay. In connection with that
20  transaction, your purchase of the patent, was there
21  any corporate resolutions prepared by or for III
22  G.I.?
23     A   Not to my knowledge.
24     Q   Okay. Was III G.I. at this time in 1996
25  represented by Andrew Pidcock at Cohen Brame &

Agren Blando Court Reporting & Video Inc.

**109**

1  STATE OF COLORADO)
2         ) ss.    REPORTER'S CERTIFICATE
3  COUNTY OF DENVER )
4         I, Marlene F. Smith, do hereby certify
5  that I am a Registered Professional Reporter and
6  Notary Public within and for the State of Colorado;
7  that previous to the commencement of the
8  examination, the deponent was duly sworn to testify
9  to the truth.
10         I further certify that this deposition was
11  taken in shorthand by me at the time and place
12  herein set forth, that it was thereafter reduced to
13  typewritten form, and that the foregoing constitutes
14  a true and correct transcript.
15         I further certify that I am not related
16  to, employed by, nor of counsel for any of the
17  parties or attorneys herein, nor otherwise
18  interested in the result of the within action.
19         In witness whereof, I have affixed my
20  signature and seal this 21st day of August, 2007.
21         My commission expires June 25, 2009.
22
23         _____
           Marlene F. Smith, RPR
24         216 - 16th Street, Suite 650
           Denver, Colorado 80202
25

**110**

1  AGREN BLANDO COURT REPORTING & VIDEO, INC.
   216 - 16th Street, Suite 650
2  Denver, Colorado 80202
   4450 Arapahoe Avenue, Suite 100
3  Boulder, Colorado 80303
4  August 21, 2007
5  Philip W. Bledsoe, Esq.
   1050 17th Street, Suite 2300
6  Denver, Colorado 80265
7  Re: Deposition of DUANE D. ROBERTSON
      Robertson vs. Avatar, et al.
8      Case No. 07-cv-00729-RPM
9  The aforementioned deposition is ready for reading
   and signing. Please attend to this matter by
10 following BOTH of the items indicated below:
11 _____ Call 303-296-0017 and arrange with
       us to read and sign the deposition in our
12     office
13 _XXX_ Have the deponent read your copy and sign the
       signature page and amendment sheets, if
14     applicable; the signature page is attached
15 _____ Read the enclosed copy of the deposition and
       sign the signature page and amendment sheets,
16     if applicable; the signature page is attached
17 _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18 _____ By _____ due to a trial date of _____
19 Please be sure the signature page and amendment
   sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC
20 and returned to Agren Blando for filing with the
   original deposition. A copy of these changes should
21 also be forwarded to counsel of record.
22 Thank you.
23 AGREN BLANDO COURT REPORTING & VIDEO, INC.
24 cc: All Counsel
25

**111**

1  AGREN BLANDO COURT REPORTING & VIDEO, INC.
   216 - 16th Street, Suite 650
2  Denver, Colorado 80202
   4450 Arapahoe Avenue, Suite 100
3  Boulder, Colorado 80303
4
5
       DUANE D. ROBERTSON
6      Robertson vs. Avatar, et al.
       Case No. 07-cv-00729-RPM
7
8  The original deposition was filed with
9  Randolph S. Dement, Esq., on approximately the
10 21st day of August, 2007.
11 _____ Signature waived
12 _____ Unsigned; signed signature page and amendment
       sheets, if any, to be filed at trial
13
       _____ Reading and signing not requested pursuant to
14         C.R.C.P. Rule 30(e)
15 _XXX_ Unsigned; amendment sheets and/or signature
       pages should be forwarded to Agren Blando to
16     be filed in the envelope attached to the
       sealed original.
17
18
19 Thank you.
20 AGREN BLANDO COURT REPORTING & VIDEO, INC.
21 cc: All Counsel
22
23
24
25

1         - AMENDMENT SHEET -
2          DUANE D. ROBERTSON
           Robertson vs. Avatar, et al.
3          August 15, 2007
           07-cv-00729-RPM
4
   The deponent wishes to make the following changes in
5  the testimony as originally given:
   Page Line      Should Read      Reason
6  ____ ____ _____ _____
7  ____ ____ _____ _____
8  ____ ____ _____ _____
9  ____ ____ _____ _____
10 ____ ____ _____ _____
11 ____ ____ _____ _____
12 ____ ____ _____ _____
13 ____ ____ _____ _____
14 ____ ____ _____ _____
15 ____ ____ _____ _____
16 ____ ____ _____ _____
17 ____ ____ _____ _____
18 ____ ____ _____ _____
19 Signature of Deponent: _____
20
   Subscribed and sworn to before me this ____ day of
21 _____, 2007.
       Notary's signature _____
22     (seal)
   Notary's address _____
23
   My commission expires _____.
24
25